**ORIGINAL**

OCT 1 0 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

|  |  |
|---|---|
| IN RE: TRI-STATE CREMATORY LITIGATION | ) ) ) )   MDL DOCKET NO. 1467 |

---

### MOTION FOR SUMMARY JUDGMENT OF
### DEFENDANT WALLIS-WILBANKS FUNERAL HOME, LLC

**COMES NOW** Defendant Wallis-Wilbanks Funeral Home, LLC and, pursuant to Fed.R.Civ.P. 56, move this Court for Summary Judgment. Defendant Wallis-Wilbanks Funeral Home, LLC moves this Court for summary judgment against the Plaintiffs identified in the accompanying Memorandum of Law, as to the claims described in that Memorandum, as there are no genuine issues of material fact precluding the entry of summary judgment, and Wallis-Wilbanks is entitled to judgment as a matter of law. In support of this Motion, Wallis-Wilbanks relies upon the facts and arguments set forth in the accompanying Memorandum of Law and Statement of Material Facts as to which There Exists No Genuine Issue and all pleadings and matters of record properly before this Court.

**WHEREFORE**, Wallis-Wilbanks Funeral Home, LLC respectfully requests this Court grant its Motion for Summary Judgment.

*539*

Respectfully submitted this ___10th___ day of October, 2003.

**HAWKINS & PARNELL, LLP**

4000 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, Georgia 30308-3243
404-614-7400

T. Ryan Mock, Jr.
Georgia Bar No. 515165
C. Shane Keith
Georgia Bar No. 411317
***Counsel for Defendants Carriage
Funeral Services, Inc. and Wallis-
Wilbanks Funeral Home, LLC***

**BRINSON, ASKEW, BERRY, SEIGLER,
RICHARDSON & DAVIS, LLP**

The Omberg House
615 West Fifth Street
P.O. Box 5513
Rome, Georgia 30162-5513
706-291-8853

Robert M. Brinson
Georgia Bar No. 082900
J. Anderson Davis
Georgia Bar No. 311077
***Lead and Liaison Counsel for
Funeral Home Defendants***

9936415



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

```
                                          )
IN RE: TRI-STATE                          )
CREMATORY LITIGATION                      )    MDL DOCKET NO. 1467
                                          )
```

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT WALLIS-WILBANKS FUNERAL HOME, LLC

### FACTUAL BACKGROUND

By now the Court is very aware of the general facts underlying this lawsuit, as it arises from the discovery of human remains on the grounds of the Tri-State Crematory on and around February 15, 2002.

### 1. *Wallis-Wilbanks Funeral Home*

In 1973, SCI Georgia bought what was then called Wallis & Sons Funeral Home from its original owner *J.D. Wallis, Sr.* (November 13, 2002 Deposition of Richard Wilbanks p. 9). SCI Georgia owned the funeral home until it was sold to Carriage Funeral Services, Inc.[1] on March 20, 1992.[2] (R. Wilbanks Depo. pp. 10-11).

---

[1] At the time it purchased Wallis & Sons from SCI Georgia, the Carriage entity was known as Carriage Funeral Services, Inc. In December 1993, that entity changed its name to Carriage Funeral Holdings, Inc., the name under which it now operates.

[2] Carriage Funeral Holdings, Inc. is not a party to this lawsuit. Even if Carriage Funeral Holdings, Inc., the owner of the funeral

539

Richard Wilbanks began working at Wallis & Sons Funeral Home (the precursor to Wallis-Wilbanks) in 1962, when he returned to LaFayette, Georgia after serving in the military. (R. Wilbanks Aff. ¶ 19). In 1963, Richard Wilbanks was first licensed, in Georgia, as a funeral director. (R. Wilbanks Depo. p. 45; R. Wilbanks Aff. ¶ 20). With the exception of a five-year period between 1982 and 1987 (where he worked as a funeral director at Lane Funeral Home, LaFayette Chapel), Richard Wilbanks has worked for, managed or had an ownership interest in the funeral home since 1962. (R. Wilbanks Depo. pp. 11-14).

The first contact Richard Wilbanks had with any member of the Marsh family was in or around the end of 1973, when he began to use the grave opening and closing services of Ray Marsh. (R. Wilbanks Aff. ¶ 21). At some point in 1982 or 1983 Ray Marsh informed Richard Wilbanks that he intended to open a crematory. (R. Wilbanks Aff. ¶ 22). In 1983, shortly after the crematory opened, Mr. Wilbanks was invited by Ray Marsh to witness a cremation, which he did. (R. Wilbanks Aff. ¶ 23). For the time period relevant to the lawsuit, the funeral home, while owned by either SCI or

---

home at issue from July 1, 1993 until March 2001, were a party to this lawsuit, it would be entitled to summary judgment, as is Wallis-Wilbanks Funeral Home, LLC, under the theories set forth herein. Thus, should Carriage Funeral Holdings, Inc. be added to this suit as a party Defendant, it is entitled to summary judgment.

Carriage, utilized the services of Tri-State between 1983 and 2001 and the funeral home while owned by Wallis-Wilbanks Funeral Home, LLC used the services of Tri-State between March 21, 2001 and January 30, 2002.   (R. Wilbanks Aff. ¶ 24).

## 2. *Plaintiff Kerry Oliver*

Plaintiff Kerry Oliver is the son of Thomas Milbern Oliver, whose funeral arrangements were handled by Wallis-Wilbanks in 1994.   (October 30, 2003 Deposition of Kerry Oliver p. 14). Thomas Oliver died on August 12, 1994.  (K. Oliver Depo. p. 27). Plaintiff Oliver did not "play any role whatsoever" in communicating with Wallis-Wilbanks regarding the arrangements of any aspect of his father's cremation.  (K. Oliver Depo. p. 14). The arrangements were handled by his mother, who is alive, and brother, Richard. (K. Oliver Depo. pp. 14-15).

After his father's funeral in 1994, the ashes were buried. (K. Oliver Depo. p. 18).  After the news of the discoveries at Tri-State, those remains were exhumed and allegedly taken to the GBI for testing.  (K. Oliver Depo. pp. 34, 49-50).  Some unknown person allegedly employed by the GBI or some other governmental entity supposedly reported to Oliver the generic finding of yet another unknown person that the remains appeared to be composed of "human teeth and bone," as opposed to concrete dust and rock.

(K. Oliver Depo. p 51).[3]  Plaintiff Oliver's father's body is not

one of those found and identified by the GBI on the grounds of the

Tri-State Crematory.   (K. Oliver Depo. p. 20).

### 3.   *Plaintiffs Jackie DeGraw and Virginia Bradley*

As their claims relate to Wallis Wilbanks,[4] these Plaintiffs

are the daughters of Ann Hawkins.  (September 29, 2003 Deposition

of Virginia Bradley, p. 5; September 29, 2003 Deposition of Jackie

DeGraw, p. 7). The funeral and cremation arrangements for the body

of Ann Hawkins were handled by Wallis-Wilbanks, on or about March

31, 1997, the day after the death of Ms. Hawkins. (V. Bradley

Depo., pp. 17, 20-21; J. DeGraw Depo., pp. 17, 22).

---

[3] Oliver and his counsel have attempted to make much of this alleged
statement in light of the fact that Oliver's father allegedly did
not have any teeth at the time of his death.  What must be pointed
out, however, is that Plaintiff Oliver and his counsel have yet to
put forth any admissible evidence as to what actually comprises the
remains in their possession.   All they have put forth is the
hearsay within hearsay statements of two unknown out of court
declarants as to the generic makeup of cremated remains generally.
Certainly this information is being put forth for the truth of the
statements; thus, when the Court acknowledges the out of court
nature of the persons allegedly making the statements, any
statements as to the makeup of the remains are hearsay and
inadmissible.   Fed. R. Evid. 801(c), 802. As the Court is well
aware, inadmissible hearsay may not be considered in deciding a
motion for summary judgment. Macuba v. DeBoer, 193 F.3d 1316, 1322
(11th Cir. 1999).

[4] These Plaintiffs have also asserted claims against W.L. Wilson &
Sons Funeral Home, as the arrangements for John Hawkins were
handled by that funeral home.

Both Ms. DeGraw and Ms. Bradley met with Richards Wilbanks
on March 31, 1997, where they were both signatories to Statement
of Funeral Goods and Services Selected. (See Defendants' Exhibit
717). On that same date, both Ms. DeGraw and Ms. Bradley
executed an Authorization for Cremation and Disposition, which
clearly authorized "Marsh" crematory to cremate the body of Ms.
Hawkins. (See Defendants' Exhibit 718).

The purported cremains of Ms. Hawkins were returned to her
family within a few days of the "cremation." (J. DeGraw Depo.,
p. 28). Those cremains were then buried at Crest Lawn Cemetery
with the cremains of John Hawkins, who had died and been cremated
in September 1994 and whose cremains had been maintained to allow
for a joint interment. (J. DeGraw Depo., p. 28). The cremains
returned to these Plaintiffs and purported to be those of Ann
Hawkins, remained buried in Crest Lawn until these Plaintiffs
learned of the discoveries at Tri-State and they were notified of
a DNA match. (V. Bradley Depo., p. 47).

These Plaintiffs, as well as their sister Tina Russell,
provided DNA samples to the GBI. (V. Bradley Depo., p. 28; J.
DeGraw Depo., p. 17). In July 2002, the GBI notified Ms. DeGraw
that there had been a DNA match and the "body" of Ann Hawkins had
been located on the Tri-State grounds. (V. Bradley Depo., pp. 31,
46; J. DeGraw Depo., p. 30). At that time, these Plaintiffs, and

their brother Herbert Duncan,[5] exhumed the cremains purported to be those of Ann Hawkins. (V. Bradley Depo., p. 47;). These Plaintiffs attempted to return these remains to the GBI, but were told to "throw them away" as the GBI was no longer testing cremains. (J. DeGraw Depo., pp. 46-47). These Plaintiffs maintained possession of the cremains. (J. DeGraw Depo., p. 47).

In April 2003, the GBI released the "body" of Ann Hawkins to W.L. Wilson & Sons Funeral Home. (V. Bradley Depo., p.48). At that time, these Plaintiffs were allowed to see their mother's "body." (V. Bradley Depo., p. 48; J. DeGraw Depo., pp. 40-42). All that was located and identified by the GBI was three bones, which were "re-cremated." (V. Bradley Depo., p. 48; J. DeGraw Depo., pp. 40-42). Plaintiff DeGraw maintains custody and control of those cremains. (V. Bradley Depo., p. 48; J. DeGraw Depo., pp. 40-42).

### 4.   *Plaintiff Alex Kitchens*

Plaintiff Alex Kitchens retained Wallis-Wilbanks to handle the disposition of his father's body, Dr. Sterling Burt Kitchens, who died on February 14, 2000. (November 12, 2003 Deposition of Alex Shield Kitchens, p. 6). Plaintiff Kitchens coordinated the arrangements for the handling of his father's final disposition

---

[5] It bears noting that Mr. Duncan has filed his own individual lawsuit in the Superior Court of Walker County.

directly with Richard Wilbanks.   (A. Kitchens Depo. p. 16).
Plaintiff Kitchens executed an "Authorization for Cremation and
Disposition," which clearly identified "Marsh Crematory" as the
provider of cremation services.   (A. Kitchens Depo. pp. 22-23;
Defendants' Exhibit 222).   After the discoveries on the Tri-State
property, Plaintiff Kitchens had the remains of his father exhumed
from the LaFayette Cemetery.   (A. Kitchens Depo. p. 40).
Plaintiff Kitchens turned the remains over to the GBI for testing,
and was informed that the remains were "consistent with human
remains." (A. Kitchens Depo. p. 40).

### 5.   *Plaintiff Llewellyn Wood, Jr.*

Plaintiff Llewellyn Wood, Jr. is the surviving spouse of Ann
Bolling Jones Jones, who died on August 27, 2000.   (June 16, 2003
Deposition of Llewellyn Wood, Jr. pp. 6, 8).   Plaintiff Wood's
son, Chief Judge Bo Wood,[6] handled the selection of Wallis-
Wilbanks as the funeral home.   (L. Wood Depo. p. 10).   After his
mother's death, Judge Wood first contacted Marsh Crematory about
performing a cremation before he contacted Wallis-Wilbanks,
because Judge Wood "knew" Brent Marsh.   (L. Wood Depo. pp. 10,
15).   Judge Wood then called Wallis-Wilbanks and asked that they

---

[6]   Bo Wood is the Chief Judge of the Lookout Mountain Georgia
Judicial Circuit.

pick up the body from the hospital and handle the cremation for the family.  (L. Wood Depo. p. 18).

On the Monday following his wife's death, Plaintiff Wood went to Wallis-Wilbanks to finalize the arrangements.  (L. Wood Depo. p. 15).  Plaintiff Wood's name is included on the statement of funeral services provided by Wallis-Wilbanks, but he did not sign it. (Defendants' Exhibit 446).

Plaintiff Wood testified that Richard Wilbanks told him that his wife's body would be cremated at "Marsh" Crematory.  (L. Wood Depo. 27).  Plaintiff Wood did not, however, sign the cremation authorization form bearing the Tri-State Crematory name.  (L. Wood Depo. p. 28).  Rather, that document was executed by his son, Judge Wood.  (Defendants' Exhibit 447).

When Plaintiff Wood obtained the remains from Wallis-Wilbanks, they were enclosed in a black plastic box.  (L. Wood Depo. p. 31). Plaintiff Wood honored the wishes of his wife and took her ashes directly home and scattered them under a tree in their yard. (L. Wood Depo. pp. 31-32).  When Plaintiff Wood spread the ashes, nothing struck him as eventful and the ashes consisted of mostly fine powder, along with some small lumps.  (L. Wood Depo. pp. 35-37).

Plaintiff Wood no longer has possession of the black box because his son, Bo, turned it over to a law enforcement agency to

9929012                              8

be tested and it is now in the process of being returned to Judge Wood.   (L. Wood Depo. p. 32).   Plaintiff Wood does not know the results of any testing performed on the box.   (L. Wood Depo. p. 37).

The body of Ann Wood has not been identified as one of the bodies recovered at the Tri-State Crematory.   (L. Wood Depo. p. 37).   Mr. Wood and his son, Bo, both submitted DNA samples for testing.   (L. Wood Depo. pp. 38-39).   Notably, Plaintiff Wood obtained a list of unidentified bodies from his son, which contained detailed explanations and descriptions of the unidentified bodies.   (L. Wood Depo. pp. 39-40).   Mr. Wood went through those unidentified bodies and could not find one that matched his wife.   (L. Wood Depo. pp. 39-40).

### 6.   *Plaintiff Robert Irwin*

Plaintiff Robert Rhett Irvin is the son of Earline Irvin, whose funeral arrangements were handled by Wallis-Wilbanks upon her death on February 4, 2001.   (June 3, 2003 Deposition f Robert Rhett Irvin pp. 5, 11).   Plaintiff Irvin, although not a signatory to a contract, made the arrangements for his mother's cremation with Wallis-Wilbanks. (R. Irvin Depo. pp. 41-42).   Plaintiff Irvin did execute an authorization allowing for the cremation of his mother's body, which clearly stated that "Marsh Crematory" would

be providing the cremation services. (R. Irvin Depo. p. 45, 47).

After he received the remains identified as his mother's, Plaintiff mailed the remains to his sister in Ontario, California, where a funeral was held and the remains were interred. (R. Irvin Depo. pp. 33-36). Those remains have not been removed or tested in any manner. (R. Irvin Depo. p. 36). Plaintiff Irvin's mother's body is not one of those found and identified by the GBI. (R. Irvin Depo. p. 32). Further, Plaintiff Irvin submitted DNA sample to the GBI for testing and has been informed that his DNA is not a match to any of the remaining unidentified bodies. (R. Irvin Depo. pp. 32-33).

**7.   *The Discovery and Investigation at Tri-State Crematory***

On February 15, 2002, uncremated remains from the 1997-2002 era were discovered at the Tri-State location. (Second Aff. of Kris Sperry, ¶¶ 4, 6-9). Three hundred and thirty-four sets of human remains were found at Tri-State and 211 of those sets of remains have been identified. According to Dr. Kris Sperry, Chief Medical Examiner of the State of Georgia, "based upon the scientific evidence analyzed to date . . . these bodies arrived at Tri-State Crematory no earlier than 1997." (Second Aff. of Kris Sperry ¶ 2). Dr. Sperry's opinion is based upon his analysis of

the methodology by which these bodies were placed in mass graves, vaults and elsewhere on the property, forensic identification of the bodies and DNA test results." (Second Aff. of Kris Sperry ¶ 4-9).

## 8.   *Plaintiffs' Allegations*

Four proposed class representatives filed suit against Tri-State, members of the Marsh family - specifically, T. Ray Brent Marsh, Clara C.  Marsh, Rhames L. Marsh and Tommy Ray Marsh (collectively "Tri-State Defendants") and 56 individual funeral homes (collectively "Funeral Home Defendants").  (Amended Complaint ¶¶ 9-62).  In their complaint on behalf of putative class members, the named Plaintiffs alleged that all decedents sent to Tri-State during its twenty years of operation were improperly cremated in a variety of ways, including failure to cremate, commingling of remains and returning to families non-human materials such as concrete dust represented as being human remains.  (Amended Complaint ¶¶ 2, 66.) Based on these allegations, Plaintiffs raised eleven claims against the Defendants, including Wallis-Wilbanks: (1) equitable (injunctive and/or declaratory) relief, (2) breach of contract, (3) breach of covenant of good faith and fair dealing, (4) breach of fiduciary duty/special duty, (5) fraudulent conduct as to Tri-State Defendants, (6) negligence, (7) willful

interference with remains and intentional mishandling of a corpse, (8) negligent interference with remains and mishandling of a corpse, (9) intentional infliction of emotional distress, (10) negligent infliction of emotional distress, and (11) unjust enrichment.  (Amended Complaint ¶¶ 97-161.)

In an Order entered March 17, 2003, the Court certified a class action for the time period 1988 to 2002 on the following four causes of action only: (1) breach of contract; (2) negligence; (3) willful interference with remains and intentional mishandling of a corpse, and (4) negligent interference with remains and mishandling of a corpse.  Wallis-Wilbanks now seeks summary judgment as to these four remaining claims of Plaintiff Kerry Oliver and summary judgment as to as to the negligence claims ((2) and (4)) and the willful interference claim ((3)) of Plaintiffs Kitchens, Wood, Bradley, DeGraw, and Irwin.

This Court certified negligence and willful interference claims based upon the Funeral Homes' selection and use of Tri-State, their "agent".  The Funeral Home Defendants believe it is undisputed that Tri-State was an independent contractor, not their agent; however, in any event, the Plaintiffs seem to be asserting a claim in the form of negligent hiring.  Negligent hiring, as all negligence claims, involves foreseeability; willfulness involves more than just negligence.  Accordingly, an analysis of the nature

9929012                          12

of Tri-State and its operators, Ray Marsh and Brent Marsh (and to some extent, the entire Marsh family) is crucial.

9.    **The Marsh Family, Tri-State Wallis-Wilbanks Funeral Home and the Concealed Activity.**

The Marsh family, including Ray Brent Marsh, were not criminals; there is not one scintilla of evidence even of criminal propensity much less of any previous criminal record.  The evidence is clearly to the contrary.  The Marshes were solid citizens of the community (Depo. of Walter Wilson, Walker County Coroner ("Coroner Wilson Depo.") at 54-5); they were known to be responsible and progressive and enjoyed a good reputation in the community and, indeed, with all who knew them.  They were "[a] good family, just well-respected, well-thought-of family."   (Walker County Sheriff Wilson Depo. at 25-27; see also pp. 183-4, 230).   They were law-abiding. (Id. at 230).  Before 2002, the Sheriff never had occasion to talk to funeral directors or funeral home employees about Tri-State or the Marshes.  (Id. at 218).

Ray Marsh, Brent's father, worked many years for the post office and then became self-employed in the grave digging business (C. Marsh Depo. at 10), and later (1982) in the crematory business.  He had enjoyed a good reputation in the community for 30-35 years (former Coroner William E. McGill Depo. at 13, 28; Coroner Wilson Depo. 54-55.)  He was trusted.  (McGill Depo. at 28-9).  He was a

member of the LaFayette Optimist Club (C. Marsh Depo. at 124) and served on the board of the Department of Family and Children Services (Id.). In 1992, Ray Marsh ran for coroner (Id.); although he did not win, he amassed 46% of the vote. In 1996, the county government declared "Ray Marsh Day" in the elder Mr. Marsh's honor. (Id. at 115).

Clara Marsh, Brent's mother, was truly a pillar in the community. She came to Walker County in 1960 to begin a teaching career. (Id. at 17, 107). She served on numerous civic, charitable and political boards. (See, generally, C. Marsh Depo., 106-121). She was named Walker County Citizen of the Year (Id. at 114) and Georgia Woman in History (Id.).

Rhames LaShae Marsh, Brent's sister, also enjoyed a good reputation. While in high school in Walker County, she ran track and served on the yearbook staff. (R.L. Marsh Depo. at 96). She graduated in 1988 and attended Dalton College for two years (Id. at 12). She teaches Sunday school. (Id. at 97-8). She, too, served on boards and in other leadership capacities. (Id. at 13, 97).

Vanessa Lynn Marsh, Brent's wife, is well educated and actively employed. (V. Marsh Depo. at 8, 63).

Central figure, Brent Marsh, followed in his family's footsteps. He was an A and B student at LaFayette High School (B. Marsh Depo. at 82), from which he graduated in 1991. In 1990, he

attended the National Young Leaders Conference in Washington, D.C. (C. Marsh Depo. at 124). He attended the University of Tennessee-Chattanooga on a football scholarship (Id. at 14) and studied business management (Id. at 15). In September 1997, he married Vanessa (Id. at 95) at the lake on the Tri-State property (C. Marsh Depo. at 116; V. Marsh Depo. at 60-61). He belongs to the New Home Missionary Baptist Church (B. Marsh Depo. at 122), where he has served as church treasurer, trustee and, since 2001, deacon in training. (Id. at 125). He joined the LaFayette Rotary Club in 2001, and he has been an at-large member of the local Democratic party for several years. (Id. at 122-3). He coached youth teams at the LaFayette Municipal Recreation Center - three years of basketball and one year of football. (Id. at 126). There is no evidence of any arrest of Brent Marsh prior to February 2002. (V. Marsh Depo. at 71).

The Tri-State property consisted of the crematory, the Ray and Clara Marsh home, the Brent Marsh home, and a lake and recreation area. The property was visited and used by the public on a regular basis. A church group visited Tri-State in the 1980's. (R.L. Marsh Depo. at 108). Frequently, people were invited and permitted to fish at the property (B. Marsh Depo. at 89; C. Marsh Depo. at 116). In 1997 or 1998, the Marshes hosted a "youth day" at the lake with several hundred children in attendance (B. Marsh Depo. at

93).  In 1997, Brent's parents hosted his and Vanessa's wedding and reception on the property where at least 150 people were invited (B. Marsh Depo. at 95; C. Marsh Depo. at 116; V. Marsh Depo. at 10-14).  The Walker County coroner was familiar with Tri-State and had been inside the crematory itself (Coroner Wilson Depo. at 20-32). Officials in Walker County had never heard of anything "derogatory" about the crematory or the Marshes prior to February, 2002. (Sheriff Wilson Depo. at 27; Coroner Wilson Depo. at 29-30, 92).

Tri-State was being operated with the knowledge and permission of state and local authorities, and had been so operating for twenty years without incident.  Georgia State Board of Funeral Services Inspector John Massey testified that Tri-State was not required to have a license as it was not open to the public. (Depo. of John Massey ("Massey Depo."), pp. 23-24).  Indeed, Mr. Massey testified that Tri-State was not required to have a license in 1993.  (Massey Depo., p. 57).  Only in 2002 were crematories which were not open to the public required to have a license. (Massey Depo., p. 61).  The record contains instances of issues involving licensure and reports which were investigated, but there is no evidence of these matters being known by the Funeral Homes. (Massey Depo., at 28-38; 56-57; 60-64)

Wallis-Wilbanks Funeral Home, with its various owners and

9929012                              16

under the names Wallis & Sons and Wallis-Wilbanks, contracted with Tri-State from 1983 until 2002 to provide cremation services; at no time did Wallis-Wilbanks control Tri-States' hours of operation, method(s) of performing cremations, use of tools and materials or techniques for performing cremations; in all of Wallis-Wilbanks's dealings with Tri-State, Tri-State operated as an independent contractor; neither Tri-State nor the Marshes were employees, agents or servants of Wallis-Wilbanks.  (R. Wilbanks Aff. ¶¶ 2-10).

At no time prior to February 15, 2002, did Wallis-Wilbanks or any of its employees have any information, or even suspicion, that any member of the Marsh family had committed any crimes or had any propensity to commit a crime; that Tri-State was improperly performing cremations; that Tri-State had given to anyone any adulterated, commingled or misidentified cremated remains; that Tri-State, willfully, intentionally or otherwise, interfered with human remains or mishandled a corpse; or that Tri-State had on its premises any uncremated bodies ( R. Wilbanks Aff. at ¶¶ 8-15). Neither Richard Wilbanks nor any other employee of Wallis-Wilbanks ever, willfully, intentionally or otherwise, interfered with human remains or mishandled a corpse.  (Id. at ¶ 16).  Additionally, neither Richard Wilbanks nor any other employee of Wallis-Wilbanks ever authorized, ratified or otherwise approved the improper cremation or adulteration of human remains, the interference with

human remains or mishandling of any corpse by Tri-State.  (<u>Id</u>. at

¶ 17).   Indeed, these acts and omissions by Tri-State were to

Wallis-Wilbanks's detriment. (<u>Id.</u> at 18).

Now, after the fact, the concealed activity (or non-activity

of Tri-State) has been discovered.  As Plaintiffs themselves have

established:

> [t]his action arises from the *recent discovery*
> that over a period of years, Tri-State
> Crematory failed to cremate human remains
> entrusted to it for cremation services in the
> manner dictated by its obligation to the
> decedents' families, applicable laws, and
> human decency.  Rather, Tri-State and the
> Marsh family defendants who were its owners
> and operators *concealed* uncremated remains and
> commingled cremated remains in rudimentary
> mass graves in wooded areas surrounding their
> property.

Plaintiffs' Memorandum of Law In Support of Plaintiffs' Motion for

Class Certification Pursuant to Federal Rule of Civil Procedure 23

(filed July, 2002), p. 1  (Emphasis added).

That Tri-States' activity was secret and actively concealed is

not disputed.[7] Likewise, the complete lack of knowledge on the part

---

[7]  The singularity of Tri-State's acts and the extent of their
stealth has now been discovered: in the case of <u>Joe Oden v. Taylor
Funeral Home</u>, an employee of the funeral home, Mrs. Taylor, took
Mrs. Oden's body to Tri-State after the funeral and watched "the
body go into the crematory, the switch was hit, that she heard the
sound of the unit start up, and the process was to begin."  (Joe
Oden Dep. at 36-37).  "[W]hen my wife's body was located [on the
Tri-State property],...the Taylors were as, I guess, surprised as

of Wallis-Wilbanks Funeral Home of Tri-State's crimes; of its
propensity for committing crimes; of the existence of uncremated
remains; of any adulterated, commingled or misidentified cremated
remains; or of Tri-State's interference with human remains or
mishandling of corpses is also undisputed. (See R. Wilbanks Aff.,
¶¶ 8-14).

## ARGUMENT AND CITATION OF AUTHORITY

### 1.  *Summary Judgment Standard*

A grant of summary judgment is appropriate "if the pleadings,
depositions, answers to Interrogatories, and Admissions on file,
together with the Affidavits, if any, show that there is no genuine
issue as to any material fact, and that the moving party is
entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c);
Allison v. McGhan Medical Corp., 184 F.3d 1300 (11th Cir. 1999);
Young v. Augusta, 59 F.3d 1160 (11th Cir. 1995). This rule does not
require the moving party to negate the claims of the non-movant but
requires only that the moving party identify those evidentiary
materials listed in Rule 56(c) that establish the absence of a

---

any of us." (Id. at 37-38). Even if Tri-State could somehow be
determined to be Wallis-Wilbanks Funeral Home's agent, Tri-State's
election to store and bury, rather than cremate, bodies was
certainly outside the scope of its employment, and Wallis-Wilbanks
cannot be liable. Hobbs v. Principal Financial Group, 230 Ga. App.
410 (1998); Fortune v. Principal Financial Group, 219 Ga. App. 367
(1995).

genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party on a Motion for Summary Judgment must show that the non-moving party has no evidence to support an essential element of the case or must present affirmative evidence demonstrating that the non-moving party will be able to prove its case at trial.  Young, 59 F.3d at 1170.

Once the moving party asserts its basis for summary judgment, the non-moving party must then go beyond the pleadings and present evidence designating "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324.  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc.,477 U.S. 242, 246 (1986) (emphasis in the original); Brown v. City of Clewiston, 848 F.2d 1534, 1537 (11th Cir. 1988).

An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative."  Anderson, 477 U.S. at 250.  A fact is not material unless it is identified by the controlling substantive law as an essential element of the non-moving party's case.  Id. at 248.  Therefore, to survive a motion for summary judgment, the non-

moving party must present specific evidence of every element material to their case so as to create a genuine issue for trial. Celotex, 477 U.S. at 323; Brown, 484 F.2d. at 1537. Otherwise, summary judgment must be entered against them.   Id.

## 2.   *Specific Claims*

### A.   Statute of Limitations

The contract claim of Plaintiff Oliver[8] is barred by the six-year statute of limitations for breach of contract claims and should be dismissed.   The Court clearly made such a finding in its Order Granting Class Certification in March 2003:

> "All actions upon promissory notes, drafts, or other simple contracts in writing shall be brought within six years after the same become due and payable." O.C.G.A. §9-3-24.   "'Under Georgia law, the statute of limitations runs from the time the contract is broken and not at the time the actual damage results or is ascertained.'" Owen v. Mobley Const. Co., Inc., 171 Ga. App. 462, 462, 320 S.E.2d 255,

---

[8] This argument, of course, assumes that Plaintiff Oliver has standing to assert the contract claim.   By his very own statements, however, it is clear that he is not the proper person to assert this claim.   His testimony reveals that he did not "play any role whatsoever" in communicating with Wallis-Wilbanks regarding the arrangements for his father's funeral and cremation.   (K. Oliver Depo. p. 14).   Rather, the evidence in the record shows that Oliver's mother (who is alive today) and his brother contracted with Wallis-Wilbanks for the services.   (K. Oliver Depo. pp. 14-15).   Thus, the undisputed record evidence shows that Plaintiff Oliver cannot pursue the contract action against Wallis-Wilbanks, and should be summarily dismissed on this basis.   For purposes of this Motion, however, Wallis-Wilbanks will discuss the remaining bars to Oliver's contract claim.

> 256 (1984)(quoting Space Leasing Assoc. v.
> Atlantic Bldg. Systems, 144 Ga. App. 320, 241
> S.E.2d   438   (1977))(internal   citations
> omitted); accord Moore v. Dept. of Human
> Resources, 220 Ga. App. 471, 472, 469 S.E.2d
> 511, 512-13 (1996).   "The discovery rule is
> not applicable to a cause of action based on
> breach of contract." Id. (citing Owen, 171
> Ga. App. At 462, 320 S.E.2d 255).

(Class Certification Order, pp. 37-38).

The class action complaint was filed February 26, 2002.  Thus, any breach of contract claim with respect to a decedent sent to Tri-State prior to February 26, 1996 is barred by the applicable six-year statute of limitations.  The contract claim of Plaintiff Oliver is barred by this statute of limitations. Plaintiff Oliver's father died on August 12, 1994 and arrangements were made (by Oliver's mother and brother) simultaneously, one and one-half years before February of 1996.

In its Class Certification Order, the Court addressed named Plaintiff Carol Bechtel's contract claim, which involved a 1992 contract, and held "Plaintiff Bechtel's breach of contract claim is time barred." (Class Certification Order, p. 38.)  In that Order, the Court also determined that the statute of limitations would not be tolled for fraudulent concealment. (Class Certification Order, p. 38, n. 11.)  Clearly, Plaintiff Oliver's contract claims are barred by the six (6) year statute of limitations under Georgia

law, just as the Court ruled Plaintiff Bechtel's are.

Plaintiff Oliver cannot prove the statute of limitations should be tolled based on fraudulent concealment because he has not alleged "actual fraud" involving "moral turpitude" on the part of Wallis-Wilbanks, as required under Georgia law.   See O.C.G.A. § 9-3-96.   Under § 9-3-96, a statute of limitations can only be tolled if the Plaintiff can show "actual fraud" of the Defendant involving "moral turpitude" which conceals the existence of a cause of action from the Plaintiff, despite Plaintiff's diligence in discovering such a claim.   More importantly to this case, the Supreme Court of Georgia has held that constructive fraud does not toll the statute of limitations.   See Shipman v. Horizon Corp., 245 Ga. 808, 267 S.E.2d 244 (1980).   Plaintiff Oliver has not ever alleged, much less presented any evidence of any fraud on behalf of Wallis-Wilbanks; without such evidence, the breach of contract claims of Plaintiffs Oliver is barred.   See Gropper v. STO Corp., 250 Ga. App. at 824, 552 S.E.2d at 123.

In order to prevail on a breach of contract claim under Georgia, there must be a "breach and the resultant damages to the party who has the right to complain about the contract being broken."[9]  Odem v. Pace Academy, 235 Ga. App. 648, 654, 510 S.E.2d

---

[9] As to Oliver's standing as a party "who has the right to complain

326, 331 (1998)(quoting Budget Rent-A-Car of Atlanta v. Webb, 220 Ga. App. 278, 279, 469 S.E.2d 712, 713 (1996)). Notwithstanding the reality that the contract claim of Oliver is indeed barred under the applicable statute of limitations, Plaintiff Oliver has adduced no evidence that his father's body was not cremated as planned. The remains of Thomas Milbern Oliver were not discovered on the grounds of Tri-State Crematory.  (K. Oliver Depo. p. 20).

Finally, Plaintiff Oliver ignores the privity of contract requirement under Georgia law which bars his breach of contract claim against Wallis-Wilbanks.  Under privity of contract, only the parties signing the funeral services contract with Wallis-Wilbanks may sue for breach of contract. Sofet v. Roberts, 185 Ga.  App. 451, 452, 364 S.E.2d 595, 596 (1987).

Moreover, only the person who entered into the funeral service contract and paid for the services has suffered any contractual damages.  See Odem  v. Pace Academy, 235 Ga. App. 648, 654, 510 S.E.2d 326, 331 (1998).  Emotional distress damages are not pecuniary damages and cannot qualify as contractual damages.  See Bauer v. North Fulton Med. Ctr., 241 Ga. App. 568, 572, 527 S.E.2d 240 (1999).  Accordingly, any breach of contract claim under Georgia law is limited to the party who entered into the contract

---

about the contract being broken," see Note 8, supra.

and any pecuniary losses shown under the contract.   Thus, Kerry

Oliver, who was not a party to any contract with Wallis-Wilbanks,

cannot raise any breach of contract claim against the funeral home.

The funeral arrangements for Oliver's father were handled by his

mother and brother.   (K. Oliver Depo. p. 20).

     **B.**    **Plaintiffs Oliver's, Bradley's and DeGraw's claims of Negligence, Negligent Interference with Remains and Mishandling of a Corpse, and Wilful Interference with Remains and Intentional Mishandling of a Corpse, Are Barred by the Applicable Four (4) Year Statute of Limitations.**

The   claims   of   negligence   and   the   negligent   and   wilful

mishandling claims asserted by Plaintiffs Oliver, Bradley and

Degraw are also time barred under Georgia's four (4) year statute

of limitations. It has been the law in Georgia for over 100 years

that the next of kin of a deceased have a "quasi-property right" in

the body of a deceased. See Rivers v. Greenwood Cemetery, 194 Ga.

524, 22 S.E.2d 134 (1942); McCoy v. Ga. Baptist Hospital, 167 Ga.

App. 495, 306 S.E.2d 746 (1983); Bauer v. North Fulton Medical

Center, 241 Ga. App. 568, 527 S.E.2d 240 (1999); Hill v. City of

Fort Valley, 251 Ga. App. 615 (2001).  Pursuant to O.C.G.A. § 9-3-

31 actions for property damage must be brought within four years

"after the right of action accrues." Likewise, pursuant to O.C.G.A.

§ 9-3-32, "actions for the recovery of personal property, or for

damages for the conversion or destruction of the same, shall be

brought within four years after the right of action accrues."

The <u>Bauer</u> court stated that the quasi-property right in a corpse is not pecuniary in nature; it only encompasses the power to ensure that a corpse is "orderly handled and laid to rest, nothing more." <u>Id</u>. at 571, 527 S.E.2d at 244.  In <u>Bauer</u>, the court determined that a widow's claims against a hospital for the mishandling of her spouse's body and unauthorized removal of organs were subject to a four year statute of limitation.  <u>Id</u>.  The Court specifically held that the "personal, quasi-property right" in a decedent's corpse is only to "ensure proper handling and burial." <u>Id</u>. at 570.

Similarly, in <u>Hill v. City of Fort Valley</u>, <u>supra</u>, the court reiterated the Georgia rule that the next of kin have a quasi-property right in the body of a deceased.  The specific issue in <u>Hill</u> was whether the family's claim for "wrongful burial" after a funeral home buried the decedent in the wrong plot was barred by the statute of limitations.  The widow of the deceased in <u>Hill</u> asserted that the funeral home failed to properly mark the boundaries of the grave site in 1981 when the decedent was buried. The court applied a four year statute of limitations and determined the statute began to run when the decedent was improperly buried in 1981. The court therefore held that "any claim for wrongful burial

in 1981" was "barred by the statute of limitations" because the family "clearly brought their claim well beyond four years" when they filed suit in 1997. Id. at 618.

Georgia courts have consistently held that the true test to determine when a cause of action accrues is to "ascertain the time when the plaintiff could first have maintained [his or] her action to a successful result." Colormatch Exteriors, Inc. v. Hickey, 275 Ga. 249, 251, 569 S.E.2d 495, 497 (2002)(quoting Travis Pruitt & Assoc. v. Bowling, 238 Ga. App. 225, 226(1), 518 S.E.2d 452 (1999)). These claims accrued at the time of the alleged negligence and mishandling of remains, namely when the decedent was allegedly not cremated properly after the decedent was brought to the Tri-State premises. See Hill, supra. Thus, these claims must arise between February 26, 1998 and February 26, 2002. The negligence, negligent and intentional mishandling claims of Oliver against Wallis-Wilbanks accrued well before 1998 and should be dismissed on statute of limitations grounds.

The father of Plaintiff Oliver clearly was sent to Tri-State by Wallis-Wilbanks in 1994. Furthermore, the body Ann Hawkins, the mother of Plaintiffs DeGraw and Bradley, was sent to Tri-State on or about March 31, 1997. Each of these claims arose before February 26, 1998, and are, thus, barred by the applicable statute

of limitations.

Moreover, the discovery rule is not applicable to these claims, which do not allege bodily harm to the Plaintiff himself. See Fort Oglethorpe Associates II, LTD v. Hails Construction Co. of Ga., 196 Ga. App. 663, 665, 396 S.E.2d 585, 587 (1990)

Further, Plaintiffs Oliver, DeGraw and Bradley have failed to present any evidence to support tolling the statute of limitations. This determination was already made by this Court in its Class Certification Order:

> Under O.C.G.A. § 9-3-96, the statute of limitations applicable to a plaintiff's claim may be tolled if the plaintiff can show "'(1) actual fraud on the part of the defendant involving moral turpitude, (2) which conceals the existence of the cause of action from the plaintiff, and (3) plaintiff's reasonable diligence in discovering his cause of action, despite his failure to do so within the time of the applicable statute of limitations.'" Gropper v. STO Corp., 250 Ga. App. 820, 824, 552 S.E.2d 118, 123, (Ga. App. 2001)(quoting McClung Surveying v. Worl, 247 Ga. App. 322, 324, 541 S.E.2d 703 (2000)(citations omitted)).

(Class Certification Order, p. 38). Under Georgia law, constructive fraud *does not* toll the statute of limitations. See Shipman, supra. These Plaintiffs have not provided *any evidence* of "actual fraud" involving "moral turpitude" on the part of Wallis-Wilbanks. Without such evidence, these Plaintiffs have no grounds

for tolling the four-year statute of limitations.  This is not

evidence which can merely be presumed; Plaintiffs must demonstrate

Wallis-Wilbanks acted fraudulently under §9-3-96, which has not

been shown in this case.    Therefore, the negligence, negligent

mishandling, and wilful mishandling claims of Plaintiffs Oliver,

DeGraw and Bradley are time barred and should be dismissed.

C.   **Wallis-Wilbanks is Entitled to Summary Judgment on
     Plaintiffs Oliver's, Degraw's, Bradley's, Wood's, Irwin's
     and Kitchens's claims of Negligence and Negligent
     Mishandling of Remains, as Plaintiffs Have Suffered No
     Recognizable Damage Permitted under Georgia Law.**

i.   *Lack of recognized injury*

Plaintiffs Wood, DeGraw, Bradley, Kitchens, Irwin and Oliver

claim that Wallis Wilbanks owed a duty to Plaintiffs

> to act with the ordinary care of a reasonable
> person with respect to all aspects of the
> services promised including, but not limited
> to, all phases of the cremation process,
> including but not limited to the hiring,
> retention, training and supervision of all
> agents, employees and representatives of the
> defendants, in connection with such services
> and transaction, the association with other
> persons and entities to accomplish the
> performance of such services, the individual,
> proper and respectful performance of all steps
> of the cremation process, and the ascertainment
> that all such services were being fully and
> properly undertaken and performed.

(Amended Complaint ¶ 133).  Plaintiffs claim that Wallis-Wilbanks

negligently and carelessly failed to discharge this broadly defined

duty.  (Amended Complaint ¶ 134.)

In order to prevail on a negligence claim under Georgia law, a party must prove the following: "(1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." Wilson v. Mallard Creek Holdings, 238 Ga. App. 746, 747, 519 S.E.2d 925, 926 (1999).

The crux of these Plaintiffs' negligence claims and the recovery sought is due to their alleged distress caused by uncertainty over the disposition of their respective decedents. Under Georgia law, "[i]n a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury." Ryckeley v. Callaway, 261 Ga. 828, 829, 412 S.E.2d 826, 826 (1992).  Thus, even under a claim for simple negligence or for negligent interference with remains, Plaintiffs must prove physical impact to obtain any recovery for emotional distress damages.  None of the Plaintiffs seeking recovery against Wallis-Wilbanks has alleged, much less proven, any such physical impact.

### ii. *Mere speculation*

Moreover, with regard to the claims of Wood, Kitchens, Irwin and Oliver, without actual evidence that the remains received are not the correct remains, such claims are far too speculative to form the basis of recovery under Georgia law. Claims of uncertainty or fear have been addressed by Georgia's appellate courts in cases involving exposure to a dreaded disease or material, such as the AIDS virus or asbestos. For example, in a decision in February 2003, the Georgia Supreme Court rejected a fear and uncertainty claim where the plaintiff alleged that she feared having contracted the AIDS virus from a blood transfusion but failed to present any evidence that she had "actual exposure" to the disease. Johnson v. American Nat'l Red Cross, 276 Ga. 270, 578 S.E.2d 106 (2003). In Johnson, the plaintiff, Ms. Mantooth, received a blood transfusion from an American Red Cross donor. After the transfusion it was discovered that the Red Cross donor had lived in Central Africa where an undetectable strain of HIV known as "Group O" was known to exist. Ms. Mantooth never tested positive for the AIDS virus and died of lung cancer in May 2001. Id., 276 Ga. at 271, 578 S.E.2d at 107-108.

Ms. Mantooth (and later her executor) sought emotional distress damages arising from her "fear" that she may have

contracted AIDS.  Since there was no evidence that Ms. Mantooth had actually been exposed to the HIV virus, the trial court granted summary judgment to the Red Cross, a decision affirmed by the Court of Appeals.

In affirming the lower court, the Georgia Supreme Court, citing Russaw v. Martin, 221 Ga. App. 683, 472 S.E.2d 508 (1996), held that:

> The [Russaw] Court of Appeals determined that
> to allow the plaintiff recovery for emotional
> injuries and mental anguish without any proof
> that she was actually exposed to HIV or
> hepatitis was "per se unreasonable."  Russaw,
> supra at 686, 472 S.E.2d 508.  In so holding,
> the Court of Appeals rightly reasoned that "it
> is axiomatic that for recovery, there must be
> some reasonable connection between the act or
> omission of a defendant and the damages which
> a plaintiff has suffered.  Without factual
> evidence of a causal connection between the
> alleged breach of duty and the purported
> damages, the damages must be considered
> whimsical, fanciful and above all too
> speculative to form the basis of recovery'"
> Id. at 686, 472 S.E.2d 508.

Johnson, 276 Ga. at 274-275, 578 S.E.2d at 109-110.

Recently, the requirement that a plaintiff show "actual exposure" or physical injury or impact to recover for emotional injuries such as fear and uncertainty was specifically discussed by the Georgia Court of Appeals in the context of a funeral home in Hang v. Wages and Sons Funeral Home, Inc., A03A043 (June 19, 2003).

After the death of their father, the Tep family retained Wages &
Sons funeral home to perform a "traditional Cambodian ceremony."
The family admitted they believed Wages was familiar with
traditional Cambodian funeral rituals and provided the funeral home
with few instructions on their desired arrangements.  The family
arranged for a viewing by other relatives and friends and a
cremation thereafter.  However, decedent Tep was cremated prior to
the scheduled viewing after a Wages employee misread the intended
date for cremation.  Although accompanying documents indicated the
remains were that of decedent Tep, his family claimed they were
uncertain whether "they actually received their father's remains."
The family specifically alleged that Wages interfered with their
right to "closure" by the improper cremation.

Wages moved for summary judgment; the trial court granted its
motion, concluding that Georgia's impact rule precluded the family
from "recovering general damages for their alleged emotional
distress."  The Georgia Court of Appeals affirmed the entry of
summary judgment in favor of Wages based on Georgia's impact rule,
which precludes recovery for emotional distress involving negligent
conduct without physical impact.  The Court specifically declined
to apply the narrow exception to the impact rule set forth in Lee
v. State Farm, 272 Ga. 583, 533 S.E.2d 82 (2000).

As the above authority demonstrates, merely having one's

family member sent to Tri-State Crematory for cremation is an insufficient basis to prevail on a claim for fear and uncertainty that those remains may have been improperly cremated.   None of these Plaintiffs have any proof that their respective decedents were not cremated or were improperly cremated  –  none of their respective decedents were identified by the GBI as one of the 334 bodies found on the Tri-State Crematory property. Without the required causal connection between their alleged fear and uncertainty and their actual damages, these claims represent the type of damages that the Georgia courts regard as "whimsical, fanciful and above all too speculative to form the basis of recovery."   Johnson, 276 Ga. at 274, 578 S.E.2d at 110. Accordingly, Plaintiffs' speculative negligence claims and their alleged damages based on fear and uncertainty should be dismissed.

Plaintiffs Wood, Irwin, Bradley, DeGraw, Kitchens, and Oliver simply have no evidence Wallis-Wilbanks willfully or intentionally mishandled the remains of their respective decedents, assuming their claims survive despite the fact they suffered no cognizable injuries.   In Georgia, a willful interference with remains claim is based in the "quasi-property right" in the body of the deceased by the next of kin.  See Hill v. City or Fort Valley, 251 Ga. App. 615 (2001); McCoy v. Georgia Baptist Hospital, 167 Ga. App. 495, 306

S.E.2d 746 (1983); Rivers v. Greenwood Cemetery, 194 Ga. 524, 22
S.E.2d 134 (1942).  This quasi-property right is not pecuniary in
nature; it only encompasses the power to ensure that a corpse is
"orderly handled and laid to rest, nothing more."  Bauer v. North
Fulton Medical Center, 241 Ga. App. 568, 571, 527 S.E.2d 240, 244
(1999).

For an intentional mishandling of a corpse claim, a
"demonstration of mere negligence is not sufficient to show wilful
or wanton behavior.  In order to prove wilful or wanton conduct, a
plaintiff must demonstrate the actions of a defendant were 'such as
to evidence a wilful intention to inflict the injury, or else
[were] so reckless or so charged with indifference to the
consequences . . . to justify . . . finding a wantonness equivalent
in spirit to actual intent.'" McNeal Loftis, Inc. v. Helmey, 218
Ga. App. 628, 629, 462 S.E.2d 789, 790 (1995).

In McNeal Loftis, the Court of Appeals reversed the denial of
summary judgment against a cemetery owner because the surviving
spouse failed to show the cemetery owner's conduct rose to the
level of wilful or intentional interference with the burial of her
husband.  Citing Habersham Mem. Park v. Moore, the Court held that
the plaintiff wife failed to show the conduct of the cemetery was
"so wanton that it could serve as the functional equivalent of

intentional conduct."   Id.   The Court held the actions of the cemetery in attempting to mitigate the problems which arose at the cemetery site before the service revealed that the cemetery had concern for the consequences of its actions and was "not behaving wantonly."   Id. at 630, 462 S.E.2d at 790.

In this case, as in McNeal Loftis, these Plaintiffs have absolutely no evidence that Wallis-Wilbanks wilfully interfered or hindered the proper cremation of their respective decedents.   Nor is there any evidence Wallis-Wilbanks was behaving wantonly or in complete disregard for consequences; indeed, Wallis-Wilbanks never had any evidence or the slightest indication that anything was amiss at Tri-State or with any of the Marsh family members prior to February 2002.

### iii. Wallis-Wilbanks cannot be held liable for the acts of Tri-State, an Independent Contractor

Recognizing the statute of limitations problems and the lack of a recognized injury, Plaintiffs also attempt to hold Wallis-Wilbanks vicariously liable for the actions of Tri-State Crematory by alleging that the crematory was the agent of the funeral home. The undisputed facts prove just the opposite — Tri-State Crematory was an independent contractor, not an agent of Wallis-Wilbanks. Thus, this Court should find as a matter of law that Tri-State Crematory and the Marshes were not the agents of Wallis-Wilbanks,

and Wallis-Wilbanks cannot be held vicariously liable for the actions of these third parties.

In Georgia, the vicarious liability principle has been codified at O.C.G.A. § 51-2-2, which provides as follows: "Every person shall be liable for torts committed by his wife, his child, or his servant by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily." See also Chorey, Taylor & Feil, P.C. v. Clark, 273 Ga. 143, 144, 539 S.E.2d 139, 140 (2000) ("Under the principle of respondeat superior, 'employers are generally jointly and severally liable along with the tortfeasor employee for the torts of employees committed within the scope of employment.'")(citations omitted).

In Georgia, vicarious liability does not apply if Tri-State is an independent contractor, not an agent for Wallis-Wilbanks.

> Generally, an employer-employee relationship, and the possibility of vicarious liability under the theory of respondeat superior, exists when the employer has the right to control the time and manner of executing the work. An independent contractor, on the other hand, has the right to perform the work by his own means, method and manner; the employer has the right merely to require certain results.

Hooters of Augusta, Inc. v. Nicholson, 245 Ga. App. 363, 367, 537 S.E.2d 468, 472 (2000)(citations omitted).

In other words, "[v]icarious liability is premised upon a principal's right to control the time and manner of executing the work performed by the agent." Butkus v. Putting Greens Int'l Corp., 222 Ga. App. 661, 663, 475 S.E.2d 693, 694-696 (1996).   The "right to control the time means the employer has assumed the right to control the person's actual hours of work.   The right to control the manner and method means the employer has assumed the right to tell the person how to perform all details of the job, including the tools he should use and the procedures he should follow." Williamson v. Coastal Physician Services of the Southeast, Inc., 251 Ga. App. 667, 668, 554 S.E.2d 739, 741 (2001).

Wallis-Wilbanks did not control Tri-State Crematory's hours of work.   Instead, an employee of Wallis-Wilbanks would call Tri-State on the telephone to inform him that Wallis-Wilbanks needed a cremation for a particular decedent.   Wallis-Wilbanks had no control over the hours of operation of Tri-State.   (R. Wilbanks Aff. ¶ 3).   Moreover, Wallis-Wilbanks did not tell Ray Marsh or Brent Marsh how to perform the cremation at Tri-State.   After a body was delivered or picked up and taken to Tri-State for cremation, neither Richard Wilbanks nor Wallis-Wilbanks's employees instructed Ray or Brent Marsh on what specific tools or materials to use for the cremation or what cremation techniques or procedure to utilize.   (R. Wilbanks Aff. ¶ 4).   Further, Wallis-Wilbanks

9929012                                    38

employees never instructed either of the Marshes to utilize a certain brand of cremation unit or to service the crematory, if necessary, by a certain time, manner, or method. (R. Wilbanks Aff. ¶ 5).

After the cremation was completed, Richard Wilbanks or another Wallis-Wilbanks employee would pick up the cremated remains or Ray or Brent Marsh would return the cremated remains back to the funeral home. (R. Wilbanks Aff. ¶ 6). This procedure was followed for every decedent sent to Tri-State Crematory for cremation by Wallis-Wilbanks. Under Georgia law, these facts prove that Tri-State Crematory was an independent contractor, not an agent of Wallis-Wilbanks.

Further, Richard Wilbanks testified in his affidavit that neither Tri-State Crematory nor Ray Marsh nor Brent Marsh was ever an agent, employee or servant of Wallis-Wilbanks. (R. Wilbanks Aff. ¶ 9).

> It has long been the Georgia rule that one who is a party to the alleged relationship (the principal or agent) may testify as a fact as to the existence or non-existence of the relationship and that such testimony would not be subject to the objection that the statement was a conclusion or the ultimate fact. The denial of the existence of any agency relationship may thus constitute an uncontradicted fact which will sustain a motion for summary judgment.

Stallings v. Sylvania Ford-Mercury, Inc., 242 Ga. App. 731, 733,

533 S.E.2d 731, 733 (2000).   See also Entertainment Developers,

Inc. v. Relco, Inc., 172 Ga. App. 176, 177, 322 S.E.2d 304, 305

(1984) ("When a party to an alleged agency relationship denies that

such    a    relationship    exists,    that    is    a    statement    of

fact.") (citations omitted).

Furthermore,  one  generally  does  not  have  to  monitor  an

independent  contractor.    "That  an  employer  is  not  bound  to

supervise  the  progress  of  contract  work  for  the  purpose  of

preventing the commission of a collateral tort by the independent

contractor, is well settled.   The employer has the right to presume

that the independent contractor will do the work in a prudent and

proper  manner."   Dekle v. Southern Bell Tel. & Tel. Co., 208 Ga.

254, 258, 66 S.E.2d 218 (1951) (overruled in part by Peachtree-Cain

Co. v. McBee, 254 Ga. 91, 93, 327 S.E.2d 188 (1985) (stating that

the exceptions of O.C.G.A. § 51-2-5 are nonexclusive).[10]

> Generally, there is no duty to control the
> conduct of third persons to prevent them from
> causing physical harm to others. [] There are
> two exceptions to this general rule where: (a)
> a special relation exists between the actor
> and the third person which imposes a duty upon
> the  actor  to  control  the  third  person's
> conduct,  or  (b)  a  special  relation  exists
> between the actor and the other which gives to

---

[10] Dekle was overruled in McBee only to the extent that the former
suggested the exceptions of O.C.G.A. § 51-2-5 are exclusive.

the other a right to protection.

_Shortnacy v. North Atlanta Internal Medicine, P.C._, 252 Ga. App. 321, 325, 556 S.E.2d 209 (2001)(internal citations and quotations omitted); _Houston v. Bedgood_, 2003 WL 22090450, *2 (Ga. App. Sept. 10, 2003).  Despite the presence of exceptions to the general rule, each is inapplicable in this case.

The first of these two exceptions is only applicable when a person actually exercises control over a third person (typically in the physician/patient relationship), "whom he knows or should know to be likely to cause bodily harm to others if not controlled". _Bradley Center, Inc. v. Wessner_, 250 Ga. 199, 201-02, 296 S.E.2d 693 (1982); _Houston v. Bedgood_, 2003 WL 22090450, *2 (Ga.App. Sept. 10, 2003); _Shortnacy_, 252 Ga.App. at 325.  This creates a "a duty to exercise reasonable care to control the third person to prevent him from doing such harm." _Bradley Center_, 250 Ga. at 201.

This exception is inapplicable because this case does not involve actual physical harm.  The exception, adopted from the _Restatement (Second) of Torts_, § 315, specifically references physical harm, and this distinction is confirmed by the fact that the only cases found in which this exception was applied involved a plaintiff seeking recovery for physical injuries.  Second, there is no evidence that Wallis-Wilbanks knew or should have known that

Tri-State and its operators would "harm" others.  Finally, there is no evidence that Wallis-Wilbanks exercised any control over Tri-State's activities.

The second exception, concerning a special relation between an actor and another which gives to the other a right to protection, is only applicable to governmental entities.  Houston v. Bedgood, 2003 WL 22090450, *2 (Ga. App. Sept. 10, 2003); Shortnacy, 252 Ga. App. at 325.  As explained by the Georgia Court of Appeals, this exception "applies only to liability of a governmental entity for the acts or omissions of the police or similar governmental public safety agency in the performance of its duties to the public." Huntington v. City of Atlanta, 241 Ga.App. 301, 527 S.E.2d 6 (1999)(citing Rowe v.  Coffey, 270 Ga. 715, 716, 515 S.E.2d 375 (1999)); City of Rome v. Jordan, 263 Ga. 26, 426 S.E.2d 861 (1993).

Plaintiffs have the burden of proof as to their agency allegations.  "[W]here the existence of any agency is relied upon, the burden rests with the party asserting the relationship." Carter v. Kim, 157 Ga. App. 418, 418, 277 S.E.2d 776, 776 (1981).  Because Wallis-Wilbanks has presented facts showing that Tri-State and the Marshes were not its agents, Plaintiffs may not respond with unsupported allegations of agency but instead must present specific facts showing an agency relationship.  See Bell South Telecommunications, Inc. v. Widner, 229 Ga. App. 634, 636, 495

9929012                                    42

S.E.2d 52, 55 (1997). "Exhibiting the mere possibility of a control situation falls short of the specific facts required." Id. (citations omitted). In this case, Plaintiffs cannot satisfy their agency burden of proof.

Accordingly, the undisputed facts prove that Tri-State Crematory, Ray Marsh and Brent Marsh were independent contractors, not agents of Wallis-Wilbanks. Thus, Wallis-Wilbanks requests that this Court find as a matter of law that Wallis-Wilbanks is not vicariously liable for the actions of these independent contractors.

### ii. Funeral Home Did Not Have any Nondelegable Duty With Respect to the Remains.

Plaintiffs also argue that Wallis-Wilbanks should be liable for Tri-State's actions because the duties imposed on the funeral home are nondelegable. "As a general rule an employer is not liable for the torts of an independent contractor. O.C.G.A. § 51-2-4." Widner v. Brookins, Inc., 236 Ga. App. 563, 564, 512 S.E.2d 405, 406 (1999). Pursuant to O.C.G.A. § 51-2-5, an employer is liable for the negligence of an independent contractor in the listed six specific situations.

Plaintiffs' claim for willful interference with remains and intentional mishandling of a corpse, however, does not qualify as a negligence claim. Thus, O.C.G.A. § 51-2-5 is inapplicable to

this claim, and there is no basis for holding Wallis-Wilbanks liable for the alleged intentional actions of Tri-State and the Marshes.  Further, the employees of Wallis-Wilbanks never willfully or intentionally interfered with human remains or mishandled a corpse.  (See R. Wilbanks Aff. ¶ 15).  Accordingly, Wallis-Wilbanks should be granted summary judgment on the Plaintiffs' intentional mishandling claim.

To understand Plaintiffs' nondelegable duty allegations with respect to the remaining negligence claims, the statute at issue, O.C.G.A. § 51-2-5, must first be examined.

> An employer is liable for the negligence of a contractor:
>
> (1)  When the work is wrongful in itself or, if done in the ordinary manner, would result in a nuisance;
>
> (2)  If, according to the employer's previous knowledge and experience, the work to be done is in its nature dangerous to others however carefully performed;
>
> (3)  If the wrongful act is the violation of a duty imposed by express contract upon the employer;
>
> (4)  If the wrongful act is the violation of a duty imposed by statute;
>
> (5)  If the employer retains the right to direct or control the time and the relation of master and servant so that an injury results which is traceable to his interference; or

> (6)   If the employer ratifies the unauthorized
>       wrong of the independent contractor.

O.C.G.A. § 51-2-5.

Plaintiffs appear to rely on subsections (2), (3) and (4) in support of their position that Wallis-Wilbanks should be liable for the alleged negligence of Tri-State Crematory.  First, Plaintiffs contend that the handling of human remains is inherently dangerous and, therefore, a nondelegable duty.  Plaintiffs, however, overlook Georgia courts' construction of this section.  "Georgia courts have held that work is not 'dangerous to others, however carefully performed' if the danger results from doing the work in an unsafe manner when there is a safe way of doing the work."  Horn v. C.L. Osborn Contracting Co., 591 F.2d 318, 320 (5th Cir. 1979)(citations omitted).  Examples of intrinsically dangerous work "include blasting operations, fumigation of premises, spraying from airplanes, the escape of a dangerous animal, emitting sparks from a railway engine, [and] raising an embankment which is unguarded."  Community Gas Co. v. Williams, 87 Ga. App. 68, 80, 73 S.E.2d 119, 129 (1952) (citations omitted).

The Eleventh Circuit has examined this issue in the context of electricity:

In Gillespie, the Georgia Court of Appeals stated

> [w]e are unwilling to hold that electricity is
> a substance so inherently dangerous that a

9929012                          45

> power company may not contract for the
> building of power lines with an independent
> contractor and absolve itself from liability
> for an injury which occurs solely because of
> the negligence of such independent contractor
> in the doing of the work.

49 Ga. App. at 794, 176, S.E. at 789.

In this case, handling or cremation of a decedent is not dangerous to others if carefully performed. As Dr. Kris Sperry, Georgia's Chief Medical Examiner, testified, embalmed bodies provide no health and safety hazard. (Sperry Depo. p. 278). As for unembalmed bodies, "unless one cuts oneself while contaminated with body fluids from someone, say who has AIDS or hepatitis B or hepatitis C," there is no biohazard. (Id. pp. 278-279). "[P]eople think that there's, you know, a miasma that exudes off of dead bodies and that's going to, you know, come — make someone come down with infectious diseases and that's ridiculous." (Id. p. 279); See Walton v. United States, 484 F. Supp. 568, 575 (S.D. Ga. 1980)("Although the handling of the dead merits special care in view of the sanctity of the remains to living family members, I cannot conclude that the transfer of a body is in 'its nature dangerous to others however carefully performed.'") (citations omitted). Because cremation is not in its nature dangerous to others however carefully performed, Plaintiffs cannot rely on O.C.G.A. § 51-2-5(2) to create a nondelegable duty.

Second, Plaintiffs allege that the duty to handle the human remains is nondelegable because it is a duty imposed by statute. Plaintiffs do not identify the statute that they are relying on. Such a statutory duty, however, must be clearly stated.   For example, a nondelegable duty of the owner or occupier of land to an invitee is created in O.C.G.A. § 51-3-1 which provides as follows:

> Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.

See FPI Atlanta, L.P. v. Seaton, 240 Ga. App. 880, 886, 524 S.E.2d 524, 530 (1999) ("O.C.G.A. § 51-3-1 imposes a personal nondelegable duty upon the landlord to keep the premises and approaches safe when it retains possession and control.").

An examination of the applicable statutes governing funeral homes and crematories shows that no such personal and nondelegable duty exists.  See O.C.G.A.  § 43-18-1 through 43-18-75.   Instead, the Georgia Board of Funeral Service "may adopt and enforce such rules as may be reasonable and necessary to provide for the sanitary disposal of dead human bodies and prevent the spread of disease and to protect the health, safety and welfare of the people of this state."  O.C.G.A. § 43-18-72(b).   Further, the Board is

authorized to "fix and prescribe standards of sanitation to be observed in the embalming of dead human bodies or cremation of dead human bodies." O.C.G.A. § 43-18-23(4). This same Board of Funeral Service, although aware of Tri-State's operations and unlicensed status after 1994, did not stop Tri-State from cremating bodies. (Massey Depo. pp. 15, 88-89, 165). In contrast, these statutory provisions do not place any affirmative, nondelegable duty on funeral homes with respect to cremation by a separate entity.

Plaintiffs hint that a nondelegable duty exists because of the necessity of protecting the health and safety of the public. O.C.G.A. § 43-18-2 places this burden on the state, not individual funeral homes. See O.C.G.A. § 43-18-2 ("It is declared that this article shall be deemed an exercise of the health powers of the state for the prevention of the spread of infectious, communicable, and contagious diseases and for the protection of the sanitation, health and welfare of the people of this state . . ."). Compare Williams v. Dept. of Corrections, 224 Ga. App. 571, 481 S.E.2d 272 (1997)(State of Georgia has a statutory, nondelegable duty to protect the health and safety of prisoners in its custody.)

Moreover, Plaintiffs reference the health hazard issue to support a claim of negligence per se against the funeral homes, even though Plaintiffs are not seeking damages for any health hazard but for failure to cremate their decedents. "'In

determining whether the violation of a statute or ordinance is negligence *per se* as to a particular person, it is necessary to examine the purposes of the legislation and decide (1) whether the injured person falls within the class of persons it was intended to protect and (2) whether the harm complained of was the harm it was intended to guard against.'" Horney v. Panter, 204 Ga. App. 474, 476, 420 S.E.2d 8, 10 (1992)(quoting Potts v. Fidelity Fruit & Produce Co., 165 Ga. App. 546, 547, 301 S.E.2d 903, 904 (1983)).

First, Plaintiffs have not referenced any statute or ordinance Wallis-Wilbanks has violated.  Second, Plaintiffs, family members of decedents, do not fall within the class of persons this health hazard statute was intended to protect.  These Plaintiffs do not participate in the care, burial or cremation of dead bodies and are, therefore, not subject to any possible health risk from the bodies.  Moreover, these Plaintiffs did not spend time at the Tri-State property, where the uncremated bodies were located.  Third, Plaintiffs are not complaining in this lawsuit of harm from any health hazard.  Finally, the alleged improper handling of the decedents is by the Tri-State Defendants, not Wallis-Wilbanks. (See R. Wilbanks Aff. § 15).  For these reasons, Plaintiffs' negligence per se argument is without merit.

Accordingly, Plaintiffs have failed to show any applicable

statutory, nondelegable duty for funeral homes with respect to the cremations by Tri-State. For these reasons, Wallis Wilbanks should be granted summary judgment on all of Plaintiffs' negligence claims.

**D.   Alternatively, Wallis-Wilbanks is entitled to summary judgment as to these Plaintiffs' claims, as the occurrences in this case were not foreseeable.**

*i.   Foreseeability generally*

This Court has certified a class on four claims, two of which are, "negligence" and "negligent interference with remains and mishandling of a corpse." Both of these claims involve general principles of negligence, which "consists of exposing someone to whom a duty of care is owed to a foreseeable, unreasonable probability of harm." Amos v. City of Butler, 242 Ga. App. 505, 506 (2000). To succeed in proving their case, Plaintiffs must present specific facts establishing a breach of duty, as well as other elements of negligence, and may not rest upon generalized allegations. Davis v. Blockbuster, Inc., 258 Ga. App. 677, 679 (2002). Regardless of whether Tri-State was Wallis-Wilbanks's agent or an independent contractor, the actions of Tri-State were wholly personal to Tri-State, see Hobbs v. Principal Financial Group, Inc., 230 Ga. App. 410 (1998), and Plaintiffs' negligence claims fail because Tri-State's acts were unforeseeable as a matter

of law.

As succinctly stated in <u>Amos v. City of Butler</u>, <u>supra</u>:

> Foresight requires the ability to anticipate a
> risk of harm from the conduct in some form.
> Thus, the legal duty to exercise ordinary care
> arises from the foreseeable, unreasonable risk
> of harm from such conduct.  Negligence is
> predicated on what should be anticipated,
> rather than on what happened, because one is
> not bound to anticipate or foresee and provide
> against what is unlikely, remote, slightly
> probable, or slightly possible.

242 Ga. App. at 506 (internal citations omitted)(emphasis added).

In this case, Plaintiffs' refrain is seductive: it focuses on the unimaginable horror of what happened at Tri-State.  But a determination of "what happened" is only a part of the required analysis.  "What happened" may be enough to establish a claim against the Tri-State Defendants, but its "unimaginable" attribute defeats any claim against the Funeral Homes.  Indeed, it is beyond chance that the criminal acts and omissions of the Tri-State Defendants were not likely or probable.  Even the possibility of such occurrence was remote or, as the spontaneous reactions testify to, "unimaginable".

In order to hold the Funeral Home Defendants liable, it must be shown "either that the act complained of was the sole occasion of the injury, or that it put in operation other causal forces, such as were the direct, natural, and probable consequences of the

original act, or that the intervening agency could have reasonably

been anticipated or foreseen by the [Funeral Home Defendants] as

the original wrongdoer[s]." <u>Stapleton v. Amerson</u>, 96 Ga. App. 471,

472 (2d), 100 S.E.2d 628 (1957).

> Negligence is not actionable unless it is the
> proximate cause of the injury complained of.
> 'The question of proximate cause depends upon
> the facts of each particular case, and, in
> ascertaining in a particular case what was the
> proximate cause of the injury, the conclusion
> reached depends upon whether the injury
> alleged was such a natural and probable
> *consequence*, under the circumstances of the
> case, as that it might and ought to have been
> foreseen by the wrongdoer as likely to ensue
> from his act.'   '(A) wrongdoer is not
> responsible for a consequence which is merely
> possible, according to occasional experience,
> but only for a consequence which is probable,
> according to ordinary and usual experience.
> The nature and probable consequences are those
> which human foresight can foresee, because
> they happen so frequently that they may be
> expected to happen again.   The possible
> consequences are those which happen so
> infrequently that they are not expected to
> happen again.   A man's responsibility for his
> negligence must end somewhere.'

<u>Rustin Stamp &c. v. Ray Bros.</u>, 175 Ga. App. 30, 31-32 (1), 332

S.E.2d 341  (1985).

> "All the past is a part of the cause of every
> present effect.   The courts can deal with that
> great body of cause only as it relates to
> human activity; and a particular court dealing
> with a particular case must as a practical
> *necessity* isolate the activities nearby to the
> effect in question, and from these must make
> the       juridic       determination       of

> responsibility.... [T]o judge the transaction
> according to the natural probabilities which
> men's minds take as the basis for passing
> judgment upon the course of human affairs, it
> may appear that causes other than the
> negligent one referred to so preponderated in
> bringing about the result as to lead us to
> say, from a human point of view, that the
> injury was just as likely to have ensued (with
> only its details somewhat varied, perhaps) if
> the negligent thing had not occurred.  In such
> cases we exempt the author of the negligence
> from liability."  Atlantic Coast Line R. Co.
> v. Daniels, 8 Ga. App. 775, 779-780 (70 SE
> 203) (1911).

Jacobs v. Taylor, 190 Ga. App. 520, 525-6 (1989).

The unforeseeability of the Tri-State Defendants' criminal acts and omissions is not just intuitive.  From the above quote from Jacobs can be gleaned several judicial standards that demonstrate how to evaluate, as is necessary, not only what happened but also "whether the facts measure up to the legal standard set by precedent", Coleman, 260 Ga. at 570, i.e., whether what happened was foreseeable.  Those standards are:  "put in operation";  "direct, natural and probable consequences"; "reasonabl[e]";  "merely possible, according to occasional experience";  "probable, according to ordinary and usual experience";  "those [consequences] which human foresight can foresee, because they happen so frequently that they may be expected to happen again";  "possible consequences...which happen so infrequently that they are not expected to happen again".  Jacobs,

190 Ga. App. at 525-26.   To this list could be added other standards utilized in the context of legal analysis of foreseeability:   "inquiry...answered in accordance with common sense and common understanding"; "in the usual, ordinary, and experienced course of events"; "circumstances as that the usual course of nature should seem to have departed from"; "mischief is attributable to the original wrong"; and "according to the usual experience of mankind".   Cope v. Enterprise Rent-a-Car, 250 Ga. App. 648, 651 (2001) (quoting Southern R. Co. v. Webb, 116 Ga. 152 (1902)).   As applied, these standards demonstrate that the Tri-State Defendants' criminal acts and omissions were clearly unforeseeable.

### a.   "put in operation".

As a group, the Funeral Home Defendants' act of hiring Tri-State in the first place certainly cannot be said to have "put in operation" what happened, i.e., Tri-State's criminal failure to cremate bodies entrusted to it.   At the absolute most, the Funeral Homes might, by entrusting the bodies to Tri-State, have furnished only the condition or occasion of the injury.   It is black-letter law that such acts do not constitute proximate cause.   Whitaker v. Jones, etc. Co., 69 Ga. App. 711(1) (1943).

b.   "direct, natural and probable consequences";
"reasonable".

The Funeral Home Defendants' act of hiring Tri-State was far removed from the subsequent criminal treatment of the bodies by Tri-State, and that treatment, as evidenced by the undisputed shock to everyone upon its discovery, was anything but natural and probable and reasonable.

c.   "merely possible, according to occasional
experience" vis-à-vis "probable, according to
ordinary and usual experience."

Even the Plaintiffs must admit that what happened at Tri-State was unprecedented.  Some would even question its possibility; no one would embrace its probability, according to "ordinary and usual experience".

iv.  "those [consequences] which human foresight can foresee,
because they happen so frequently that they may be
expected to happen again" vis-a-vis "possible
consequences ...which happen so infrequently that they
are not expected to happen again".

The events at Tri-State are clearly the latter.  The bizarre, unimaginable discovery at Tri-State reflects no "common sense and understanding"; no "usual, ordinary and experienced course of events"; it departed from "the usual course of nature"; it was an unanticipatable "mischief".  It is not "the usual", but, instead, a singular "experience of mankind".

Coupled with the bizarre nature of Tri-State's actions is a

record that demonstrates the absence of any indications that such conduct was taking place.  It is undisputed that for over twenty years, some of the Funeral Homes contracted with Tri-State to perform cremations;  Wallis-Wilbanks utilized Tri-State's independent contractor services for almost 20 years.  It is also undisputed that Wallis-Wilbanks did not control the time, manner or means by which Tri-State operated, so that Tri-State was not its employee, agent or servant.  Importantly, it is also undisputed that the Tri-State Defendants had no criminal or derogatory record, and that Wallis-Wilbanks had no knowledge of any inefficacy in Tri-State's operations or any mistreatment of human remains or any criminal propensity on the part of the Marshes.  Indeed, the information was just the opposite: the Marshes were solid and trustworthy members of the community, ostensibly operating a worthwhile business, and Tri-State consistently represented to Wallis-Wilbanks that the respective cremated remains returned to Wallis-Wilbanks were those of the respective body sent to be cremated at Tri-State.  Plaintiffs have never disputed this certainty, and there was no evidence demonstrating that Tri-State was not operating in a prudent and proper manner.

Plaintiffs have presented no evidence whatsoever that the criminal activity of the Tri-State Defendants could have been reasonably anticipated by Wallis-Wilbanks.  It is well settled that

there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury.  An intervening criminal act of a third party, without which the injury would not have occurred, must be treated as the proximate cause of the injury thus breaking the causal connection between the defendants' alleged negligence and the injury unless the criminal act was a reasonably foreseeable consequence of the defendants' conduct.  <u>Walker v. Hammock</u>, 246 Ga. App. 640, 641-42 (2000).

Plaintiffs have complained that the Tri-State property had junk cars and trash on it and appeared to be in a state of disarray.  Yet regardless of this irrelevant observation, there is no evidence of any inefficacy of operations or any negligent or criminal acts known to exist prior to the discovery in February 2002.  The appellate courts of Georgia have, in many cases, addressed the nature and quality of evidence alleged to create a jury issue on foreseeability.  Based upon this precedent, this Court should not find that junk cars and trash on the property or

disarray foretold the bizarre criminality of Tri-State.[11] While the
Georgia cases address contentions of foreseeability based upon
evidence of prior knowledge of various behaviors or actions, none
of these cases even approaches what happened at Tri-State without
any such prior behavior, much less any prior knowledge by Wallis-
Wilbanks.   What happened at Tri-State was without prior knowledge
of even the possibility of its occurrence, much less its
probability: a solid, trustworthy family operating an efficacious
business for two decades did something that was both aberrant and

---

[11] See Hobbs v. Principal Fin. Group, Inc., 230 Ga. App. 410 (1998)
(lying about personal and professional qualifications on
application, long-term financial difficulties and poor score on
qualifications test do not constitute proof of propensity of
independent contractor to commit any crime, job-related or
otherwise); Fortune v. Principal Fin. Group, 219 Ga. App. 367
(1995)(same); see also, Davis v. Blockbuster, Inc., 258 Ga. App.
677 (2002)(recording of pornography on children's videotape owned
and rented by defendant was a criminal act of a third party that
was not reasonably foreseeable by retailer); Cope v. Enterprise
Rent-a-Car, 250 Ga. App. 648 (2001)(providing defective rental car
may have been a "cause in fact" of renter's being attacked when car
broke down, but it was not proximate cause); Brown v. Mobley, 227
Ga. App. 140, 142-42 (1997)(drunkenness and "threatening gesture
toward the steering wheel" and "I'll kill all of you" threat did
not support foreseeability of front seat passenger's commandeering
of vehicle in "suicidally criminal act before fatal collision");
Morris v. Baxter, 225 Ga. App. 186 (1997)("bored with life ... does
not foretell suicide"); Henderson v. Kroger Co., 217 Ga. App. 252,
253 (1995)("47 prior shopliftings at the store" does not support
foreseeability argument, and intervening act of shoplifting and
flight injuring plaintiff was proximate cause); Simmons v. Dept. of
Human Resources, 213 Ga. App. 98 (1994)(whether girl was
negligently placed and supervised in group home pretermitted; third
parties' criminal act was intervening cause insulating defendants).

bizarre; its like had never happened before. These cases demonstrate that the appellate courts of Georgia have "a problem with [finding] causation because of the extraordinary speculation inherent in the subject of deterrence of men bent upon criminal ventures.'" Fallon v. Metropolitan Life Ins. Co., 238 Ga.App. 156, 158 (1999) (quoting Godwin v. Olshan, 161 Ga. App. 35 (1982)). As the Georgia Court of Appeals has held, "[o]ne is bound to anticipate and provide against what usually happens and what is likely to happen; but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen or what, as it is sometimes said, is only remotely and slightly probable." Rustin Stamp Etc., Inc. v. Ray Bros. Etc., 175 Ga. App. 30, 32 (1985). Without question, what happened at the Tri-State property was well beyond the "unusual and unlikely"; rather, what happened was "unheard of" and highly improbable.

Finally, a very recent case, Griffin v. Fowler, 260 Ga. App. 443 (2003), punctuates the clear state of foreseeability jurisprudence in Georgia. In Griffin, an attorney was accused of a breach of his fiduciary duty to his client for, among other things, failing to warn the client of his concerns about the appointment of a particular trustee to handle certain estate trusts. The court held that, even in a case involving the

heightened obligation of a lawyer to his client, i.e., a fiduciary relationship, foreseeability is still an essential for liability to attach.   The court noted that "there [was] no evidence in the record demonstrating [the lawyer's] awareness of any facts that would lead him to conclude that [the trustee] was untrustworthy." Id. at 448-49.   Indeed, unlike the facts in the case at bar, the court found that, even in the face of the lawyer's suspicions about the trustee, the lawyer could not be held liable for the trustee's "intervening act of making an unauthorized withdrawal from [the plaintiff's] trust."   Id. at 449.

As these cases make clear, the utter lack of foreseeability of the very extraordinary, improbable, and criminal acts and omissions of Tri-State prevent Plaintiffs from maintaining a negligence action against Wallis-Wilbanks.

2.   *Intentional Conduct.*

Plaintiffs have alleged, and the Court has certified, an additional claim for "willful interference with remains and intentional mishandling of a corpse."   Plaintiffs have not and cannot submit any evidence that Wallis-Wilbanks engaged in any conduct which gives rise to such claim.   For purposes of argument, even assuming Plaintiffs have created an issue of fact as to Wallis-Wilbanks's negligence, Plaintiffs' claim of willful or

intentional conduct still must fail.  As the Georgia Court of
Appeals very recently confirmed, "negligence, without more, is not
evidence of 'a reckless disregard of the rights of others,
equivalent to an intentional tort[.]'"  <u>Roddy v. Tanner Medical</u>
<u>Center, Inc.</u>, __ Ga. App. __, 2003 WL 21525268, *2 (Ga. App.) (July
8, 2003).

     Likewise, Plaintiffs have not and cannot submit any evidence
tending to show that Wallis-Wilbanks engaged in any "willful"
conduct.

> Wilful conduct is based on an actual intention
> to do harm or inflict injury; wanton conduct
> is that which is so reckless or so charged
> with indifference to the consequences as to be
> the equivalent in spirit to actual intent.
> Wilful misconduct, or wilful failure or
> refusal to perform a duty required by statute,
> is more than negligence or even gross
> negligence; it involves conduct of a criminal
> or quasi-criminal nature, the intentional
> doing of something, either with the knowledge
> that it is likely to result in serious injury,
> or with the wanton and reckless disregard of
> its probable consequences.

     <u>Muller v. English</u>, 221 Ga. App. 672, 676, 472 S.E.2d 448
(1996)(internal citations and quotations omitted).  There is no
evidence of any sort showing an intention to do harm or inflict
injury upon Plaintiffs.  To the contrary, the evidence shows
Wallis-Wilbanks did not engage in any conduct which might be
construed as the interference with remains or the mishandling of a

corpse.   The positive, unequivocal sworn statement by Richard Wilbanks clearly demonstrates that neither he nor employee of Wallis-Wilbanks ever, intentionally or otherwise, interfered with human remains or mishandled a corpse.   (R. Wilbanks Aff. ¶ 15). Moreover, neither Richard Wilbanks nor any other employee of Wallis-Wilbanks ever authorized, ratified or otherwise approved the improper   cremation   or   adulteration   of   human   remains,   the interference with human remains or mishandling of any corpse by Tri-State.   (Id. at ¶ 16).

In light of the complete absence of any evidence showing any willful or intentional conduct on the part of Wallis-Wilbanks or any of its employees, Plaintiffs' claim for willful interference with remains and intentional mishandling of a corpse fails as a matter of law.

### CONCLUSION

This lawsuit arises from the morbid, the odd, the bizarre, and, perhaps, the criminal acts of one set of Defendants.   Those Defendants   are   not,   however,   the   Funeral   Home   Defendants. Moreover, those Defendants do not include Wallis-Wilbanks.   For the reasons set for at length herein, Wallis-Wilbanks Funeral Home, LLC respectfully requests that this Court grant summary judgment in its favor as to all claims of Plaintiff Kerry Oliver and the non-

9929012                                    62

contract claims of Plaintiffs Wood, Irwin, Kitchens, DeGraw and Bradley.

Respectfully submitted this 10th day of October, 2003.

**HAWKINS & PARNELL, LLP**

4000 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, Georgia 30308-3243
404-614-7400

T. Ryan Mock, Jr.
Georgia Bar No. 515165
C. Shane Keith
Georgia Bar No. 411317
**Counsel for Defendants Carriage Funeral Services, Inc. and Wallis-Wilbanks Funeral Home, LLC**

**BRINSON, ASKEW, BERRY, SEIGLER, RICHARDSON & DAVIS, LLP**

The Omberg House
615 West Fifth Street
P.O. Box 5513
Rome, Georgia 30162-5513
706-291-8853

Robert M. Brinson
Georgia Bar No. 082900
J. Anderson Davis
Georgia Bar No. 311077
**Lead and Liaison Counsel for Funeral Home Defendants**



ORIGINAL
FILED IN CLERK'S OFFICE

OCT 1   2003

[signature]
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

IN RE: TRI-STATE                )
CREMATORY LITIGATION            )        MDL DOCKET NO. 1467
                                )
                                )

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS NO GENUINE ISSUE IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT OF DEFENDANT WALLIS-WILBANKS FUNERAL HOME, LLC

**COMES NOW** Wallis-Wilbanks Funeral Home, LLC, a Defendant in the above-captioned civil action, and, pursuant to L.R. 56(B)(1), hereby files its Statement of Material Facts as to Which There Exists No Genuine Issue in Support of its Motion for Summary Judgment filed herewith.  Defendant respectfully shows this Court:

1.   In 1973, SCI Georgia bought what was then called Wallis & Sons Funeral Home from its original owner J.D. Wallis, Sr. (November 13, 2002 Deposition of Richard Wilbanks p. 9).

2.   SCI Georgia owned that funeral home until it was sold to Carriage Funeral Services, Inc. on March 20, 1992. (R. Wilbanks Depo. pp. 10-11).

3.   Richard Wilbanks began working at Wallis & Sons Funeral Home (the precursor to Wallis-Wilbanks) in 1962, when he returned to LaFayette, Georgia after serving in the military. (R. Wilbanks Aff. ¶ 19).

9936433                          1

*539*

4.  In 1963, Richard Wilbanks was first licensed, in Georgia, as a funeral director. (R. Wilbanks Depo. p. 45; R. Wilbanks Aff. ¶ 20).

5.  With the exception of a five-year period between 1982 and 1987 (where he worked as a funeral director at Lane Funeral Home, LaFayette Chapel), Richard Wilbanks has worked for, managed or had an ownership interest in Wallis & Sons and Wallis-Wilbanks since 1962. (R. Wilbanks Depo. pp. 11-14).

6.  The first contact Richard Wilbanks had with any member of the Marsh family was in or around the end of 1973, when he began to use the grave opening and closing services of Ray Marsh. (R. Wilbanks Aff. ¶ 21).

7.  At some point in 1982 or 1983 Ray Marsh informed Richard Wilbanks that he intended to open a crematory. (R. Wilbanks Aff. ¶ 22).

8.  In 1983, shortly after the crematory opened, Mr. Wilbanks was invited by Ray Marsh to witness a cremation, which he did. (R. Wilbanks Aff. ¶ 23).

9.  Wallis & Sons (while owned by either SCI or Carriage) utilized the services of Tri-State between 1983 and 2001 and Wallis-Wilbanks Funeral Home, LLC used the services of Tri-State between March 21, 2001 and January 30, 2002. (R. Wilbanks Aff. ¶ 24; Defendant Wallis-Wilbanks Funeral Home,

LLC'S, Responses to Plaintiffs' First Master Set of Interrogatories to Defendants # 2).

10. Plaintiff Kerry Oliver is the son of Thomas Milbern Oliver, whose funeral arrangements were handled by Wallis-Wilbanks in 1994. (October 30, 2003 Deposition of Kerry Oliver p. 14).

11. Thomas Oliver died on August 12, 1994. (K. Oliver Depo. p. 27).

12. Plaintiff Oliver did not "play any role whatsoever" in communicating with Wallis-Wilbanks regarding the arrangements of any aspect of his father's cremation. (K. Oliver Depo. p. 14).

13. The arrangements were handled by his mother, who is alive, and brother, Richard. (K. Oliver Depo. pp. 14-15).

14. After his father's funeral in 1994, the ashes were buried. (K. Oliver Depo. p. 18).

15. After the news of the discoveries at Tri-State, those remains were exhumed and allegedly taken to the GBI for testing. (K. Oliver Depo. pp. 34, 49-50).

16. Some unknown person allegedly employed by the GBI or some other governmental entity supposedly reported to Oliver the generic finding of yet another unknown person that the remains appeared to be composed of "human teeth and bone,"

as opposed to concrete dust and rock. (K. Oliver Depo. p 51).

17. Plaintiff Oliver's father's body is not one of those found and identified by the GBI on the grounds of the Tri-State Crematory. (K. Oliver Depo. p. 20).

18. Plaintiff Alex Kitchens retained Wallis-Wilbanks to handle the disposition of his father's body, Dr. Sterling Burt Kitchens, who died on February 14, 2000. (November 12, 2003 Deposition of Alex Shield Kitchens, p. 6).

19. Plaintiff Kitchens coordinated the arrangements for the handling of his father's final disposition directly with Richard Wilbanks. (A. Kitchens Depo. p. 16).

20. Plaintiff Kitchens executed an "Authorization for Cremation and Disposition," which clearly identified "Marsh Crematory" as the provider of cremation services. (A. Kitchens Depo. pp. 22-23; Defendants' Exhibit 222).

21. After the discoveries on the Tri-State property, Plaintiff Kitchens had the remains of his father exhumed from the LaFayette Cemetery. (A. Kitchens Depo. p. 40).

22. Plaintiff Kitchens turned the remains over to the GBI for testing, and was informed that the remains were "consistent with human remains." (A. Kitchens Depo. p. 40).

23.   Jackie DeGraw and Virginia Bradley are the daughters of Ann
      Hawkins.  (September 29, 2003 Deposition of Virginia Bradley,
      p. 5; September 29, 2003 Deposition of Jackie DeGraw, p. 7).

24.   The funeral and cremation arrangements for the body of Ann
      Hawkins were handled by Wallis-Wilbanks, on or about March
      31, 1997, the day after the death of Ms. Hawkins. (V. Bradley
      Depo., pp. 17, 20-21; J. DeGraw Depo., pp. 17, 22).

25.   Both Ms. DeGraw and Ms. Bradley met with Richards Wilbanks
      on March 31, 1997, where they were both signatories to
      Statement of Funeral Goods and Services Selected.  (See
      Defendants' Exhibit 717).

26.   On that same date, both Ms. DeGraw and Ms. Bradley executed
      an Authorization for Cremation and Disposition, which clearly
      authorized "Marsh" crematory to cremate the body of Ms.
      Hawkins.  (See Defendants' Exhibit 718).

27.   The purported cremains of Ms. Hawkins were returned to her
      family within a few days of the "cremation."  (J. DeGraw
      Depo., p. 28).

28.   Those cremains were then buried at Crest Lawn Cemetery with
      the cremains of John Hawkins, who had died and been cremated
      in September 1994 and whose cremains had been maintained to
      allow for a joint interment.  (J. DeGraw Depo., p. 28).

29.     The cremains returned to Ms. DeGraw and Ms. Bradley and purported to be those of Ann Hawkins, remained buried in Crest Lawn until these Plaintiffs learned of the discoveries at Tri-State and they were notified of a DNA match. (V. Bradley Depo., p. 47).

30.     Ms. DeGraw and Ms. Bradley, as well as their sister Tina Russell, provided DNA samples to the GBI. (V. Bradley Depo., p. 28; J. DeGraw Depo., p. 17).

31.     In July 2002, the GBI notified Ms. DeGraw that there had been a DNA match and the "body" of Ann Hawkins had been located on the Tri-State grounds. (V. Bradley Depo., pp. 31, 46; J. DeGraw Depo., p. 30).

32.     At that time, Ms. DeGraw and Ms. Bradley, and their brother Herbert Duncan, exhumed the cremains purported to be those of Ann Hawkins. (V. Bradley Depo., p. 47;).

33.     Ms. DeGraw and Ms. Bradley attempted to return these remains to the GBI, but were told to "throw them away" as the GBI was no longer testing cremains. (J. DeGraw Depo., pp. 46-47).

34.     Ms. DeGraw maintained possession of the cremains. (J. DeGraw Depo., p. 47).

35.     In April 2003, the GBI released the "body" of Ann Hawkins to W.L. Wilson & Sons Funeral Home. (V. Bradley Depo., p.48).

9936433                                6

36.   At that time, these Plaintiffs were allowed to see their mother's "body." (V. Bradley Depo., p. 48; J. DeGraw Depo., pp. 40-42).

37.   All that was located and identified by the GBI was three bones, which were "re-cremated." (V. Bradley Depo., p. 48; J. DeGraw Depo., pp. 40-42).

38.   Plaintiff DeGraw maintains custody and control of those cremains. (V. Bradley Depo., p. 48; J. DeGraw Depo., pp. 40-42).

39.   Plaintiff Llewellyn Wood, Jr. is the surviving spouse of Ann Bolling Jones Jones, who died on August 27, 2000.  (June 16, 2003 Deposition of Llewellyn Wood, Jr. pp. 6, 8).

40.   Plaintiff Wood's son, Chief Judge Bo Wood, handled the selection of Wallis-Wilbanks as the funeral home.  (L. Wood Depo. p. 10).

41.   After his mother's death, Judge Wood first contacted Marsh Crematory about performing a cremation before he contacted Wallis-Wilbanks, because Judge Wood "knew" Brent Marsh.  (L. Wood Depo. pp. 10, 15).

42.   Judge Wood then called Wallis-Wilbanks and asked that they pick up the body from the hospital and handle the cremation for the family.  (L. Wood Depo. p. 18).

43.   On the Monday following his wife's death, Plaintiff Wood went

to Wallis-Wilbanks to finalize the arrangements.  (L. Wood
Depo. p. 15).

44.    Plaintiff Wood's name is included on the statement of funeral
services provided by Wallis-Wilbanks, but he did not sign it.
(Defendants' Exhibit 446).

45.    Plaintiff Wood testified that Richard Wilbanks told him that
his wife's body would be cremated at "Marsh" Crematory.  (L.
Wood Depo. 27).

46.    Plaintiff  Wood  did  not,  however,  sign  the  cremation
authorization form bearing the Tri-State Crematory name.  (L.
Wood Depo. p. 28).

47.    Rather, that document was executed by his son, Judge Wood.
(Defendants' Exhibit 447).

48.    When  Plaintiff  Wood  obtained  the  remains  from  Wallis-
Wilbanks, they were enclosed in a black plastic box.  (L.
Wood Depo. p. 31).

49.    Plaintiff Wood honored the wishes of his wife and took her
ashes directly home and scattered them under a tree in their
yard. (L. Wood Depo. pp. 31-32).

50.    When Plaintiff Wood spread the ashes, nothing struck him as
eventful and the ashes consisted of mostly fine powder, along
with some small lumps.  (L. Wood Depo. pp. 35-37).

51.   Plaintiff Wood no longer has possession of the black box
      because his son, Bo, turned it over to some law enforcement
      agency to be tested and it is now in the process of being
      returned to Judge Wood.  (L. Wood Depo. p. 32).

52.   Plaintiff Wood does not know the results of any testing
      performed on the box.  (L. Wood Depo. p. 37).

53.   The body of Ann Wood has not been identified as one of the
      bodies recovered at the Tri-State Crematory.  (L. Wood Depo.
      p.  37).

54.   Mr. Wood and his son, Bo, both submitted DNA samples for
      testing.  (L. Wood Depo. pp. 38-39).

55.   Plaintiff Wood obtained a list of unidentified bodies from
      his   son,   which   contained   detailed   explanations   and
      descriptions of the unidentified bodies.  (L. Wood Depo. pp.
      39-40).

56.   Mr. Wood went through those unidentified bodies and could not
      find one that matched his wife.  (L. Wood Depo. pp. 39-40).

57.   Plaintiff Robert Rhett Irvin is the son of Earline Irvin,
      whose funeral arrangements were handled by Wallis-Wilbanks
      upon  her  death  on  February  4,  2001.    (June  3,  2003
      Deposition of Robert Rhett Irvin pp. 5, 11).

58.    Plaintiff Irvin, although not a signatory to a contract, made the arrangements for his mother's cremation with Wallis-Wilbanks. (R. Irvin Depo. pp. 41-42).

59.    Plaintiff Irvin did execute an authorization allowing for the cremation of his mother's body, which clearly stated that "Marsh Crematory" would be providing the cremation services. (R. Irvin Depo. p. 45, 47).

60.    After he received the remains identified as his mother's, Plaintiff mailed the remains to his sister in Ontario, California, where a funeral was held and the remains were interred. (R. Irvin Depo. pp. 33-36).

61.    Those remains have not been removed or tested in any manner. (R. Irvin Depo. p. 36).

62.    Plaintiff Irvin's mother's body is not one of those found and identified by the GBI.  (R. Irvin Depo. p. 32).

63.    Further, Plaintiff Irvin submitted DNA sample to the GBI for testing and has been informed that his DNA is not a match to any of the remaining unidentified bodies. (R. Irvin Depo. pp. 32-33).

64.    On February 15, 2002, uncremated remains from the 1997-2002 era were discovered at the Tri-State location.  (Second Aff. of Kris Sperry, ¶¶ 4, 6-9).

65.   Three hundred and thirty-four sets of human remains were found at Tri-State and 211 of those sets of remains have been identified.   According to Dr. Kris Sperry, Chief Medical Examiner of the State of Georgia, "based upon the scientific evidence analyzed to date . . . these bodies arrived at Tri-State Crematory no earlier than 1997." (Second Aff. of Kris Sperry ¶ 2).

66.   Dr. Sperry's opinion is based upon his analysis of the methodology by which these bodies were placed in mass graves, vaults and elsewhere on the property, forensic identification of the bodies and DNA test results." (Second Aff. of Kris Sperry ¶ 4-9).

67.   The Marshes were solid citizens of the community (Depo. of Walter Wilson, Walker County Coroner ("Coroner Wilson Depo.") at 54-5); they were known to be responsible and progressive and enjoyed a good reputation in the community and, indeed, with all who knew them.   They were "[a] good family, just well-respected, well-thought-of family."   (Walker County Sheriff Wilson Depo. at 25-27; see also pp. 183-4, 230). They were law-abiding. (Id. at 230).

68.   Before 2002, the Sheriff never had occasion to talk to funeral directors or funeral home employees about Tri-State or the Marshes.   (Id. at 218).

69.  Ray Marsh, Brent's father, worked many years for the post
     office and then became self-employed in the grave digging
     business (C. Marsh Depo. at 10), and later (1982) in the
     crematory business.  He had enjoyed a good reputation in the
     community for 30-35 years (former Coroner William E. McGill
     Depo. at 13, 28; Coroner Wilson Depo. 54-55.)

70.  He was trusted.  (McGill Depo. at 28-9).

71.  He was a member of the LaFayette Optimist Club (C. Marsh
     Depo. at 124) and served on the board of the Department of
     Family and Children Services (Id.).

72.  In 1992, Ray Marsh ran for coroner (Id.); although he did not
     win, he amassed 46% of the vote.

73.  In 1996, the county government declared "Ray Marsh Day" in
     the elder Mr. Marsh's honor.  (Id. at 115).

74.  Clara Marsh came to Walker County in 1960 to begin a teaching
     career.  (Id. at 17, 107).

75.  She served on numerous civic, charitable and political
     boards.  (See, generally, C. Marsh Depo., 106-121).

76.  She was named Walker County Citizen of the Year (Id. at 114)
     and Georgia Woman in History (Id.).

77.  While in high school in Walker County, Rhames LaShae Marsh,
     Brent's sister, ran track and served on the yearbook staff.
     (R.L. Marsh Depo. at 96).

78.   She graduated in 1988 and attended Dalton College for two years (Id. at 12).

79.   She teaches Sunday school. (Id. at 97-8).

80.   She, too, served on boards and in other leadership capacities. (Id. at 13, 97).

81.   Vanessa Lynn Marsh, Brent's wife, is well educated and actively employed. (V. Marsh Depo. at 8, 63).

82.   Brent Marsh was an A and B student at LaFayette High School (B. Marsh Depo. at 82), from which he graduated in 1991.

83.   In 1990, he attended the National Young Leaders Conference in Washington, D.C. (C. Marsh Depo. at 124).

84.   He attended the University of Tennessee-Chattanooga on a football scholarship (Id. at 14) and studied business management (Id. at 15).

85.   In September, 1997, he married Vanessa (Id. at 95) at the lake on the Tri-State property (C. Marsh Depo. at 116; V. Marsh Depo. at 60-61).

86.   He belongs to the New Home Missionary Baptist Church (B. Marsh Depo. at 122), where he has served as church treasurer, trustee and, since 2001, deacon in training. (Id. at 125).

87.   He joined the LaFayette Rotary Club in 2001, and he has been an at-large member of the local Democratic party for several years. (Id. at 122-3).

9936433                              13

88.   He coached youth teams at the LaFayette Municipal Recreation Center - three years of basketball and one year of football. (Id. at 126).

89.   There is no evidence of any arrest of Brent Marsh prior to February 2002. (V. Marsh Depo. at 71).

90.   The Tri-State property consisted of the crematory, the Ray and Clara Marsh home, the Brent Marsh home, and a lake and recreation area.   (See generally map of Tri-State property).

91.   The property was visited and used by the public on a regular basis.   A church group visited Tri-State in the 1980's. (R.L. Marsh Depo. at 108).

92.   Frequently, people were invited and permitted to fish at the property (B. Marsh Depo. at 89; C. Marsh Depo. at 116).

93.   In 1997 or 1998, the Marshes hosted a "youth day" at the lake with several hundred children in attendance (B. Marsh Depo. at 93).

94.   In 1997, Brent's parents hosted his and Vanessa's wedding and reception on the property where at least 150 people were invited (B. Marsh Depo. at 95; C. Marsh Depo. at 116; V. Marsh Depo. at 10-14).

95.   The Walker County coroner was familiar with Tri-State and had been inside the crematory itself (Coroner Wilson Depo. at 20-32).

96.    Officials in Walker County had never heard of anything
       "derogatory" about the crematory or the Marshes prior to
       February, 2002.  (Sheriff Wilson Depo. at 27; Coroner Wilson
       Depo. at 29-30, 92).

97.    Tri-State was being operated with the knowledge and
       permission of state and local authorities, and had been so
       operating for twenty years without incident.  Georgia State
       Board of Funeral Services Inspector John Massey testified
       that Tri-State was not required to have a license as it was
       not open to the public.  (Depo. of John Massey ("Massey
       Depo."), pp. 23-24).

98.    Tri-State was not required to have a license in 1993.
       (Massey Depo., p. 57).

99.    Only in 2002 were crematories which were not open to the
       public required to have a license.  (Massey Depo., p. 61).

100.   The record contains instances of issues involving licensure
       and reports which were investigated, but there is no evidence
       of these matters being known by the Funeral Homes.  (Massey
       Depo., at 28-38; 56-57; 60-64).

101.   Wallis-Wilbanks Funeral Home, with its various owners and
       under the names Wallis & Sons and Wallis-Wilbanks, contracted
       with Tri-State from 1983 until 2002 to provide cremation
       services.  (R. Wilbanks Aff. ¶¶ 2-10).

102. At no time did Wallis-Wilbanks control Tri-States' hours of operation, method(s) of performing cremations, use of tools and materials and techniques for performing cremations; in all of Wallis-Wilbanks's dealings with Tri-State, Tri-State operated as an independent contractor (R. Wilbanks Aff. ¶¶ 2-10).

103. Neither Tri-State nor the Marshes were employees, agents or servants of Wallis-Wilbanks.  (R. Wilbanks Aff. ¶¶ 2-10).

104. At no time prior to February 15, 2002, did Wallis-Wilbanks or any of its employees have any information, or even suspicion, that any member of the Marsh family had committed any crimes or had any propensity to commit a crime; that Tri-State was improperly performing cremations; that Tri-State had given to anyone any adulterated, commingled or misidentified cremated remains; that Tri-State, willfully, intentionally or otherwise, interfered with human remains or mishandled a corpse; or that Tri-State had on its premises any uncremated bodies (R. Wilbanks Aff. at ¶¶ 8-15).

105. Neither Richard Wilbanks nor any other employee of Wallis-Wilbanks ever, willfully, intentionally or otherwise, interfered with human remains or mishandled a corpse.  (Id. at ¶ 16).

106.    Neither Richard Wilbanks nor any other employee of Wallis-
        Wilbanks ever authorized, ratified or otherwise approved the
        improper cremation or adulteration of human remains, the
        interference with human remains or mishandling of any corpse
        by Tri-State.  (Id. at ¶ 17).

107.    These acts and omissions by Tri-State were to Wallis-
        Wilbanks's detriment. (Id. at 18).


        Respectfully submitted this __10th__ day of October, 2003.

                            **HAWKINS & PARNELL, LLP**


4000 SunTrust Plaza         T. Ryan Mock, Jr.
303 Peachtree Street, NE    Georgia Bar No. 515165
Atlanta, Georgia 30308-3243 C. Shane Keith
404-614-7400                Georgia Bar No. 411317
                            *Counsel for Defendants Carriage*
                            *Funeral Services, Inc. and Wallis-*
                            *Wilbanks Funeral Home, LLC*



                            **BRINSON, ASKEW, BERRY, SEIGLER,**
                            **RICHARDSON & DAVIS, LLP**


The Omberg House            Robert M. Brinson
615 West Fifth Street       Georgia Bar No. 082900
P.O. Box 5513               J. Anderson Davis
Rome, Georgia 30162-5513    Georgia Bar No. 311077
706-291-8853                *Lead and Liaison Counsel for*
                            *Funeral Home Defendants*


9936433                          17