**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.
*Rome*
NOV 13 2003
By: *[signature]* rk
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

IN RE: TRI-STATE          :
CREMATORY LITIGATION      :          **MDL DOCKET NO. 1467**
                     :
_____   :

### FUNERAL HOME DEFENDANTS' RESPONSE TO
### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

COME NOW, Funeral Home Defendants and file this Response to Plaintiffs'

Motion for Partial Summary Judgment, showing the Court as follows:

## I.    INTRODUCTION

Plaintiffs seek partial summary judgment arguing that Tri-State Crematory ("Tri-

State") was the Funeral Home Defendants' agent and that the Funeral Home

Defendants had a nondelegable statutory duty to perform cremations at Tri-State.[1]

They further argue that because Tri-State was not licensed, the Funeral Home

Defendants breached their nondelegable duty and are therefore responsible for Tri-

State's negligence. Plaintiffs' motion should be denied for the reasons set forth herein.

---

[1]  In their motion, Plaintiffs also argue that they are entitled to summary judgment as a matter of
law for "any liability (for actual and punitive damages)" proven against the Defendants. As
noted in the Class Certification Order, "punitive damages are not appropriate for class action
certification in this case." In re Tri-State Crematory Litigation, 215 F.R.D. 660, 679 (N.D. Ga.
2003).

662

First, Plaintiffs conflate the issues of independent contractor and agency. While a finding of an independent contractor relationship is necessary to support Plaintiffs' nondelegable duty argument, O.C.G.A. § 51-2-5, Plaintiffs reject that status.[2]  See Pls.' Mem. at 2 and 3.  They instead argue throughout their brief that Tri-State was the agent of the Funeral Home Defendants.  Even though Plaintiffs have the burden of proof as to any claim of agency, Plaintiffs have not presented any proof in their partial summary judgment brief to show that Tri-State was the agent, under Georgia law, of the individual funeral homes.  See Carter v. Kim, 157 Ga. App. 418, 418, 277 S.E.2d 776, 776  (1981) ("[W]here the existence of any agency is relied upon, the burden rests with the party asserting the relationship.").  Accordingly, Tri-State must be considered an independent contractor with respect to its dealings with the individual funeral homes, and agency is not an issue in Plaintiffs' Motion for Partial Summary Judgment.

Second, to impose a nondelegable duty, Plaintiffs must point to a statute that specifically imposes a precise nondelegable duty on the Funeral Home Defendants. Plaintiffs have failed to point to such a statute, and they have failed to specifically describe the alleged "duty" of the Funeral Home Defendants.

---

[2]  "...[T]he 'independent contractor' status of the Marsh Defendants and Tri-State is without meaning as a matter of law." Pls.' Mem. at 2.

Plaintiffs also gloss over the fact that if any nondelegable duty exists, it is only applicable to negligence claims, specifically Plaintiffs' negligence and negligent interference with remains claims. See O.C.G.A. § 51-2-5.  It has no bearing on any other claim.

Moreover, even Plaintiffs' agency claims fail because they present absolutely no evidence of an agency relationship between Tri-State and the Funeral Home Defendants. See, e.g., J.D. Hill Funeral Homes' Brief in Support of Summary Judgment, pp. 33-37. Furthermore, the Funeral Home Defendants are not responsible for the acts of the Marsh Defendants and Tri-State.

Finally, in the second part of their summary judgment motion, Plaintiffs request that any adverse inference resulting from Brent Marsh's invocation of the Fifth Amendment should also be applied to the Funeral Home Defendants. The Court should also deny Plaintiffs' motion on this point. First, Plaintiffs have not shown that the prerequisites to creating an adverse inference have been met:  showing which questions and answers that any adverse inference would attach to and presenting independent evidence to support an adverse inference.  Second, because the Marsh Defendants are not agents or corporate representatives of the Funeral Home

Defendants, no adverse inference can be imposed against them.   Accordingly,

summary judgment should be denied on this issue.

## II.   ARGUMENT AND CITATION OF AUTHORITY

### A.   PLAINTIFFS' NONDELEGABLE DUTY ARGUMENT FAILS BECAUSE THEY HAVE FAILED TO POINT TO A SPECIFIC STATUTE CREATING A PRECISE NONDELEGABLE DUTY.

Plaintiffs allege that a nondelegable duty of the Funeral Home Defendants to

supervise and/or directly cremate human remains was imposed by Georgia statutes

and regulations.  Plaintiffs' motion on this point should be denied because Plaintiffs

have failed to prove there is a specific statute or regulation which imposes a precise

nondelegable duty on any funeral home defendant.

Moreover, in support for their position, Plaintiffs cite Tennessee, California,

Illinois, New York and Alaska cases construing these states' laws or federal laws,

even though Georgia law governs the issues in this case.  See Plaintiffs'

Memorandum pp. 17-20; Class Certification Order, pp.  28-30.  Certainly, a

California statute has no bearing whatsoever as to whether a nondelegable duty is

created by Georgia statutes or regulations.  Therefore, all of the cases from other

jurisdictions cited by Plaintiffs are simply inapplicable to the facts and Georgia

law of this case.

### 1. Lack Of Statutory Authority To Provide Precise Duty Description Precludes Nondelegable Duty Argument.

Although Plaintiffs argue that the Marsh Defendants are not independent contractors, see Pls.' Mem. at 3, they rely on independent contractor law to support their nondelegable duty argument.[3] Plaintiffs argue that a nondelegable duty was imposed on the Funeral Home Defendants by statute, yet they do not point to a statute that specifically imposes such a precise duty. The general law of independent contractors holds that an employer is generally "not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." O.C.G.A. § 51-2-4; see also Widner v. Brookins, Inc., 236 Ga. App. 563, 564, 512 S.E.2d 405, 406 (1999). There are, however, exceptions to this rule and, under certain circumstances, an employer may be liable for an independent contractor's negligence. See Owens v. Barclays American/Mortgage Corp., 218 Ga. App. 160, 460 S.E.2d 835 (1995); O.C.G.A. § 51-2-5. Plaintiffs rely on the exception that the employer may be liable

---

[3] A finding of an independent contractor relationship is necessary to support Plaintiffs' non-delegable duty argument. O.C.G.A. §51-2-5. While stating that the relationship is one of an agent, Plaintiffs rely on a case involving independent contractor law, Smith v. Poteet, 127 Ga. App. 735, 195 S.E. 2d 213 (1972), and the Restatement (Second) of Agency referring to the negligence of an independent contractor (Pls.' Mem. at 1-2) to argue that the Funeral Home Defendants are liable for the Marsh Defendants and Tri-State's negligence.

for negligence of an independent contractor "[i]f the wrongful act is the violation of a duty imposed by statute." See Pls.' Mem. at 20.

**Georgia case law holds that the statute must be precise in setting forth the duty in order to find a nondelegable duty.** See FPI Atlanta, L.P. v. Seaton, 240 Ga. App. 880, 886, 524 S.E.2d 524, 530 (1999) ("O.C.G.A. § 51-3-1 imposes a personal nondelegable duty upon the landlord to keep the premises and approaches safe when it retains possession to control."); Owens, 218 Ga. App. at 162, 460 S.E.2d at 837 (relying on O.C.G.A. § 44-7-50 in holding that statute does not allow owner to be relieved for liability for wrongful eviction).  Plaintiffs could have even pointed to a specific regulation that places responsibility for overseeing every aspect of the final disposition of a body, yet they failed to do so.  See Perry v. Soil Remediation, Inc., 221 Ga. App. 386, 471 S.E.2d 320 (1996) (reversing summary judgment in favor of defendant on grounds that defendant had a statutory duty to be responsible for transportation of solid waste; duty found in regulation stating that "owner or occupant of any premises . . . *shall be responsible* for the collection and transportation of all solid waste accumulated at the premises") (emphasis added).

Unlike these cases, in which a specific statute or regulation expressly places responsibility or liability for the **exact actions** addressed by the statute or regulation,

Plaintiffs cannot point to any statute or regulation[4] that places responsibility or liability for performing or supervising the cremations in this case on the Funeral Home Defendants. Plaintiffs simply insist—without any citation of authority—that "responsibility for the final disposition by cremation rested squarely with the funeral director." See Pls.' Mem. at 9-10. That statement follows their recitation of various definitions in the Code. **The definitions explain the substantive part of the statute and do not impose any duty on the Funeral Home Defendants to be liable for all acts or omissions of an independent contractor.** Moreover, the definitions do not state that a funeral director or funeral home must directly supervise and be liable for every aspect of a cremation. See Pls.' Mem. at 8. Plaintiffs quote the definition of "practice of funeral directing" to include making arrangements for preparation and transportation of the dead and supervising and directing funeral services.

---

[4] Plaintiffs also cite the following regulatory provision on page 9 of their Memorandum: "A licensed funeral establishment may operate a crematory without a separate crematory license, but must nevertheless abide by all rules and regulations of the Board pertaining to either funeral establishments, crematories or both." Ga. Comp. R. & Regs. 250-6-.01(e), attached to Pls.' Mot. as Exh. 6. Neither does this statute impose a duty on the Funeral Home Defendants. There is no evidence that any funeral home in this case acted in any way to operate Tri-State: no funeral director was in full and continuous charge of Tri-State and no funeral director placed a duplicated of his license at Tri-State. Tri-State operated as a separate entity without direction or control by the Funeral Home Defendants. For these reasons, Plaintiffs cannot prove that Tri-State was operating under the licenses of the individual funeral homes which used Tri-State's cremation services intermittently through the years.

Supervising or overseeing cremation, much less being liable for any negligence by that independent contractor, is not included in that definition or any other definition.

### 2. The Health And Safety Code Does Not Provide Authority For Plaintiffs' Nondelegable Duty Argument.

Plaintiffs attempt to use the Health and Safety Code to create a nondelegable duty on the part of the Funeral Home Defendants, even though such a duty cannot be found in the statutory language. See Pls.' Mem. at 5. Georgia law is clear that the statute must state with specificity that the duty is nondelegable in order to hold the Funeral Home Defendants responsible for Tri-State's negligence. See Perry, supra; Owens, supra; FPI Atlanta, LP., supra. Plaintiffs hint that the Funeral Home Defendants have a nondelegable duty because of the necessity of protecting the health and safety of the public. However, Plaintiffs' argument fails because O.C.G.A. § 43-18-2 specifically places this burden on the state, **not** on individual funeral homes. See O.C.G.A. § 43-18-2; cf. Williams v. Dep't of Corrections, 224 Ga. App. 571, 481 S.E.2d 272 (1997) (State of Georgia has a statutory, nondelegable duty to protect the health and safety of prisoners in its custody).

Moreover, Plaintiffs cannot reference a health hazard issue to support their usage of the statute to create a nondelegable duty or to support a claim of negligence per se against the funeral homes. "In determining whether the violation of a statute

or ordinance is negligence *per se* as to a particular person, it is necessary to examine

the purposes of the legislation and decide (1) whether the injured person falls within

the class of persons it was intended to protect and (2) whether the harm complained

of was the harm it was intended to guard against." Horney v. Panter, 204 Ga. App.

474, 476, 420 S.E.2d 8, 10 (1992) (quoting Potts v. Fid. Fruit & Produce Co., 165 Ga.

App. 546, 547, 301 S.E.2d 903, 904 (1983)).

Additionally, Plaintiffs, family members of decedents, do not fall within the

class of persons this health hazard statute was intended to protect. Compare Payne

v. Twiggs County School District, 269 Ga. 361, 362, 496 S.E.2d 690,691(1998).

They did not participate in the care, burial or cremation of dead bodies and were not

subject to any possible health risk from the bodies. Neither did they spend time at the

Tri-State property, where the uncremated bodies were located. Further, Plaintiffs are

not complaining of harm from any health hazard.

Plaintiffs cite dicta in Smith v. Poteet, 127 Ga. App. 735, 195 S.E.2d 213

(1972), in an attempt to create a nondelegable duty based on a health hazard. As

already discussed, the health hazard does not apply to the claims in this class action.

Plaintiffs also ignore that the Court ruled that the company preparing the burial site

did not create any health hazard.  Thus, this company was not forbidden by law from

serving as an independent contractor at the burial site.  Id. at 738, 195 S.E.2d at 216.

Moreover, this 1972 case was decided prior to the widespread use of cremation

and the statutory and regulatory provisions governing cremation in Georgia.  Alan

Kroboth, a cremation expert, testified that through the years, the Southeast, excepting

Florida, has had a much lower cremation rate than the rest of the country.  Class

Certification Hearing Transcript, December 17, 2002, p. 108, lines 1-19, attached as

Exhibit "A."  Because of the more widespread use of cremation and the resulting

statutory changes, Smith v. Poteet is inapposite to the current case, as shown by the

following quote:

> [S]uch services as involve handling the corpse cannot be
> delegated or contracted to an unlicensed individual.
> However, one must distinguish between the portions of a
> funeral director's work which are directly aligned with his
> statutory professional responsibility of embalming and burial
> and those responsibilities he assumes because of our social
> mores.  The former **is fixed by statute** to avoid health
> hazards.  The latter is decreed by society because of our
> culture and customs.

Id. at 738, 195 S.E.2d at 216 (emphasis added).

From 1982 to 1994, the applicable statutes and regulations permitted Tri-State

to perform cremations, with the issue of licensing not arising until July 1, 1994.  See

O.C.G.A. § 43-18-72(g)(no licensing requirement until July 1, 1994); Massey Depo.,

p. (Tri-State was not required to have a license in 1993).   Thus, the funeral homes

were not contracting with an unlicensed entity prior to 1994.  After 1994, the Board

allowed Tri-State to continue to operate, thereby creating either a de facto license or

regulatory authorization, without the necessity of a license.  Only by the legislative

enactment in 2002 were all crematories required to be licensed by the Funeral Service

Board.  Massey Depo., p. 61.

Moreover, Georgia's statutes and the Funeral Board regulations set forth the

requirements for a crematory.  The Funeral Homes in this case, at the time that they

used Tri-State, were not licensed to perform cremations and did not perform

cremations.  In contrast, Tri-State had been performing cremations for twenty years,

with the knowledge and implied  acquiescence of the Funeral Board.  Accordingly,

Tri-State's authority to perform cremations had been fixed by statute, regulation or

Board authority, an important distinction from the Smith v. Poteet facts.

For these reasons, Plaintiffs' health hazard/ negligence per se argument is

without merit.

> **3.     The Funeral Home Defendants Had No Duty To Inquire Into
> Tri-State's Licensure Status.**

Plaintiffs' attempted nondelegable duty argument under <u>Smith v. Poteet</u>, 127 Ga. App. 735, 738; 195 S.E. 213, 216 (1972), presupposes that the Funeral Home Defendants had a duty to inquire whether Tri-State was licensed, despite the fact it had been operating under the State's eye without a license. The Funeral Home Defendants did not have such a duty because they were not required to inquire as to the licensure status of Tri-State and because Tri-State operated with the State's approval.

In <u>Tanner v. USA Today</u>, 179 Ga. App. 722, 347 S.E.2d 690 (1986), USA Today and Bounds had an "Independent Hauler Agreement" that Bounds would deliver newspapers for USA Today. Bounds hired Howard, who was involved in an accident resulting in a death. <u>Id.</u>, 179 Ga. App. at 722, 347 S.E.2d at 690. The plaintiff argued that USA Today was liable for the negligence of Bounds because Bounds was not licensed by the Georgia Public Service Commission as required by the statute. <u>Id.</u> 179 Ga. App. at 723, 347 S.E.2d at 691. The court wrote, however, that the plaintiff's argument "presupposed a duty on the part of USA Today to inquire and ascertain if defendant Bounds was properly licensed. Since such a duty does not exist this argument is without merit." <u>Id.</u>; <u>see also</u> <u>Georgia Power Co. v. Gillespie</u>, 49 Ga. App. 788, 176 S.E. 786 (1934) ("[a] person employing another to do a lawful

act is presumed, in the absence of evidence to the contrary, to have employed him to do it in a lawful and reasonable manner; and therefore . . . the employer is not responsible for damages occasioned by the negligent mode in which the work is done.").

Critically, the Funeral Home Defendants, much like the rest of the public, never suspected that the Marsh Defendants were not properly disposing of the bodies that they were charged with cremating and, therefore, never suspected that there would be any reason to inquire into Tri-State's status. (See Anita Taylor affidavit, filed 12/18/02; see also Briefs in Support of various Funeral Home' Motions for Summary Judgment). A party should not be held liable under the nondelegable duty doctrine for wrongful acts of the independent contractor when the party has no reason to be aware of the wrongful acts. See Uniroyal, Inc. v. Hood, 588 F.2d 454, 466 (5th Cir. 1979) ("Such a result, of course, would nullify the Georgia statute protecting an employer from liability for the torts of an independent contractor except in specified, carefully limited situations."). The Funeral Home Defendants should not be held liable for acts they never knew were taking place, particularly when the State itself was not aware of the acts and never took any regulatory action against Tri-State.

Therefore, this is not one of the "carefully limited situations in which an employer should be liable for the independent contractor's actions.

**4.      The Funeral Home Defendants Had No Duty To Police The State's Licensing Requirements.**

Plaintiffs also argue that Tri-State should have been licensed and that the Funeral Home Defendants should have been responsible for policing the State's licensing requirements. However, despite Plaintiffs' extensive review of the statutory and regulatory history regarding the disposition of the dead, Plaintiffs fail to point to any specific statute or regulation imposing a nondelegable duty on the Funeral Home Defendants to police crematories. See supra, Part II.A.1.

**5.      No License was Required for Tri-State to Operate Legally.**

Furthermore, assuming *arguendo* that the Funeral Home Defendants were required to police Tri-State or inquire into its licensure status, Tri-State was not required to be licensed. Plaintiffs rely on Smith v. Poteet to impose a nondelegable duty on the Funeral Home Defendants, but Smith is not applicable to this case. First, as discussed above, Georgia law requires that a statute impose the duty and the Smith case does not refer to any statute imposing the duty Plaintiffs wish to impose. Second, Tri-State was not required to be licensed such that that Funeral Home

Defendant would not have violated any nondelegable duty in contracting with Tri-State because it was authorized to operate.

Critically, the very definition of "crematory" in the Georgia statutes never, prior to 2002, required licensure of Tri-State. Plaintiffs emphasize a 1981 Attorney General Opinion which considered whether crematories are subject to regulation under Georgia Code Ann. § 84-801. The Attorney General concluded that persons engaged in the business or profession of cremating dead human bodies are "funeral directors"[5] and are engaged in "funeral directing." According to the Attorney

---

[5] The Attorney General examined the definitions in the Georgia Code of funeral director, funeral directing and funeral establishment:

"(3)     'Funeral director' means a person engaged in the business or profession of directing or supervising funerals for hire or profit, or the preparing of dead human bodies for burial by means other than embalming, or the disposition of dead human bodies.

(4)     'Funeral directing' means the business or profession of directing or supervising funerals for hire or profit, or the preparing of dead human bodies for burial by means other than embalming, or the disposition of dead human bodies, or the provision or maintenance of a place for the preparation for disposition or future care or disposition of dead human bodies, or the use in connection with a business of the words or terms 'funeral director,' 'undertaker,' mortician,' or similar words or terms.

(7)     'Funeral establishment' means a place of business used in the care and preparation for burial or transportation or other disposal of dead human bodies or any place or premises at or from which any person or persons shall represent himself or themselves or hold out himself or themselves as being engaged in the business or profession of funeral directing or embalming or both."

General, the place of business where dead human bodies are cremated is a "funeral

establishment." See Exh. 1 to Pls,' Mot.

Plaintiffs rely on this Attorney General Opinion, invalid starting in 1990, as

support for their claim that Tri-State was a funeral establishment and Ray Marsh was

a funeral director[6], even though both were unlicensed.  However, "opinions of the

Attorney General are not binding upon this court, even where applicable to the issues

before us." Williams v. State, 162 Ga. App. 415, 418, 291 S.E.2d 732, 735 (1982);

see also Metheny v. Hammonds, 216 F.3d 1307, 1313 (11th Cir. 2000) ("[T]hat the

Attorney General had issued an opinion stating that the statute was unconstitutional

is not decisive.").

---

[6] To try and justify their position that Tri-State was required to be licensed, Plaintiffs also reference a memorandum from Lori Gold dated October 24, 1986. See Exhibit 2 to Plaintiffs' Brief. In this memorandum, Gold presents the Funeral Board's "best effort" at defining when a crematory will be in substantial compliance with the definition of a funeral establishment. John Massey, a funeral inspector for the Board since 1981, explained the purpose of this memorandum:

> "During the mid 1980s, prior to the Funeral Service Board presenting anything to the legislature for a statute on crematories, there was discussions (sic) entered into with the Funeral Service Board and the Attorney General's office for guidelines for crematories.  This is informational-wise that they were looking for guidelines for crematories. . . .It's not a statute or a rule that has been in effect.  This was informational in working up guidelines, trying to work up guidelines, for crematories prior to the legislative act of 1990."

Massey Depo., pp. 13, 45.  In fact, Ray Marsh "was part of the initial committee who worked on the guidelines for the crematory regulations prior to 1990." Id., p. 145.  In any event, a 1986 memorandum providing suggestions as to possible guidelines as to crematories does not create any nondelegable duty on the part of the Funeral Home Defendants.

Certainly the Funeral Service Board did not accept or implement this non-binding opinion when it, by and through the Attorney General, dismissed a 1996 Administrative Hearing alleging that Ray Marsh was operating his crematory illegally, because he had not been licensed.

In 1995, then Walker County Coroner Bill McGill filed a formal complaint with the Georgia State Board of Funeral Service, alleging that Ray Marsh was operating Tri-State Crematory without a license. (McGill Depo. p. 36, Exh. 84, attached as Exhibit "B") The Funeral Service Board initiated an investigation and issued a cease and desist order. (Massey Depo. p, 59, Exh. 37, attached at Exhibit "C"). Ray Marsh who was represented by counsel, submitted an affidavit, along with a memorandum of law, swearing under oath that:

> 3. Tri-State was founded in 1982 for the purposes of operating a crematory in Walker County, Georgia to service the needs for such services in the Northwestern Georgia area. At the time that Tri-State was established, there were no crematories in Walker County and the surrounding counties in Georgia. As of the date of this affidavit [June 6, 1996], it is one of two crematories in Tri-State's Georgia trade area.
>
> 4. At the time plans were being formulated for Tri-State, inquiries were made to the State of Georgia regarding state regulation of crematories. Affiant was informed that the State of Georgia did not regulate crematories and, in particular, he was informed that the operator of a crematory was not required to be a licensed funeral director and was not required to hold any other license issued by the State of Georgia. (Marsh affidavit, Massey Depo. p. 92, Exh .33).

Ray Marsh swore that he was not open to the public, that he dealt with funeral homes. (Id.) Thereafter, on July 9, 1996, the Attorney General for the State of Georgia, voluntarily dismissed the administrative action. (Massey Depo. p. 59, Exh. 38). Apparently based upon the representations made by Ray Marsh, the Funeral Service Board concluded that Tri-State was not subject to licensing. (Massey Depo. pp. 37-38,48-49).

Further, the definitions the Attorney General relied on in his 1981 opinion were completely changed by the Georgia General Assembly in its 1990 legislative enactment. See Plaintiffs' Exhibit "6." For example, after 1990, a funeral director is defined as "a person who practices funeral directing or uses in connection with that person's name or with a picture of that person the words 'funeral director,' 'licensed funeral director,' 'undertaker,' or 'mortician' or offers or holds himself or herself out as offering such services." See O.C.G.A. § 43-18-1(11)(Plaintiffs' Exhibit 6). Moreover, under the 1990 statute "practice of funeral directing" means "making or directing, at need or preneed, arrangements for the preparation and transportation of dead human bodies for final disposition **and** the supervision and direction of all funeral services." O.C.G.A. § 43-18-1(19)(emphasis added)(Plaintiffs' Exhibit 6). Thus, these subsequent statutory enactments superceded the 1981 Attorney General

opinion. "Courts should defer to the agency in matters involving the interpretation of the statutes which it is empowered to enforce." Albany Surgical, P.C. v. Dep't of Comty. Health, 257 Ga. App. 636, 638, 572 S.E.2d 638, 641 (2002).

Moreover, the legislature did not accept the 1981 Attorney General's opinion in its 1990 law. Specifically, in 1990, the Georgia General Assembly extensively revised the statutory provisions relating to funeral directors and embalmers. For the first time, the statutory provisions reference cremations. The statute defined "crematory" as "a place that is **owned by a funeral director or funeral establishment where cremation is performed and which is open to the public.**" O.C.G.A. § 43-18-1(6) (1990).[7] However, Tri-State was not open to the public nor was it owned by a funeral director or funeral establishment. (See Massey deposition.)

In the 1990 legislation, also added was a provision regarding licensing for certain crematories:

      (a)    It shall be unlawful for any person, firm, corporation, or association to operate a crematory without first obtaining a license from the board in accordance with this article. The crematory must be at a specific address or location and must have the following minimum equipment, facilities, and personnel:

---

[7] This was the definition at all relevant times to this lawsuit.

> (1) A room with seating for a minimum of 30 people in which funeral services may be conducted;
>
> (2) A display room containing an adequate supply of urns;
>
> (3) Rolling stock consisting of at least one operable motor hearse either owned or leased by said firm with current Georgia registration;
>
> (4) At least one operable retort for cremation; and
>
> (5) At least one church truck.

O.C.G.A. § 43-18-72(a) (1990). Despite these laws, Tri-State was never sanctioned under O.C.G.A. § 31-25-5(a) which places the burden on the Georgia officials to punish facilities which are operating illegally. In fact, the Georgia officials allowed Tri-State to continue to operate.

After July 1, 1994, despite the fact that a law had been passed generally requiring crematories to be licensed by July 1, 1994, see infra Part II.A.6, Tri-State did not obtain a license. The Funeral Service Board, although aware of Tri-State's operations and unlicensed status after 1994, allowed Tri-State to cremate bodies. Massey Depo., pp. 15, 88-89, 165. John Massey, an inspector of the Funeral Service Board, testified that Tri-State did not fit the definition of a crematory because it was

not owned by a funeral director and was not open to the public.  Massey Depo., pp. 24, 66, 114.

Under Georgia law, "[i]t is a 'well settled principle that public officials shall be presumed to have performed their duties and acted in good faith unless clearly proven otherwise.'" Narramore v. State, 181 Ga. App. 254, 255, 351 S.E.2d 643, 644 (1986) (quoting Richmond County Hosp. Auth. v. Richmond County, 255 Ga. 183, 192, 336 S.E.2d 562, 569 (1985)).  In other words, "[u]nless the contrary appears, it is presumed that a public official performs his duties in a proper manner."  Scott v. DeKalb County Hosp. Auth., 169 Ga. App. 257, 258, 312 S.E.2d 154, 155 (1983).

Although the Funeral Service Board was aware Tri-State was operating without a license, the Board allowed Tri-State Crematory to operate.  Plaintiffs are asserting that the Funeral Home Defendants should have made a legal determination as to whether the Tri-State Defendants were required to be licensed by statute and, moreover, that they should have reached an opposite conclusion than the State reached.  The Funeral Home Defendants, who were not given the authority to police crematories, had to rely on the Board to determine the legal status of Tri-State. According to Leroy Wilson, a funeral director of one of the Funeral Home Defendants, he inquired of John Massey regarding the licensing status of Tri-State

and was told Tri-State was legal.  (Leroy Wilson, Depo, pp. 81-82, attached as

Exhibit "D"; see also Dean Lay, Depo. p. 43 attached as Exhibit "E", Charles E.

Joyce, Depo. p. 27 attached as Exhibit "F" and  John Wesley Peeples, Depo. p. 119

attached as Exhibit "G").  As funeral director Robert Ryan testified, he knew Tri-

State was legal because, if not, the State Board would have shut the facility down.

(Robert A. Ryan, Jr. Depo. pp. 92-93, attached as Exhibit "H." Because the Funeral

Board, which had jurisdiction over licensing of crematories, permitted Tri-State to

continue to operate, the Funeral Home Defendants were authorized to use Tri-State.

**6.     The Effective Date of Licensing Requirements  Precludes
Summary Judgment in Favor of Plaintiffs.**

Although the Funeral Home Defendants strongly assert that Tri-State was never

required, prior to 2002, to be licensed, it certainly was not required, under any

circumstances, to be licensed before July 1, 1994.  In 1992, the legislature added the

following provision:

> (g)     Notwithstanding any other provision of this
> chapter to the contrary, no person operating a
> crematory on January 1, 1992, shall be
> required until July 1, 1994 to obtain a license
> from the board to operate such crematory.

O.C.G.A. § 43-18-72(g).  Thus, under the plain language of this provision, even a

crematory operating on January 1, 1992, would not be subject to any licensing

provision until July 1, 1994. <u>See</u> <u>State v. English</u>, 276 Ga. 343, 348, 578 S.E.2d 413,

418 (2003) ("This Court is to construe the statute to give sensible and intelligent

effect to all of its provisions and to refrain from any interpretation which renders any

part of the statute meaningless.").

> Also in 1992, the General Assembly added the following provision:

> > It shall be unlawful for any person to incinerate or cremate a dead body or parts thereof provided, however, that the provisions of this subsection shall not apply to a crematory licensed by the State Board of Funeral Service pursuant to Chapter 18, Title 43 or to a hospital, clinic, laboratory, or other facility authorized by the Department of Human Resources and in a manner approved by the Commissioner of Human Resources.   A person who violates the provisions of subsection (a) of this code shall be guilty of a misdemeanor.

O.C.G.A. § 31-25-5(a).

Plaintiffs propose that this Court ignore O.C.G.A. § 43-18-72(g), which stated

that no crematory operating on January 1, 1992 had to worry about licensing until

July 1, 1994, and just focus on   O.C.G.A. § 31-25-5(a).   These provisions,

implemented in the same year, must be read together.  "Under the established rules

of statutory construction, we cannot ignore the clear language of either statute.

Statutes in *pari materia* must be construed together and harmonized, if possible, so

as to ascertain and give effect to the legislative intent."  <u>In Interest of C.P.</u>, 217 Ga.

App. 505, 506, 458 S.E.2d 166, 168 (1995); see also Lawson v. State, 224 Ga. App.

645, 647, 481 S.E.2d 856, 860 (1997) ("Under the rules of statutory construction, we

must construe all related statutes together, give meaning to each part of the statute,

and avoid constructions which result in surplusage and meaningless language.").

Accordingly, under its terms, O.C.G.A. § 31-25-5(a) defers to the Funeral Service

Board or the Department of Human Resources regarding whether a crematory or

facility is permitted to cremate remains.

### 7.   Plaintiffs Ask This Court To Violate The Separation of Powers Between The Legislature And The Courts.

Plaintiffs appear to be arguing that the Court should create a nondelegable duty

on the part of the Defendant Funeral Homes, even if one cannot be found in the

statutory language.  This request violates the separation of powers between the

legislature and the courts.  "[T]he role of the judicial branch is to apply statutory

language, not to rewrite it." Harris v. Garner, 216 F.3d 970, 976 (11th Cir. 2000)(en

banc).  "This common-sense reliance upon the plain statutory language also helps

courts avoid the danger of mistakenly substituting their will for that of the legislature,

and thus the judicial branch properly fulfills its role within the constitutional

separation of powers." Dombrowski v. Swiftships, Inc., 864 F.Supp. 1242, 1246

(S.D. Fla. 1994).  Thus, the Court should decline to legislate in this case, especially retroactive legislation as suggested by Plaintiffs.

### 8.    Tri-State Was Not Operating Under the Licenses of Individual Funeral Homes.

In a desperate attempt to create a nondelegable duty on the part of the Funeral Home Defendants, Plaintiffs suggest that Tri-State was operating under the licenses of the separate funeral homes.   Plaintiffs base this argument on the following regulatory provision: "A licensed funeral establishment may operate a crematory without a separate crematory license, but must nevertheless abide by all rules and regulations of the Board pertaining to either funeral establishments, crematories or both."  Ga. Comp. R. & Regs. 250-6-.01(5).   The other statutes and regulations governing funeral establishments prove Plaintiffs' scenario is impossible.

First, if another funeral home was operating Tri-State, a funeral director from the funeral home would have to be in full and continuous charge of Tri-State.  See Ga.  Comp. R. & Regs 250-6-.01(2)("A license for a funeral establishment or crematory is issued to that particular establishment or crematory under a specified name, at a specified location, and under a specified funeral director in full and continuous charge."); 250-6-.01(3)("A license may be issued to funeral establishment or crematory only if such business has a licensed funeral director in full and

continuous charge."). There is no evidence to support a claim that one director from one of the Funeral Home Defendants was in full and continuous charge of Tri-State. Certainly Plaintiffs cannot be claiming that the funeral directors from all the Funeral Home Defendants were simultaneously in continuous charge of Tri-State. Plaintiffs have produced no evidence to refute the Court's finding that the "Funeral Home Defendants were simply unrelated, parallel businesses that engaged in the similar conduct of doing business with Defendant Tri-State." In re Tri-State Crematory Litigation, 215 F.R.D. 660, 687 (N. D. Ga. 2003). As shown by the affidavits of the funeral directors, the funeral homes only used Tri-State intermittently through the years. See, e.g., Affidavit of J. Parnick Jennings Sr. ¶ 19 ("Jennings only sent two (2) decedents to Tri-State during the year 1988. Thereafter Jennings began using another crematory.").

Second, if another funeral home was operating Tri-State, a funeral director from the funeral home would have to place a duplicate of his license at Tri-State. See Ga. Comp. R. & Regs 250-5-.07(2)("A trade embalmer or funeral director who works in more than one establishment must display a duplicate photocopy of his/her license in each establishment or crematory in which he/she works."). No one has testified to seeing any license at Tri-State.

Third, even if Tri-State was operating under the license of another funeral home, Tri-State would have to comply with the statutory requirements for a crematory. "Nothing in this article shall require a funeral establishment to have a separate license for a crematory but such establishment must comply with **all the minimum equipment and facilities requirements, and all other statutes, rules, and regulations relating to crematories**."   O.C.G.A. § 43-18-72(f)(emphasis added).  As John Massey testified, Tri-State was not owned by a funeral director and was not open to the public.[8]  Massey Depo., pp. 24, 66, 114.  See also O.C.G.A. § 43-18-1(6)("'Crematory' means a place that is **owned** by a funeral director or funeral establishment where cremation is performed and which is **open to the public**.")(emphasis added); O.C.G.A. § 43-18-72(a)(A crematory must have a "room with seating for a minimum of 30 people in which funeral services may be conducted.").

In trying to place Tri-State under the licenses of individual funeral homes, Plaintiffs mischaracterize and take out of context John Massey's deposition

---

[8]  Plaintiffs attach  a copy of a purported advertisement of LaShea Marsh's accomplishment of her graduation from Gupton Jones College of Mortuary Science of Atlanta, Ga., but no where in the purported advertisement does it say that the Crematory is open to the public; it does say to call to arrange visititation.  LaShea Marsh graduated in 1993; she became a licensed funeral director in Tennessee in 1993; a licensed embalmer in Georgia in 2001; and a licensed funeral director in Georgia in 2001.  (L. Marsh depo. pp. 14-15, 26-27).

testimony.   Instead, Massey's testimony confirms the statutory and regulatory requirements for a crematory operating under a funeral home license.  "[I]t depends upon how they operate.  If they operate in conjunction with an established funeral home that has a license by the Board, then it does not have a separate license, it is in conjunction with that funeral home establishment license."  See Massey Depo., pp. 20-21.[9]  "There's probably – in the neighborhood, there's probably 15 or 20 – 10 to 15, probably, licensed crematories in the state of Georgia, and then there's probably that many that are operating in conjunction with a licensed funeral establishment." Id., p. 47.   Also, Massey clarified that any reference to agency meant that the "crematory is a contracting party with the funeral home."  Id., p. 177.  Of course, the crematory can also qualify as an independent contractor which has entered into a contract with a funeral home.  As discussed in the summary judgment briefs of the individual Funeral Homes, the relationship between the funeral home and the crematory must be examined to determine whether the crematory qualifies as an agent or independent contractor.  According to the underlying facts in these cases, Tri-State

---

[9]  Plaintiffs liberally interpret the deposition of John Massey.  In their Memorandum, they refer to Massey deposition pages 20 and 47, but fail to acknowledge the previous questions which puts the deposition testimony in context.  Massey, at no time, testified that Tri-State had to operate in conjunction with an established funeral home that had a license.  This argument is not only meritless, but is intellectually disingenuous.

was an independent contractor of the individual Funeral Homes.   See, e.g. J.D. Hill

Funeral Homes' Brief in Support of Summary Judgment, pp. 33-37.

For these reasons, Plaintiffs cannot prove that Tri-State was operating under

the licenses of the individual funeral homes which used Tri-State's cremation services

intermittently through the years.

> **9.     If The Funeral Home Defendants Violated A Nondelegable
> Duty, They Are Only Liable For Any Negligence By The
> Marsh Defendants and Tri-State And Not Their Intentional
> Torts.**

Because the Funeral Home Defendants are independent contractors, if the

Court finds that they violated a nondelegable duty, the only claims to which liability

could be purportedly imputed are the negligence claims.   See O.C.G.A. § 51-2-5.

Plaintiffs even recognize this point.   See Pls.' Mem. at 1 (quoting Restatement

(Second) of Agency § 214, cmt. b); Id. at 19 (citing Whack v. St. Mary's Hosp., No.

3627/00, 2003 WL 230702, at *4 (N.Y. City Civ. Ct., Jan. 22, 2003)).

Therefore, granting Plaintiffs' motion on this point will not simplify or shorten

the trial because additional evidence will need to be presented on the other claims

against the Funeral Home Defendants, contrary to Plaintiffs' argument.   See Pls.'

Mem. at 21.

### B.   THE FUNERAL HOME DEFENDANTS ARE NOT LIABLE FOR ANY NEGLIGENCE BY THE MARSH DEFENDANTS OR TRI-STATE BECAUSE THE MARSH DEFENDANTS AND TRI-STATE ARE NOT THEIR AGENTS.

Plaintiffs have not offered any evidence that the Marsh Defendants were acting as agents of the Funeral Home Defendants and, therefore, the Funeral Home Defendants cannot be held liable as the principal.[10]   Further, even if the Marsh Defendants could be considered agents—which they are not—their conduct involving the handling of the decedents is outside the scope of any employment with the result that the Funeral Home Defendants are not liable for that conduct.

### 1.   Plaintiffs Have Not Met Their Burden For Proving Agency And Therefore the Funeral Home Defendants Are Not Liable As Principal.

It is Plaintiffs' burden to show that the Marsh Defendants were agents of the Funeral Home Defendants and they have utterly failed to present any evidence showing that relationship.  See Carter v. Kim, 157 Ga. App. 418, 418, 277 S.E.2d 776, 776 (1981) ("[W]here the existence of any agency is relied upon, the burden rests with the party asserting the relationship.").  The test to determine whether an

---

[10]  Because Plaintiffs have not shown that the Marsh Defendants are agents of the Funeral Home Defendants, there is no basis in Plaintiffs' Memorandum for arguing that the statute of limitations has been tolled as to claims against the Funeral Home Defendants because of any fraud by the Marsh Defendants.  See Trust Co. Bank v. Union Circulation Co., Inc., 241 Ga. 343, 245 S.E.2d 297 (1978) (refusing to toll statute of limitations against bank for the fraud of bank's vice-president and his wife because their fraud is not imputed to the bank).

individual is an agent or an independent contractor is "whether the contract gives, or the employer assumes, the right to control the time, manner, and method of the performance of the work, as distinguished from the right merely to require certain definite results in conformity with the contract." Williams v. Dep't of Corrections, 224 Ga. App. 571, 573, 481 S.E.2d 272, 275 (1997). Plaintiffs have not shown that the Funeral Home Defendants assumed any right of control over the Marsh or Tri-State Defendants. (See Affidavits of J. Parnick Jennings, Sr., J. Parnick Jennings, Jr., Eugene M. Pike, Robert K. Schrader, Stonewall Ponders, Earle Rainwater, Durward Pettit, Leroy Wilson, Dan Ewton, Eugene Overstreet, Wayne Bush, Dean Lay, Larry Moore, Robert Ryan, John Taylor, Bruce Thomas, Bryan Boyd, John Wesley Peeples, Jesse R. Jones, R. J. Burt, Jr. and others attached to individually filed Motions for Summary Judgment by the joined funeral homes.).

> **2.    Even If An Agency Relationship Exists, The Marsh Defendants' Conduct Was Outside The Scope Of Employment And The Funeral Home Defendants Cannot Be Liable.**

While a principal may be liable for an agent's torts, even when it arises to criminal conduct, to impose that liability, the agent's action must be done within the scope of the employment. See O.C.G.A. § 51-2-2 ("Every person shall be liable for torts committed by . . . his servant by his command or in the prosecution

and within the scope of his business, whether the same are committed by negligence

or voluntarily."); O.C.G.A. § 10-6-60 ("The principal shall be bound . . . for the

neglect and fraud of his agent in the transaction of such business).  The test is not

whether the act was done during the existence of the employment, "but whether it

was done within the scope of the actual transaction of the master's business for

accomplishing the ends of employment."  Hobbs v. Principal Fin. Group, Inc., 230

Ga. App. 410, 412, 497 S.E.2d 243, 245 (1998) (affirming grant of summary

judgment in favor of principal because the agent's conduct in fraudulently inducing

plaintiffs to invest in a nonexistent fund was a tort committed outside the scope of his

employment).

In the instant case, the actions by the Marsh Defendants were completely

outside the scope of any employment.  The recent Georgia Supreme Court case of

Piedmont Hospital, Inc. v. Palladino,  276 Ga. 612, 580 S.E.2d 215 (2003) is

closely analogous to the case at bar.  In Palladino, the plaintiff had checked into

the hospital to have groin surgery.  While recovering from surgery, he awoke in

the middle of the night to discover a male nurse massaging his penis and preparing

to engage in an act of oral sodomy.  The court held:

> "Every person shall be liable for torts committed by his . . . servant by
> his command . . . and within the scope of his business, whether the same

are committed by negligence or voluntarily." n3 "Two elements must be present to render a master liable [under respondeat superior]: first, the servant must be in furtherance of the master's business; and, second, he must be acting within the scope of his master's business." n4 "If a tort is committed by an employee not by reason of the employment, but because of matters disconnected therewith, the employer is not liable. n5 If a tortuous act is committed not in furtherance of the employer's business, "but rather for purely personal reasons disconnected from the authorized business of the master, the master [is] not ... liable."

Therefore, the Supreme Court reversed the Court of Appeals and held the hospital could not be held liable for the nurse's actions. The nurse's employment did authorize him to inspect and clean the incision in the victim's groin, in no way did it permit the nurse to sexually manipulate the victim's genitals. The only nexus between these two actions is that they occurred in the same region of the body. This was an insufficient basis to expose an employer to vicarious liability for its employee's tortuous conduct, especially when the misconduct was obviously outside the scope of his employment.

Similarly, in the case at bar, the mere nexus of handling a deceased body does not create a basis to have the funeral homes liable for the failure of Tri-State to cremate the bodies. Such acts on the part of the Brent Marsh were clearly for his own personal twisted benefit and outside of the business of Tri-State, much less any funeral home.

Because the Marsh Defendants did not actually accomplish the goal of the relationship—to cremate the bodies—Plaintiffs cannot succeed on this argument. The Funeral Home Defendants did not benefit from the Marsh Defendants' actions because they had already paid for a specific job to be completed, yet that job was never done. Therefore, no actions by the Marsh Defendants can be imputed to the Funeral Home Defendants.

### 3. The Marsh Defendants and Tri-State Were Not Agents of the Funeral Home Defendants.

Plaintiffs further argue, by analogy, that the relationship between the Funeral Homes and Tri-State is comparable to the relationship between nursing homes and independent contractor operator (Scott v. Ashland Healthcare Center, Inc. 49 S.W. 3d 281 (Tenn. 2001); or a truck driver and an interstate trucking company, or a hospital's duty to maintain it's freezer for corpses. (Whack v. St. Mary's Hospital of Brooklyn, slip op. No. 3627/00, 2003 WL 230702). In these cases, the defendants claimed that the at-fault party was an independent contractor, but the courts found that there was in fact an agency relationship. Plaintiffs make broad analogies from cases where the negligent acts were made by persons over whom the defendant had the right to control the time, method and manner of their duties which is the general rule under Georgia Agency Law. Hooters of Augusta, Inc. v. Nicholson, 245 Ga.

App. 363, 367, 537 S.E.2d 468, 472 (2000). Before the State of Georgia will impose such an onerous burden upon an entity that believes they have hired an independent contractor, Georgia laws require a minimum showing of control over the entity in question. Plaintiffs have made no such showing.

There is no question that the Funeral Home Defendants had no control over the time, method and manner of Tri-State's cremations. Tri-State Crematory was an independent business operating on its own schedule and performing cremations according to its own manner and methods.

The bootstrap argument that the protection of health and welfare somehow makes the duties of the crematory transferable to the Funeral Homes is also misplaced. In hospitals in Georgia, where the health and welfare of the public is tantamount, the Georgia courts allow for an independent contractor relationship to exist between the hospital and the physicians who work there. Whitaker v. Zirkle 188 Ga. App. 706 (1988). It is an accepted custom and practice that physicians make independent judgments regarding the care and treatment of their patients with some minimal control by the hospital in the form of policies and procedures. Therefore, the acts of physicians are not imputed to the institution where they work unless there are specific facts which make the relationship more blended.

As this Court stated in <u>Stewart v. Midani</u>, 525 F. Supp. 843 (1981), "whether and individual is an employee or an independent contractor - defies facile explication." <u>Id.</u> at 845. Plaintiffs have attempted to circumvent the law of agency and the requirement that the Funeral Home Defendants have some control over Defendant Tri-State Crematory by suggesting that, through statute there is a non-delegable duty on the part of all Funeral Homes to protect and monitor the final disposition of a deceased body. If one carries that rule through a series of scenarios, beyond this case, it rapidly becomes more absurd.

For instance, if a funeral home hired a contractor to drive a body to another state and there was a car wreck, the funeral home would be liable. If the funeral home shipped a body by airplane to another state and the body was damaged or lost in route, the funeral home would be liable. This is NOT the result the legislature intended or envisioned.

## C.  THE MARSH DEFENDANTS' INVOCATIO OF THE FIFTH AMENDMENT DOES NOT CREATE AN ADVERSE INFERENCE AGAINST THE FUNERAL HOME DEFENDANTS.

### 1.  Plaintiffs Have Not Satisfied the Requirements for an Adverse Inference Against Brent Marsh.

In this section, Plaintiffs ask the Court to grant summary judgment, finding that any adverse inference created by the Marsh Defendants' invocation of the Fifth

Amendment privilege against self-incrimination also be chargeable to the Funeral Home Defendants. In making this argument, Plaintiffs are putting the cart before the horse. First, Brent Marsh's use of the Fifth Amendment at his deposition does not create any adverse inference. The issue is how Brent Marsh will testify at trial. Plaintiffs can rely on Brent Marsh's deposition only if he is unavailable at trial. <u>See</u> Fed. R. Evid. 804. Also, at trial, the questions may change and/or Brent Marsh may change his responses to questions and not invoke the Fifth Amendment. "[T]he assertion of the privilege necessarily attaches only to the question being asked and the information sought by that particular question." <u>Doe ex rel. Rudy-Glanzer v. Glanzer</u>, 232 F.3d 1258, 1265 (9th Cir. 2000)   Thus, it is impossible at this point to know what the questions and answers will be and what adverse inferences, if any, will be created.

Second, just because a defendant invokes the Fifth Amendment to a question does not create an adverse inference. As the United States Supreme Court stated in <u>Baxter v. Palmigiano</u>, 422 U.S. 308 (1976), the seminal case on this issue, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify **in response to probative evidence offered against them.**" <u>Id.</u> at 318 (emphasis added).

[L]ower courts interpreting <u>Baxter</u> have been uniform in suggesting that the key to the <u>Baxter</u> holding is that such adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer. <u>See, e.g.</u>, <u>LaSalle Bank Lake View v. Seguban</u>, 54 F.3d 387, 391 (7th Cir. 1995); <u>Peiffer v. Lebanon Sch. Dist.</u>, 848 F.2d 44, 46 (3d Cir. 1988). Thus, an adverse inference can be drawn when silence is countered by *independent evidence* of the fact being questioned, but that same inference cannot be drawn when, for example, silence is the answer to an allegation contained in the complaint. <u>See Nat'l Acceptance Co. v. Bathalter</u>, 705 F.2d 924, 930 (7th Cir. 1983). In such instances, when there is no corroborating evidence to support the fact under inquiry, the proponent of the fact must come forward with evidence to support the allegation, otherwise no negative inference will be permitted. <u>See LaSalle Bank</u>, 54 F.3d at 391.

<u>Doe ex rel. Rudy-Glanzer</u>, 232 F.3d at 1264. Accordingly, Plaintiffs must present evidence to support their questions and proposed adverse inferences. Brent Marsh's silence is not enough to create such an inference.

This independent evidence requirement confirms that the Fifth Amendment is available to the innocent as well as the guilty.

But we have never held, as the Supreme Court of Ohio did, that the privilege is unavailable to those who claim innocence. To the contrary, we have emphasized that one of the Fifth Amendment's "basic functions . . . it to protect *innocent* men . . . 'who otherwise might be ensnared by ambiguous circumstances.'" <u>Grunewald v. United States</u>, 353 U.S. 391, 421, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957)(quoting <u>Slochower v. Board of Higher Ed. of New</u>

> York City, 350 U.S. 551, 557-558, 76 S.Ct. 637, 100 L.Ed.
> 692 (1956))(emphasis in original).   In Grunewald, we
> recognized that truthful responses of an innocent witness,
> as well as those of a wrongdoer, may provide the
> government with incriminating evidence from the
> speaker's own mouth.   353 U.S. at 421-422, 77 S.Ct. 963.

Ohio v. Reiner, 532 U.S. 17, 21 (2001).

### 2.   The Facts in this Case Prohibit an Adverse Inference Against the Funeral Home Defendants Based on the Testimony of Brent Marsh.

Assuming that Plaintiffs satisfy these hurdles and the Court charges the jury

that adverse inferences can be raised against Brent Marsh, such inferences are not,

as a matter of law, chargeable against the Funeral Home Defendants.  As already

discussed herein and in the Funeral Home Defendants' various summary judgment

briefs, the Marsh Defendants are not agents of the individual funeral homes.  As for

the principle of nondelegable duty, that concept only applies to claims of negligence.

Furthermore, Brent Marsh's invocation of the Fifth Amendment does not carry

over to Tri-State.  Organizations have no privilege against self-incrimination.  United

States v. A  Single Family Residence & Real Property Located at 900 Rio Vista

Blvd., Ft. Lauderdale, 803 F.2d 625, 629 n.4 (11th Cir. 1986).  Thus, any time Brent

Marsh is invoking the Fifth Amendment, he is doing so personally, not as a corporate

representative of Tri-State Crematory.  See Veranda Beach Club Ltd. Partnership v.

Western Surety Co., 936 F.2d 1364, 1374 (1st Cir. 1991)("An individual's invocation

of his fifth amendment privilege against self-incrimination is a personal decision.  It

cannot be imputed to a corporation.").

As shown by the affidavits of funeral home personnel, many of the Funeral

Home Defendants had no dealings whatsoever with Brent Marsh.  Therefore, an

adverse inference cannot be created against these funeral homes based on the

statements of Brent Marsh.  As for the Funeral Home Defendants who dealt with

Brent Marsh at certain times, it will create mass confusion to try to limit the adverse

inferences to certain funeral homes and specific years.

Even if a funeral home had business dealings with Brent Marsh, the parties

operated at arms length, with Brent Marsh acting as an independent contractor.  The

business relationship between the parties does not give rise to an adverse inference.

In LiButti v. United States, 107 F.3d 110 (2d Cir. 1997), the Second Circuit suggested

a number of non-exclusive factors which should guide the trial court when deciding

whether a non-party's invocation of the Fifth Amendment should create an adverse

inference against a party.  These factors emphasize the relationship between the

parties and the individual circumstances of each case, specifically: (1) the nature of

the relevant relationship; (2) the degree of control of the party over the non-party witness; (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation. Id. at 123. In other words, the relationship between the parties should be examined "from the perspective of a non-party witness' loyalty to the plaintiff or defendant, as the case may be. The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship." Id. The overarching concern, however, is "whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." Id. at 124.

A case illustrating the application of these factors is Banks v. Yokemick, 144 F.Supp.2d 272 (S.D.N.Y. 2001). In this civil action, a police officer, Craig Yokemick, was accused of excessive force in the arrest of a suspect, as well as the wrongful death of that suspect. A criminal investigation in the events was ongoing at the time of the civil suit, but no charges had been brought. Certain of Yokemick's fellow officers who were also at the scene of the arrest invoked the Fifth Amendment to certain questions. Plaintiff Banks, the decedent's mother, requested that an adverse

inference be entered against Yokemick based on the testimony of his fellow officers.

The District Court ruled as follows:

> Banks's request for an adverse inference rests on the relationship between Yokemick and Geraghty as police patrol partners and on Krumm's status as the ranking officer at the scene. Without more, these ties do not strike the Court as sufficient to establish that Yokemick could exercise any form of control over Krumm or Geraghty to guide their testimony or to support a necessary inference that at this time their interests coincide. It is conceivable that police officers teamed on patrol could maintain a strained or even hostile relationship or no relationship at all.
>
> Ties of patrol partnership are not invariably close enough to sustain a conclusion that in offering sworn testimony one officer will always seek ways to protect the other. In theory, the claim of a Fifth Amendment privilege by Krumm and Geraghty may be consistent with their desire to protect only their own interests, without regard to Yokemick's.

Id. at 290.

The ties between Brent Marsh and the funeral homes do not establish that the funeral homes could exercise any control over Marsh's testimony or that their interests coincide. Further, Brent Marsh's claim of a Fifth Amendment privilege is consistent with this desire to protect his own interests, without regard to the interests

of the funeral homes.  Accordingly, there is no basis for an adverse inference against the funeral homes based on Brent Marsh's invocation of the Fifth Amendment.

## III.  CONCLUSION

For all of the foregoing reasons, the Funeral Home Defendants respectfully request that the Court deny Plaintiffs' motion for partial summary judgment.

Respectfully submitted this __13th__ day of November, 2003.

**BRINSON, ASKEW, BERRY, SEIGLER,<br>RICHARDSON & DAVIS, LLP**

By: _Robert M. Brinson_

    Robert M. Brinson<br>
    Georgia Bar No. 082900

By:_ J. Anderson Davis_

    J. Anderson Davis<br>
    Georgia Bar No. 211077

The Omberg House
615 West First Street
Post Office Box 5513
Rome, GA 30162-5513
Phone  706/291-8853
Fax 706/234-3574
adavis@brinson-askew.com
137041

Lead and Liaison Counsel for Defendant Funeral Homes



 EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

**EXHIBIT "A"**

ALAN KROBOTH - DIRECT BY COTTER        107

1   A.   MY LAST LOOK AT THE LIST WAS ABOUT 600 FUNERAL DIRECTORS.

2   Q.   ALL RIGHT.  AND HOW MANY CREMATION UNITS DO YOU PRESENTLY

3   HAVE?

4   A.   THREE, SIR.

5   Q.   HOW MANY DO YOU FIGURE YOU'VE SEEN IN YOUR CAREER?

6   A.   THE CREMATION UNITS?

7   Q.   YES.

8   A.   OF THE DIFFERENT TYPES, PROBABLY EIGHT MAJOR DIFFERENT

9   TYPES OF UNITS.

10  Q.   ALL RIGHT.  GOING BACK TO THE STANDARD OF CARE AS YOU

11  HAVE DEFINED IT, WHAT CONDITIONS AND UNDER WHAT CIRCUMSTANCES

12  DOES THE STANDARD OF CARE NOT CHANGE BUT IS IT IMPACTED,

13  INFLUENCED?

14  A.   IT'S IMPACTED BY TIME, WHAT ERA WE'RE DEALING WITH.  IT'S

15  IMPACTED BY LOCATION, GEOGRAPHY.  IT'S IMPACTED BY THE TYPE OF

16  EQUIPMENT AND THE SIZE OF THE OPERATION.

17  Q.   OKAY, LET'S START WITH THE FIRST.  WHAT DOES TIME HAVE TO

18  DO WITH IT, WHETHER IT'S 1982, 1992, OR 2002?

19  A.   AS WE HAVE EVOLVED, AND AS I'D SAID, WE HAD MADE SOME

20  CHANGES IN THE STANDARDS RELATIVE TO TIME FRAME THAT WAS -- IN

21  OTHER WORDS, INITIALLY, THE FIRST DOCUMENT, THEN SUBSEQUENTLY

22  WE CHANGED AND HAVE ADJUSTED THOSE CHANGES THROUGHOUT THE LAST

23  20 SOME ODD YEARS.

24  Q.   ALL RIGHT.  WHAT DIFFERENCE DOES LOCATION MAKE?  WHAT

25  IMPACT DOES THAT HAVE ON THE STANDARD OF CARE AS PRACTICED?

ALAN KROBOTH - DIRECT BY COTTER        108

1  A.   WELL, IT'S -- THERE'S SEVERAL FACTORS.  I THINK I

2  EXPLAINED ALREADY ONE FACTOR THAT WE LOOKED AT.  A DIFFERENT

3  PART OF THE COUNTRY MAY HAVE NOT ACCEPTED MECHANICAL

4  PULVERIZING AS BEING THEIR PREDOMINANT METHOD OF RECOVERY.

5  LOWER CREMATION RATE AREAS, BE IT THE SOUTHEAST, EXCEPT FOR

6  FLORIDA I WOULD SAY.  BUT IN THIS PARTICULAR AREA OF THE

7  COUNTRY, THE LOWER CREMATION RATE MAY HAVE SOME IMPACT ON

8  THOSE, ON THOSE STANDARDS.

9  Q.   COULD YOU GIVE THE COURT AN UNDERSTANDING AS TO WHAT THE

10 RANGE OF RATES MIGHT BE IN 2002?

11 A.   COULD BE AS LOW AS NINE, 10 PERCENT AND AS HIGH AS 50

12 PERCENT, 60 -- 50 TO 60 PERCENT.

13 Q.   AND HAVE THOSE RATES GROWN THROUGH THE LAST 20 YEARS?

14 A.   YES, SIR.

15 Q.   AND HAVE THEY GROWN IN THE STATE OF GEORGIA IN THE LAST

16 20 YEARS?

17 A.   ABSOLUTELY, YES, SIR.

18 Q.   ALL RIGHT.  I THINK YOU MENTIONED FACILITIES --

19 A.   YES, SIR.

20 Q.   -- WOULD HAVE SOMETIMES AN IMPACT ON THE STANDARD OF CARE

21 AS PRACTICED.  HOW SO?

22 A.   WELL, ONE OF THE ISSUES THAT WE'VE DEALT WITH IS THE

23 CHANGE AND THE DEVELOPMENT OF PROCESSING EQUIPMENT, CHANGE IN

24 THOSE -- THAT TYPES OF EQUIPMENT.  WE'VE HAD CHANGE IN --

25 MINOR CHANGES IN THE ACTUAL CREMATION EQUIPMENT ITSELF OVER

Laser stock Form FMC8

Corby USA 1-800-255-5040

ALAN KROBOTH - DIRECT BY COTTER          109

1    THE PAST 20 YEARS OR EVEN 30 YEARS.

2    Q.   OKAY.   THE SIZE OF THE OPERATION I BELIEVE YOU MENTIONED.

3    WHAT IMPACT, IF ANY, WOULD THAT HAVE ON THE STANDARD OF CARE

4    AS PRACTICED?

5    A.   THE SIZE OF THE OPERATION MAY PREDICATE, FOR AN EXAMPLE,

6    AN OPERATION, AND I CAN USE MINE AS AN EXAMPLE.   WE WILL TAKE

7    POSSIBLY MORE STEPS NECESSARY TO ENSURE IDENTIFICATION THAN A

8    MUCH SMALLER OPERATION MAY DO, SUCH AS SOMEONE WHO ONLY DOES

9    100 CREMATIONS A YEAR.   THEIR STEPS MAY NOT BE AS SIGNIFICANT

10   AS WHAT WE MAY DO IN A MUCH, MUCH LARGER OPERATION.

11   Q.   OKAY, LET'S TURN TO TRI-STATES.   WHEN DID YOU FIRST

12   BECOME INVOLVED, CONSULT, WITH RESPECT TO THE DISPUTE BEFORE

13   THE COURT REGARDING TRI-STATES CREMATORY?

14   A.   MR. BRINSON CONTACTED ME BACK IN MAY OF THIS PAST YEAR.

15   Q.   AND WHAT WERE YOU INITIALLY ASKED TO DO, MR. KROBOTH?

16   A.   TO PROVIDE CONSULTATION, REPORTS, INSPECTION.

17   Q.   AND DID YOU PROCEED TO DO JUST THAT?

18   A.   YES, SIR.

19   Q.   DID YOU PROCEED TO INSPECT?

20   A.   YES, SIR.

21   Q.   WHAT HAVE YOU INSPECTED, SIR?

22   A.   I'VE INSPECTED THE FACILITY AT TRI-STATE ON JUNE 20TH OF

23   THIS YEAR.

24   Q.   HAVE YOU SEEN ANY VIDEOTAPE OR PHOTOGRAPHS OF TRI-STATE

25   WHICH DEPICT THE CONDITIONS AT A TIME PRIOR TO JUNE OF 2002?

ALAN KROBOTH - DIRECT BY COTTER          110

1   A.   YES, SIR.  I WITNESSED THE G.B.I. VIDEOTAPES OF FEBRUARY

2   15TH AND 16TH OF 2002.

3   Q.   ALL RIGHT.  HAVE YOU REVIEWED ANY DOCUMENTATION REGARDING

4   TRI-STATES?

5   A.   OTHER THAN TESTIMONY OR AFFIDAVITS THAT HAVE BEEN

6   SUBMITTED BY OTHER PEOPLE THAT ARE INVOLVED IN THE CASE.

7   Q.   AND WHO WERE THOSE AFFIDAVITS OR TESTIMONY PROVIDED FROM;

8   DO YOU RECALL?

9   A.   MR. MASSEY'S VIDEOTAPED DEPOSITION, MR. CRAWFORD'S

10  DEPOSITION AND HIS TRIAL TESTIMONY IN THE ODEN CASE,

11  MR. DOUTHIN'S DEPOSITION, LASHEA MARSH'S -- I THINK SEVERAL

12  PAGES OUT OF HER DEPOSITION I REVIEWED, THE ODEN TRANSCRIPT IN

13  ITS ENTIRETY, ODEN TRANSCRIPT OUT OF CHATTANOOGA THAT I DID IN

14  ENTIRETY.  I BELIEVE THAT'S ALL.

15  Q.   WHAT PHYSICAL FEATURES, WHAT PHYSICAL, TANGIBLE THINGS,

16  ARE NECESSARY TO OPERATE A CREMATORY WHICH MEETS THE STANDARD

17  OF CARE?

18           THE COURT:  WHAT STANDARD OF CARE?

19           MR. COTTER:  AS OF 2002.  FEBRUARY 15, 2002.

20  A.   BASICALLY, A FACILITY OR A BUILDING, THE CREMATION UNIT

21  ITSELF, METHODOLOGY OF LOADING OR TRANSPORTING THE HUMAN

22  REMAINS, PROCESSING EQUIPMENT, AND OBVIOUSLY IN THAT FACILITY

23  THERE'S A HOLDING AREA FOR ANY HUMAN REMAINS.

24  Q.   BASED ON YOUR INVESTIGATION THIS YEAR, 2002, DID YOU FIND

25  EVIDENCE OF THE EXISTENCE OF THE PHYSICAL THINGS YOU HAVE JUST

Laser stock Form FMC8

Corby USA 1-800-255-5040

ALAN KROBOTH - DIRECT BY COTTER        111

1   LISTED FOR THE COURT AT TRI-STATES?

2   A.   YES, SIR.

3   Q.   AND WOULD YOU BRIEFLY RUN DOWN THOSE THINGS THAT YOU

4   FOUND?

5   A.   THERE WAS AN HYDRAULIC LIFT TABLE AT TRI-STATES.   THERE

6   WAS A POWER-PAK CREMATION UNIT.   OBVIOUSLY, THE BUILDING

7   FACILITY ITSELF.   AND I LOCATED SOME LATER -- SOMEWHERE OFF ON

8   THE SIDE OF THE PROPERTY A TAPPING DEVICE, WHICH IS WHAT WE IN

9   THE INDUSTRY WOULD CALL A MORTAR AND PESTLE TYPE PROCESSING

10  UNIT.

11  Q.   OKAY.   LET'S GO TO THE FIRST PHYSICAL CHARACTERISTIC, AND

12  I THINK YOU SAID THAT WAS THE CREMATION UNIT.   RETORT IS WHAT

13  PEOPLE OUTSIDE YOUR PROFESSION SOMETIMES REFER TO IT AS.

14  A.   YES, SIR.

15  Q.   OKAY.   COULD YOU IN A BRIEF PARAGRAPH DESCRIBE FOR THE

16  COURT HOW THE CREMATION UNIT IN THE UNITED STATES OF AMERICA

17  HAS CHANGED OR EVOLVED OVER THE LAST 20, 25 YEARS?

18  A.   I HAVE TO GO BACK A LITTLE BIT FURTHER THAN 25 YEARS, BUT

19  WE'LL GO -- START IN THE SIXTIES, WHERE THE PREDOMINANCE OF

20  CREMATION EQUIPMENT THAT WAS MANUFACTURED AT THAT TIME WAS

21  WHAT'S CALLED BUILT IN PLACE.   SUBSEQUENT TO THOSE LATE

22  SIXTIES INTO THE SEVENTIES WAS A DEVELOPMENT OF THE PACKAGED

23  CREMATION UNIT, WAS A CREMATION UNIT THAT COULD BE FIT ONTO A

24  TRAILER, BROUGHT TO YOUR FACILITY, OFFLOADED WITH A CRANE, AND

25  IN A MATTER OF LITERALLY HOURS YOU COULD BE UP AND RUNNING

Laser stock Form FMCB

Corky USA 1-800-255-5040

ALAN KROBOTH - DIRECT BY COTTER          112

1   WITH YOUR FIRST CREMATION.

2           THE COURT:  THAT WAS IN THE SEVENTIES?

3           THE WITNESS:  YES, SIR, LATE SIXTIES AND THE

4   SEVENTIES AS IT WAS DEVELOPING.  THERE WERE BASICALLY TWO AND

5   THEN THREE MANUFACTURERS HERE IN THE UNITED STATES THAT

6   PRODUCED THOSE.

7   A.    THEN THROUGH THE LATE SEVENTIES, AS CREMATION STARTED TO

8   RISE IN NUMBERS, FACILITIES LIKE MYSELF WERE LOOKING TO THE

9   MANUFACTURERS TO DEVELOP MUCH MORE LARGER EQUIPMENT THAT COULD

10  HANDLE A HIGHER VOLUME OR A HIGHER RATE, AND THOSE WERE

11  INTRODUCED -- WERE IN '79 UP AND THROUGH THE EIGHTIES, AND

12  CERTAIN OTHER MACHINES THEN BECAME AVAILABLE TO THE

13  MARKETPLACE FASTER, MORE EFFICIENT, SOMEWHAT LITTLE MODERATE

14  DESIGN CHANGES.

15  Q.    OKAY.  WHAT IS THE TYPE OF CREMATION UNIT THAT YOU

16  OBSERVED AT TRI-STATES UPON YOUR VISIT?

17  A.    IT'S CALLED POWER-PAK UNIT MADE BY INDUSTRIAL EQUIPMENT

18  AND ENGINEERING.

19  Q.    IS THAT -- INDUSTRIAL ENGINEERING, IS THAT A REPUTABLE

20  NAME BRAND OF EQUIPMENT?

21  A.    YES, SIR.

22  Q.    ALL RIGHT.  AND THE POWER-PAK, IS THAT AN ACCEPTABLE

23  CREMATION UNIT, BOTH IN THE 1980'S AS WELL AS UP UNTIL TODAY?

24  A.    YES, SIR, IT IS.

25  Q.    HAVE YOU PERSONALLY USED ONE?

Laser stock Form FMCB

Corby USA 1-800-255-5040



# EXHIBIT / ATTACHMENT

## B

(To be scanned in place of tab)

# EXHIBIT "B"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

IN RE:  TRI-STATE                )
CREMATORY LITIGATION             )  MDL DOCKET NO. 1467

VIDEOTAPE DEPOSITION OF

WILLIAM E. McGILL

November 15, 2002

10:00 a.m.

615 West First Street
Rome, Georgia

Lisa A. Messina CCR A-421

B  R  O  W  N
Reporting INC.

1740 Peachtree St, N.W.
Atlanta, GA 30309
404-876-8979

6

1          (Reporter disclosure made pursuant to
2       Article 8.B. of the Rules and Regulations
3       of the Board of Court Reporting of the
4       Judicial Council of Georgia.)
5          THE VIDEOGRAPHER:  We're on the
6       record.
7              WILLIAM E. McGILL,
8    having been first duly sworn, was examined and
9    testified as follows:
10              DIRECT EXAMINATION
11   BY MR. LEMAN:
12       Q.   If you would, state your full name for the
13   record.
14       A.   Full name is William E. McGill.
15       Q.   Mr. McGill --
16          MR. MOCK:  Joe, before we get going,
17       I don't know if y'all are taking this for
18       evidence or what the stipulation is and I
19       don't want to unduly object about anything,
20       so why don't we clarify that.
21          MR. LEMAN:  Same stipulations?
22          MR. SMALLEY:  Yes.  I don't know that
23       it's an evidence deposition.  I think it's
24       a discovery deposition.
25          MR. MOCK:  All right.  Then we're

36

1      A.     Right.   That's Exhibit --

2      Q.     85?

3      A.     -- 85 --

4      Q.     All right.

5      A.     -- which included 85-A, a copy of a death

6   certificate that was not correct.

7      Q.     Okay.  Did you ever get any kind of

8   response from the State of Georgia in response to

9   your letter that you wrote on August 11th, 1995,

10  which is Exhibit 85 and contains 85-A?

11     A.     I never received any acknowledgment of any

12  complaint whatsoever.  I never received anything from

13  the State of Georgia.

14     Q.     All right.  And let me ask you about

15  Exhibit 84.

16            This is the May 30th, 1995 -- this would

17  have been the first complaint that you made about

18  Tri-State; is that right?

19     A.     Right.

20     Q.     Did you ever receive anything from the

21  State of Georgia in response to that letter?

22     A.     I did not.

23     Q.     Okay.  Did you conclude -- well, what did

24  you conclude, Mr. McGill, was the State of Georgia's

25  position regarding Tri-State Crematory in light of



# EXHIBIT / ATTACHMENT

_____

(To be scanned in place of tab)

# EXHIBIT "C"

1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF GEORGIA
2                ROME DIVISION

3

4

5   IN RE:  TRI-STATE              )
    CREMATORY LITIGATION           )  MDL DOCKET NO. 1467
6

7

8

9

10
              VIDEOTAPE DEPOSITION OF
11
                  JOHN MASSEY
12

13

14               October 4, 2002

15                10:34 a.m.

16

17
               300 The Peachtree
18             1355 Peachtree Street
                Atlanta, Georgia
19

20

21      Carl R. Forte, CCR-A-597, RMR, CRR

22

23          B R O W N
            Reporting INC.

24
           1740 Peachtree St, N.W.
25            Atlanta, GA 30309
               404-876-8979

9

1    with the order.

2              Would you swear in our deponent?

3                   JOHN MASSEY,

4    having been first duly sworn, was examined and

5    testified as follows:

6                   CROSS-EXAMINATION

7    BY MR. COTTER:

8         Q.    Mr. Massey, I'm Steve Cotter, and I'm

9    going to be asking you a number of questions.  We

10   just met a few minutes ago.  If, at any time, my

11   questions are unclear or you're not yet done with

12   your answer and I'd start to ask another question, if

13   you'd please let us know, because we want the whole

14   truth of all of your testimony to come out, okay?

15        A.    Correct.

16        Q.    You're here pursuant to a notice and

17   subpoena which has been marked No. 24 as modified by

18   Judge Murphy; is that right?

19        A.    Correct.

20        Q.    Okay.  And in accordance with the

21   subpoena, as modified by Judge Murphy's order that

22   I've just read the pertinent parts of, you, through

23   your counsel, the Attorney General of the State of

24   Georgia, have made available certain documents which

25   are not privileged, which I -- a copy of which I've

59

1    areas within the same organization.

2         Q.    What involvement, if any, did you have

3    with respect to the enforcement action which was

4    initiated against Tri-States on March 8, 1996?

5              I hand you Exhibit No. 37.  See if that

6    refreshes your recollection.

7         A.    I'm not aware that I had anything to do

8    with this.

9         Q.    Were you even aware that it was going on?

10        A.    Possibly or possibly not.  Because I'm not

11   aware of all the investigations that go through our

12   office.

13        Q.    They did not ask for your input insofar

14   as --

15        A.    Correct.

16        Q.    -- that was concerned.

17        A.    Correct.

18        Q.    Okay.  With respect to the termination of

19   that, I hand you Exhibit No. 38, Voluntary Dismissal

20   Without Prejudice filed by the Attorney General's

21   office.

22             Were you aware that on July 9, 1996, the

23   proceedings against Ray Marsh, Tri-State Crematory,

24   were dismissed?

25        A.    I'm not sure at what point I knew it, but

92

1      Q.     In terms of part of your inspection.

2      A.     Only to ask them about their general price

3    list, if they have one that's required, and their

4    contract, do they issue a contract.  I ask for that,

5    yes.

6      Q.     Issue a contract for --

7      A.     Written contract for services provided.

8      Q.     Do you look at those written contracts or

9    do you just check to see whether they have them?

10     A.     I take their word for it most of the time.

11   Occasionally, I will spot check one.

12     Q.     Okay.  You don't look at any disposition

13   of human remains or transporting forms that a funeral

14   home may or may not use.

15     A.     No.

16     Q.     Okay.  Now, let me hand you what we've

17   marked as Exhibit No. 33, which is an affidavit of

18   Mr. Ray Marsh, which was part of the files that have

19   been produced.  And this affidavit is dated June 6 of

20   1996.

21          In paragraph 4 of Mr. Marsh's affidavit,

22   Mr. Ray Marsh asks -- Mr. Ray Marsh states that, At

23   the time plans were being formulated for Tri-State,

24   inquiries were made to the State of Georgia regarding

25   state regulation of crematories.  Then he testified



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

# EXHIBIT "D"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

IN RE:  TRI-STATE            )
CREMATORY LITIGATION         )  MDL DOCKET NO. 1467

VIDEOTAPE DEPOSITION OF
W. LEROY WILSON

October 3, 2002

10:10 a.m.

The Forum
2 Government Plaza
Rome, Georgia

Lisa A. Messina, CCR A-421

**B R O W N**
*Reporting* INC.

1740 Peachtree St, N.W.
Atlanta, GA 30309
404-876-8979

6

1          W. LEROY WILSON,

2     having been first duly sworn, was examined and

3     testified as follows:

4                    CROSS-EXAMINATION

5     BY MR. COLVIN:

6          Q.    You're Leroy Wilson; is that correct?

7          A.    Yes, sir.

8          Q.    Mr. Wilson, I'm Bill Colvin.  I'll be

9     asking you some questions today concerning the

10    Tri-State Crematory and the operation of W. L. Wilson

11    & Sons Funeral Home.

12              Do you understand that's the subject

13    today?

14         A.    Yes, sir.

15         Q.    Is this your first deposition?

16         A.    No.

17         Q.    All right.  What I'd like to do, if I ask

18    a question that is unclear or confusing to you, will

19    you please let me know so I can rephrase it, be sure

20    that my questions are clear for you?

21         A.    Yes.

22         Q.    I'm going to ask you to be sure to answer

23    questions yes or no.  With the video it helps, but to

24    be sure the transcript is clear either answer yes or

25    no and give whatever explanation or comment you feel

81

1    the identification of the decedent remain next to the

2    retort throughout the entire cremation process."

3    It's the last sentence of your response.

4        A.    Yes, sir.

5        Q.    Did you ever observe anything like that at

6    Tri-State?

7        A.    No, sir, nothing but the papers.

8        Q.    Do you recall a situation where W. L.

9    Wilson & Sons ever delivered more than one body a day

10   to Tri-State for cremation?

11       A.    Not that I recall, no.

12       Q.    Do you recall any situation where you

13   received more than one set of cremated remains back

14   from Tri-State in a day?

15       A.    No, sir, I do not.

16       Q.    In Interrogatory Response No. 24 you

17   stated that in 1994 you had asked John Massey about

18   Tri-State Crematory, whether it was operating legally

19   without a license.

20            What prompted you to ask that question?

21       A.    I knew that in '92 there was a new law

22   passed and given to '94 to comply, I guess is the

23   word to use.  So after that point I began to ask and

24   he always told me that he was legal, he was breaking

25   no laws, that he was an appropriate facility to use.

82

1    Q.    Did you talk to Mr. Massey on more than

2    one occasion about this?

3    A.    Yes, sir.

4    Q.    Do you know how often you talked to him

5    about it?

6    A.    Anytime that I was there when he did an

7    inspection -- I say anytime, a lot of times when he

8    was there, I don't know exactly which times, I would

9    ask him about that.

10   Q.    With regard to Tri-State in particular?

11   A.    Yes, sir.

12   Q.    Did you ever ask about any other facility?

13   A.    No, sir.

14   Q.    Why did you keep having questions in your

15   mind about whether Tri-State was operating legally or

16   not?

17   A.    I had read the rules and regulations that

18   was put out and that was my understanding and, of

19   course, he kept telling me that he was legal.

20   Q.    Did that have anything to do with your

21   decision to install a retort or crematory at your

22   facility?

23   A.    Not really.  Economics was our reason.

24   Q.    How much does it cost -- what's your

25   actual cost to perform a cremation now?



# EXHIBIT / ATTACHMENT

_E_

(To be scanned in place of tab)

# EXHIBIT "E"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION


IN RE:   TRI-STATE                )
CREMATORY LITIGATION              )  MDL DOCKET NO.  1467



VIDEOTAPE DEPOSITION OF

DEAN LAY



November 13, 2002

1:00 p.m.



The Forum
2 Government Plaza
Rome, Georgia



John P. Payne, RPR, CRR, CCR A-1006


**B R O W N**
*Reporting* INC.

1609 Martha Berry Blvd.
Rome, GA 30165
706-235-8300

3

1              THE VIDEOGRAPHER:  We're on the record.

2              MS. BRYAN:  Would you please state

3        your full name and address for the record?

4              MR. LAY:  Swear me in.

5              MS. BRYAN:  He will swear you in.

6              MR. LAY:  Dean Lay.

7              MS. BRYAN:  Don't worry.  I won't forget

8        it.

9              MR. LAY:  Okay.  Dean Lay, Monteagle,

10       Tennessee.

11             MS. BRYAN:  Okay.  Now.

12                        DEAN LAY,

13    having been first duly sworn, was examined and

14    testified as follows:

15                       EXAMINATION

16    BY MS. BRYAN:

17       Q.    Mr. Lay, you understand you're testifying

18    here today as a corporate representative of

19    Cumberland Funeral Home; is that right?

20       A.    It's a sole proprietorship.

21       Q.    Okay.  But you're testifying here today on

22    behalf of Cumberland?

23       A.    Yes.

24       Q.    All right.  And I gather if it's a sole

25    proprietorship, there is nobody other than you who

43

1   Tri-State in the '89 to '94 time frame, did you

2   believe that they were a licensed crematory?

3        A.    Yes.

4        Q.    And what was the basis for your belief

5   that they were a licensed crematory?

6        A.    Well, they had forms printed up, had their

7   name, address, phone number.  They had business

8   cards.  They answered the phone Tri-State Crematory.

9        Q.    Did you ever see a license?

10       A.    No, ma'am.

11       Q.    Or any official --

12       A.    Never seen one at any crematory I've been

13   to.

14       Q.    Well, you have a license, right, to

15   operate Cumberland Funeral Home?

16       A.    Yes, ma'am.

17       Q.    And where is the State of Tennessee

18   funeral home license?

19       A.    I keep it in my business office.  If you

20   go in my garage, I don't have one in my garage.

21       Q.    Well, so if I go to your facility in

22   Monteagle, am I going to see it on the wall?

23       A.    If you go in the business office.  If you

24   go to the garage, you won't see it.

25       Q.    Well, when you went to Tri-State, you went



# EXHIBIT / ATTACHMENT

F

(To be scanned in place of tab)

# EXHIBIT "F"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION


IN RE:  TRI-STATE            )
CREMATORY LITIGATION         )  MDL DOCKET NO. 1467




VIDEOTAPE DEPOSITION OF

CHARLES E. JOYCE


November 6, 2002

2:10 p.m.


The Forum
2 Government Plaza
Rome, Georgia


Lisa A. Messina CCR A-421


**B R O W N**
*Reporting* INC.

1740 Peachtree St, N.W.
Atlanta, GA 30309
404-876-8979

4

1          MR. FLEISSNER:  Because we do have to

2       assume if you answer the question, that it

3       must have made sense to you.

4          MR. JOYCE:  All right.

5          MR. FLEISSNER:  As we were discussing

6       a moment ago, if you need a break for any

7       reason, all you've got to do is say so and

8       we'll stop.  Okay?

9          MR. JOYCE:  All right.

10          MR. FLEISSNER:  Will you kindly state

11       your complete name for the record?

12          MR. WEISBECKER:  Do you want to

13       swear him first?

14          MR. FLEISSNER:  Oh, okay.  Sorry.

15               CHARLES E. JOYCE,

16   having been first duly sworn, was examined and

17   testified as follows:

18               CROSS-EXAMINATION

19   BY MR. FLEISSNER:

20       Q.    State your complete name, please.

21       A.    Charles E. Joyce.

22       Q.    Mr. Joyce, where do you reside?

23       A.    Dalton, Georgia.

24       Q.    Okay.  And we have a lady with you here

25   today.  Is this your wife or --

47

1          A.      Repeat that.

2          Q.      As a licensed funeral director yourself in

3    the State of Georgia, do you have an opinion whether

4    it meets the standard of care for a funeral

5    establishment in this state to entrust deceased

6    bodies that come into your care for cremation to an

7    unlicensed crematory?

8               MR. WEISBECKER:  Object to form.

9               THE WITNESS:  An unlicensed

10          crematory?  He didn't have to have a

11          license.

12          Q.     (By Mr. Fleissner)  Well, is that your

13    answer?

14          A.      Yes.  I didn't object to using him, no.

15          Q.      Okay.  If, hypothetically, your

16    understanding that he did not have to have a license

17    were incorrect, and I'm posing this to you as a

18    hypothetical, if that were so and under all of the

19    circumstances of Tri-State's operation it were

20    required -- it was required to be licensed at any

21    point in time, during the point in time at which it

22    was required to be licensed, would it have met your

23    standard of care as a funeral establishment?

24          A.      No.

25               MR. WEISBECKER:  Let me make an



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

# EXHIBIT "G"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION


IN RE:  TRI-STATE              )
CREMATORY LITIGATION           )  MDL DOCKET NO. 1467



VIDEOTAPE DEPOSITION OF

JOHN WESLEY PEEPLES


October 24, 2002

10:10 a.m.


615 West First Street
Rome, Georgia



John P. Payne, RPR, CRR, CCR A-1006




**B R O W N**
*Reporting* INC.

1609 Martha Berry Blvd.
Rome, GA 30165
706-235-8300

4

```
 1              (Reporter disclosure made pursuant to

 2          Article 8.B. of the Rules and Regulations

 3          of the Board of Court Reporting of the

 4          Judicial Council of Georgia.)

 5              THE VIDEOGRAPHER:  On the record.

 6          Would you please swear in the witness?

 7                  JOHN WESLEY PEEPLES,

 8  having been first duly sworn, was examined and

 9  testified as follows:

10                      EXAMINATION

11  BY MR. FLEISSNER:

12      Q.     State your name, please.

13      A.     My name is John Wesley Peeples.

14      Q.     Mr. Peeples, we introduced ourselves

15  before we started here.  My name is Phil Fleissner.

16  I'm an attorney from Chattanooga.

17      A.     Uh-huh.

18      Q.     And I represent a number of the plaintiffs

19  in this case along with Joe Leman next to me and

20  Allen Murphy.  You may know all these other gentlemen

21  here and, of course, Ms. Anderson, who are defense

22  counsel?

23      A.     Uh-huh.

24      Q.     Have you ever had your deposition taken

25  before?
```

119

1        A.     No.

2               MR. DAVIS:  Object to the form to the

3        extent it called for a legal conclusion.

4        Q.     (By Mr. Fleissner)  In your capacity as a

5   licensed funeral director -- before I go on, would

6   that have continued to be your opinion, that you did

7   not have such duty, throughout the time that you did

8   business with Tri-State?

9        A.     No.

10       Q.     I'm sorry?

11       A.     I didn't -- I didn't feel that I needed to

12  do that.

13       Q.     What specifically as you alluded to a

14  minute ago that you thought the State of Georgia

15  would do, what specifically did you rely upon them or

16  expect them to do in terms of Tri-State Crematory?

17       A.     I assumed that they would be expected just

18  like funeral homes and everything else, and I assumed

19  that the State would regulate what they did and check

20  them for license and have an inspection just like we

21  do at our funeral homes.

22       Q.     And what did you base that assumption on?

23       A.     I just -- I don't know.  I just assumed

24  it.

25       Q.     Why would you have felt that was



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

# EXHIBIT "H"

1

1
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
2
ROME DIVISION

3

4

5   IN RE:  TRI-STATE                )
    CREMATORY LITIGATION     ) MDL DOCKET NO. 1467
6

7

8

9

10

11              VIDEOTAPE DEPOSITION OF

12              ROBERT A. RYAN, JR.

13

14              October 16, 2002

15              10:30 a.m.

16

17          615 West First Street
                Rome, Georgia
18

19      Lisa A. Messina, CCR A-421

20

21

22              B R O W N

23              Reporting, INC.

24
        1740 Peachtree St, N.W.
25           Atlanta, GA 30309
             404-876-8979

6

1          ROBERT A. RYAN, JR.,

2    having been first duly sworn, was examined and

3    testified as follows:

4                  CROSS-EXAMINATION

5    BY MS. NEWBERN:

6        Q.    There's my first wobble.

7              Have you ever given a deposition in a case

8    before?

9        A.    No.

10       Q.    Have you ever been a witness or a party in

11   a civil or a criminal proceeding?

12       A.    No.

13       Q.    All right.  Then let me just give a little

14   bit of background on how this is going to work this

15   morning.  I'm going to be asking you questions.  If I

16   ask you any question that you find to be unclear or

17   confusing, please stop me and let me know so that I

18   can rephrase so that I can make sure that you and I

19   are on the same page and that you're actually

20   answering the question that I'm asking.

21             If at any point, you know, you need to

22   take a break or you want to just hold things up for a

23   second, please feel free to ask.  We'll probably be

24   going for a few hours this morning.  I'm not that

25   good at talking for that long, so don't feel hesitant

92

1    Q.    All right.  And you're aware, are you not,

2    that under Georgia laws that existed in February of

3    2002 it was unlawful for anyone to cremate a body

4    unless they were a licensed crematory?

5         MR. LEHMAN:  Object to the form;

6         calls for a legal conclusion.  You can

7         answer the question.

8         THE WITNESS:  I was not assured that

9         he wasn't licensed.

10   Q.    (By Ms. Bryan)  I'm sorry.  You were not

11   assured that he wasn't licensed?

12   A.    Right, that he wasn't illegal.

13   Q.    What discussions did you have with anyone

14   about whether he was or was not, as you say, legal?

15   A.    He continued to operate through the years.

16   Q.    Did you have any discussions with anyone

17   about whether Tri-State was licensed?

18   A.    No.

19   Q.    Then how did you come to wonder whether he

20   was legal or not?

21   A.    He wasn't shut down.  The State Board

22   didn't shut him down.

23   Q.    And when would the State Board have shut

24   him down?

25   A.    If he wasn't legal.

1      Q.     It's your belief that if he had not been

2   legal, the State Board would have shut him down?

3      A.     The State of Georgia, yes.

4      Q.     Okay.

5             THE VIDEOGRAPHER:   Off the record,

6      please.

7             (Discussion ensued off the record.)

8             THE VIDEOGRAPHER:   Back on the

9      record.

10     Q.     (By Ms. Bryan)  Mr. Ryan, I believe your

11  interrogatory responses indicate that the last time

12  that Ryan Funeral Home sent a body to Tri-State for

13  cremation was February 24th of 1999.

14            Is that consistent with your recollection?

15     A.     That is correct.

16     Q.     And yet after that time Ryan continued to

17  offer cremation services to its customers; is that

18  correct?

19     A.     That's correct.

20     Q.     Why did you discontinue using Tri-State?

21     A.     When we were acquired by the other owners,

22  they said that we had to go to another crematory and

23  we used Southcrest Chapel of Lane Funeral Home.

24     Q.     All right.  And this would have been the

25  acquisition of ECI by SCI; is that right?



EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

# EXHIBIT "I"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION


IN RE:  TRI-STATE            )
CREMATORY LITIGATION         )  MDL DOCKET NO.  1467



VIDEOTAPE DEPOSITION OF

RHAMES LaSHEA MARSH



December 4, 2002

4:06 p.m.



The Forum
2 Government Plaza
Rome, Georgia



Carl R. Forte, CCR-A-597, RMR, CRR

B R O W N
Reporting INC.

1609 Martha Berry Blvd.
Rome, GA 30165
706-235-8300

7

1          (Reporter disclosure made pursuant to

2      Article 8.B. of the Rules and Regulations

3      of the Board of Court Reporting of the

4      Judicial Council of Georgia.)

5          THE VIDEOGRAPHER:  On the record.

6      Would you please swear in the witness?

7              RHAMES LaSHEA MARSH,

8  having been first duly sworn, was examined and

9  testified as follows:

10         MR. SMALLEY:  This will be the

11     deposition of Rhames LaShea Marsh, taken by

12     agreement of counsel.  We'll use the same

13     stipulations we've used in all the other

14     depositions, reserving all objections

15     except as to form and responsiveness.

16         Is that acceptable?

17         MR. VARNER:  Yes.

18         MR. POSTON:  You'll notice that Chris

19     Varner is the wired-up lawyer, in terms of

20     electronically.

21         MR. SMALLEY:  Does that mean you're

22     not going to be talking?

23         MR. POSTON:  So he will be making

24     most of the statements --

25         MR. SMALLEY:  Okay.

14

1    Q.    And when were you licensed in Tennessee?

2    A.    1993.

3    Q.    And what about Georgia?

4    A.    2001.

5    Q.    Why is there that eight-year gap between

6    your licensure in Tennessee and Georgia?

7    A.    Because I did not apply for a Georgia

8    license until 2001.

9    Q.    Why is that?

10   A.    Because I didn't.

11   Q.    No other reason?

12   A.    I didn't apply for them until 2001.

13   Q.    Where do you work?

14   A.    Franklin-Strickland Funeral Home.

15   Q.    In Chattanooga?

16   A.    Yes.

17   Q.    Is there only one location of that funeral

18   home?

19   A.    No.

20         MR. HIGNEY:  Object to the form.

21   Q.    (By Mr. Smalley)  Okay.  Then can you tell

22   me, is there a particular location at which you work?

23   A.    I worked at the Central Avenue location.

24   Q.    Can you tell me how many locations or how

25   many branches there are, how many different

15

1    facilities there are?

2              MR. VARNER:  Object to the form.

3              THE WITNESS:  There are two.

4        Q.    (By Mr. Smalley)  And what are they?  Or

5    how are they known by people who work at

6    Franklin-Strickland?

7        A.    At Central Avenue chapel and Avondale

8    chapel.

9        Q.    Is one considered to be the main office

10   over the other?

11       A.    Yes.

12       Q.    Which one is the main office?

13       A.    Central Avenue.

14       Q.    Okay.  And that's where you worked?

15       A.    Yes.

16       Q.    For how long have you worked for

17   Franklin-Strickland Funeral Home?

18       A.    Since 1992.

19             MR. VARNER:  Object to the form.

20       Q.    (By Mr. Smalley)  Okay.  So, if I'm

21   trying -- I'm trying to remember my dates.  If you

22   graduated from the mortuary school in 1993, and you

23   began working at Franklin-Strickland in 1992, then

24   you began working at Franklin-Strickland before you

25   graduated; is that correct?

16

1      MR. VARNER:  Object to the form.

2      MR. HIGNEY:  Object to the form.

3      THE WITNESS:  That wasn't your

4  question to me.  That wasn't what I said to

5  you.

6      Q.   (By Mr. Smalley)  Okay.  Did I misstate --

7      A.   Yes, sir, you did misstate.  You didn't

8  ask me when I graduated.

9      Q.   When did you graduate?

10      A.   In 1992.

11      Q.   Okay.  And so, did you go to work for

12  Franklin-Strickland directly after graduating from

13  mortuary school?

14      A.   Yes, I did.

15      Q.   Is your job at Franklin-Strickland Funeral

16  Home the only job that you have ever held in the

17  funeral industry or business?

18      MR. VARNER:  Object to the form.

19      MR. HIGNEY:  Object to the form.

20      THE WITNESS:  You mean as far as

21  working in a funeral home?

22      Q.   (By Mr. Smalley)  Yes.

23      A.   Yes.

24      Q.   And have you continuously worked for

25  Franklin-Strickland -- and let's just -- can we agree

26

1        THE WITNESS:  Yes.

2        Q.    (By Mr. Smalley)  Okay.  What duties have

3   you performed?

4        A.    I was requested by Mr. John Franklin, when

5   his wife died, I think in October -- she had

6   requested that I come to embalm her body, which I was

7   out of town and was not able to do; but then I was

8   also requested to work that funeral service for that

9   family, and I did do that for them.

10       Q.    Are you also a licensed embalmer?

11       A.    Yes.

12       Q.    When did you become a licensed embalmer?

13       A.    In 2001, I think.

14            MR. VARNER:  Object to the form.

15            MR. SMALLEY:  What's the objection?

16            MR. VARNER:  Okay.  If you want me to

17       tell you, you didn't ask which state.

18            MR. SMALLEY:  Okay.  I was going to.

19       Q.    (By Mr. Smalley)  Did that become -- did

20   you become a licensed embalmer in the State of

21   Tennessee?

22       A.    Yes.

23       Q.    All right.  And when you became a licensed

24   funeral director in the State of Georgia, did you

25   also become a licensed embalmer in the State of

27

1    Georgia?

2         A.    What was your question again, please?

3         Q.    Are you also a licensed embalmer in the

4    State of Georgia?

5         A.    Yes.

6         Q.    And did that licensure in Georgia and

7    Tennessee occur at around the same time?

8              MR. HIGNEY:  Object to the form.

9              MR. VARNER:  Object to the form.

10             THE WITNESS:  I don't know what's

11        your meaning of around the same time.  If

12        you mean the same -- at the same date --

13        Q.    (By Mr. Smalley)  At the same time.

14        A.    No.

15        Q.    Have you performed any other services --

16             MR. POSTON:  Can we take a brief

17        break?

18             THE VIDEOGRAPHER:  Off the record.

19             MR. POSTON:  Off the record.

20             MR. SMALLEY:  Okay.

21             (A recess was taken from 4:25 till 4:31.)

22             THE VIDEOGRAPHER:  Back on the record.

23        Q.    (By Mr. Smalley)  Okay, Ms. Marsh, I don't

24   remember exactly where we were when we took a short

25   break here, but what have you -- have you done any

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for all parties with a copy

of the within and foregoing **FUNERAL HOME DEFENDANTS' RESPONSE TO**

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** by causing

a copy of same to be placed in first class U.S. Mail with adequate postage affixed

thereto and addressed as follows:

Robert H. Smalley, III, Esquire
McCAMY, PHILLIPS, TUGGLE & FORDHAM, LLP
Post Office Box 1105
Dalton, GA  30720-1105
Liaison for Plaintiffs

McCracken Poston, Jr., Esquire      Frank E. Jenkins, III, Esquire
OFFICE McCRACKEN POSTON      JENKINS & OLSON
Post Office Box 1130      15 Public Square, South
Ringgold, GA   30736      Cartersville, GA   30120-3350
Liaison/Lead Counsel for Tri-State Crematory, Inc. and the Marsh Family

This __13th__ day of November, 2003.

J. Anderson Davis

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

IN RE:  TRI-STATE                    :
         CREMATORY LITIGATION    :          MDL DOCKET NO. 1467

_____ :

## CERTIFICATE OF COMPLIANCE WITH LR 5.1(B)

This is to certify that the foregoing document was prepared using Times New

Roman 14 point font in accordance with LR 5.1(B).

This 13th day of November 2003.

BY: _____

J. ANDERSON DAVIS
Georgia Bar No. 211077

Post Office Box 5513
Rome, GA  30162-5513
(Phone - 706/291-8853)
(Fax - 706/234-3574)

106905.1

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

NOV 1   2003

By *Jacken*
Deputy Clerk

| | |
|---|---|
| IN RE: TRI-STATE CREMATORY LITIGATION | MDL DOCKET NO. 1467 |

## FUNERAL HOME DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTESTED MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1(B)(2) for the United States District Court for the Northern District of Georgia, the Funeral Home Defendants submit the following response to Plaintiffs' statement of material facts to which the Plaintiffs contend that there is no genuine issue to be tried.

Throughout their statement of facts, Plaintiffs primarily refer to legal issues, not facts. For example, Plaintiffs refer to numerous laws passed by the Georgia Legislature. Construction of these statutes and regulations cited by Plaintiffs triggers the rules of statutory construction and does not create issues of undisputed material facts. Accordingly, the Funeral Home Defendants will not be listing any disputed material facts in response. The Funeral Home Defendants, however, insist that one material fact not in dispute is that Tri-State Crematory was the

662

independent contractor, not the agent, of the individual Funeral Home Defendants.

<u>See</u> Summary Judgment Pleadings filed by individual Funeral Home Defendants.

1. In 1899 the Georgia Legislature passed  Ga. L. 1899, p. 70.

   **RESPONSE:**

   Admitted.

2. A true and correct copy of Ga. L. 1899, p. 70 is part of Exhibit 6 to

   Plaintiffs' Motion for Partial Summary Judgment.

   **RESPONSE:**

   Denied.  The Funeral Home Defendants are not in a position to authenticate

   Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

3. In 1916 the Georgia Legislature amended the act establishing the State

   Board of Embalming Ga. L. 1916, p. 77, § 1, *et seq*.

   **RESPONSE:**

   Admitted.

4. A true and correct copy of Ga. L. 1916, p. 77, § 1, *et seq* is part of Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied. The Funeral Home Defendants are not in a position to authenticate Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

5. In 1950 the Georgia Legislature establishing the State Board of Funeral Service and passed Ga. L. 1950, p. 238, §§ 1-29, *et seq*.

**RESPONSE:**

Admitted.

6. A true and correct copy of Ga. L. 1950, p. 238, §§ 1-29, *et seq*. is part of Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied. The Funeral Home Defendants are not in a position to authenticate Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

7. In 1966 the Georgia Legislature passed Ga. L. 1966, p. 377 *et. seq.* that

amended the State Board of Funeral Service law to provide at Section 18:

" . . .There shall be conspicuously displayed in all establishments the name

and license of the licensed funeral director who is in full and continuous

charge."

**RESPONSE:**

Admitted.

8.  A true and correct copy of Ga. L. 1966, p. 377 *et. seq.*  is part of Exhibit 6

to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied.  The Funeral Home Defendants are not in a position to authenticate

Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

9. In 1980 the Georgia Legislature amended the Act establishing the State

Board of Funeral Service (Georgia Law, 1950, p. 238).

**RESPONSE:**

Admitted.

10. A true and correct copy of Georgia Law, 1950, p. 238 is part of Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied. The Funeral Home Defendants are not in a position to authenticate Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

11. On June 8, 1981 the Attorney General of the State of Georgia, Hon. Arthur Key Bolton, issued Opinion No. 81-45.

**RESPONSE:**

Admitted.

12. A true and correct copy of the June 8, 1981 Attorney General Opinion No. 81-45, found at annotation O.C.G. A. § 43-18-1 is attached as Exhibit 1 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied. The Funeral Home Defendants are not in a position to authenticate Exhibit 1 to Plaintiffs' Motion for Partial Summary Judgment.

13. That on October 24, 1986, Lori Gold, Executive Director of the Georgia

State Board of Funeral Service issued a memorandum to the Assistant

Attorney General for the State of Georgia  specifically stating that in order

for a crematory to be in compliance with the law it was a requirement that

"it be operated by a  licensed funeral director."

**RESPONSE:**

Denied.  The Memorandum dated October 24, 1986 from Lori Gold states

that the definition is simply "our best effort at defining 'Substantial

Compliance.'" The Memorandum is not a legislative enactment and does

not review current legislation.


14. A true and correct copy of the October 24, 1986, memorandum to the

Assistant Attorney General for the State of Georgia is attached as Exhibit 2

to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied.  The Funeral Home Defendants are not in a position to authenticate

Exhibit 2 to Plaintiffs' Motion for Partial Summary Judgment.

15. In 1990 the Georgia Legislature passed  Ga. L. 1990, p. 1372.

**RESPONSE:**

Admitted.

16. A true and correct copy of Ga. L. 1990, p. 1372. is attached as part of

Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied.  The Funeral Home Defendants are not in a position to authenticate

Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

17. That Pursuant to the 1990 statute, the Georgia State Board of Funeral

Service enacted "Establishment/Crematory Licensure and Regulations."

*Rules of the Georgia State Board of Funeral Service, Chapter 250-6,*

(December 17, 1991).

**RESPONSE:**

Denied.  The Funeral Home Defendants are not in a position to state why

the Georgia State Board of Funeral Service enacted certain regulations.

18. A true and correct copy of "Establishment/Crematory Licensure and

Regulations." *Rules of the Georgia State Board of Funeral Service, Chapter

250-6,* (December 17, 1991), is attached as part of Exhibit 7 to Plaintiffs'

Motion for Partial Summary Judgment.

**RESPONSE:**

Denied.  The Funeral Home Defendants are not in a position to

authenticate Exhibit 7 to Plaintiffs' Motion for Partial Summary

Judgment.

19. That Board Rule 260-6.01(e) provided: "(e)  A licensed funeral

establishment may operate a crematory without a separate crematory license,

but must nevertheless abide by all rules and regulations of the Board

pertaining to either funeral establishments, crematories, or both."

**RESPONSE:**

Denied.  The Board Rule Plaintiffs appear to be citing is Ga. Comp, R. &

Regs 250-6-.01(e).

20. That Pursuant to the 1990 statute, the Georgia State Board of Funeral

Service enacted *Rule of the Georgia State Board of Funeral Service,*

*Chapter 250-5-.07.*

**RESPONSE:**

Denied.  The Funeral Home Defendants are not in a position to state why

the Georgia State Board of Funeral Service enacted certain regulations.

21. A true and correct copy of *Rule of the Georgia State Board of Funeral*

*Service, Chapter 250-5-.07* is attached as part of Exhibit 7 to Plaintiffs'

Motion for Partial Summary Judgment.

**RESPONSE:**

Denied.  The Funeral Home Defendants are not in a position to authenticate

Exhibit 7 to Plaintiffs' Motion for Partial Summary Judgment.

22. That the regulations set forth in Rule 250-6.01 remained in effect as of the

date of the gruesome discoveries at Tri-State in February, 2002. of Exhibit 7

to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied.  Ga. Comp. R. & Regs 250-6-.01 has been amended since its effective date in 1992.  The Funeral Home Defendants admit that the version of Ga. Comp. R. & Regs 250-6-.01, amended after 1995, was in effect in February 2002.

23. On April 6, 1992, the Georgia Legislature passed § 31-25-21-5(a).

**RESPONSE:**

Denied.  The correct cite is O.C.G.A. § 31-21-5(a).

24. A true and correct copy of O.C.G.A. § 31-25-21-5(a). is attached as part of Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied.  The Funeral Home Defendants are not in a position to authenticate Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

25. On July 1, 1992, the Legislature passed a law, codified at Georgia Code § 43-18-17(g), relating to crematories.

**RESPONSE:**

Admitted.


26. A true and correct copy of O.C.G.A. § 31-25-21-5(a) is attached as part of

Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied. The Funeral Home Defendants are not in a position to authenticate

Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.


27. In 1995 Georgia enacted a law that required identification tags to be placed

*inside* the vessel containing cremated remains. O.C.G.A § 43-18-8 (1995).

**RESPONSE:**

Denied. The statute, O.C.G.A. § 43-18-8, refers to a tag but also states that

the "vessel containing cremated remains shall be plainly labeled on the

outside so as to identify the deceased with the same information, excluding

social security number, as is required to be on the tag inside the vessel and

so as to identify the name of the person or firm to which such remains are to

be delivered or released." O.C.G.A. § 43-18-8(a)(2). Further, the statute

provided that "[n]o funeral establishment shall accept or take delivery of

any cremated remains from any crematory unless the vessel containing such

remains is labeled as required by paragraph (2) of subsection (a) of this

Code section." O.C.G.A. § 43-18-8©).


28. A true and correct copy of O.C.G.A. § 31-25-21-5(a) is attached as part of

Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied.  The Funeral Home Defendants are not in a position to authenticate

Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.


29. In October 2002 the Plaintiffs deposed John Massey, an inspector for the

Georgia State Board of Funeral Service.

**RESPONSE:**

Admitted.  The Funeral Home Defendants also deposed Mr. Massey

on that date.


30. Mr. Massey  stated that Tri-State could operate as a business either under

its own license (if it were licensed) or "in conjunction with an established

funeral home that had a license" (Massey Deposition, p. 20, ll. 21-23; *see also* p. 47, ll. 14-19).

**RESPONSE:**

Denied. Mr. Massey's deposition testimony is taken out of context, and he did not make that statement about Tri-State. Instead Mr. Massey testified as follows:

"Q.   And are there other than licensed crematories in the state of Georgia?

A.    There are — it depends upon how they operate if they operate in conjunction with an established funeral home that has a license by the Board, then it does not have a separate license, it is in conjunction with that funeral home establishment license."

John Massey Deposition ("Massey Depo."), p. 20, lines 19-25, p. 21, lines 1-3.

"Q.   How many crematories today — this is October 4, 2002. How many crematories are you aware of in business in the state of Georgia?

A.    Are you referring to licensed crematories or retorts in entirety in the state of Georgia?

Q.    Let's start off with licensed, and then go to the second.

-13-

A. I'm not sure.  There's probably — in the neighborhood, there's

probably 15 or 20 — 10 to 15, probably, licensed crematories in the

state of Georgia, and then there's probably that many that are

operating in conjunction with a licensed funeral establishment."

Massey Depo., p. 47, lines 7-19.


31. Mr. Massey testified that under these circumstances if he, as a funeral

director used a unlicensed crematory, that the "crematory would be acting as

my agent." (Massey Deposition, p. 123, line 14).

**RESPONSE:**

Denied.  Mr. Massey testified as follows:

Q. "Well, if this were a crematory that you were going to do business

with in — as a licensed funeral director, would you think it

appropriate to go tour the facility?

A. "I would probably take into consideration the person who I was

dealing with, if I thought that person was dependable.  Because

you're — the crematory would be acting as my agent."

Massey Depo., p. 123, lines 7-14.

Mr. Massey later clarified that when stating that the crematory acts as an agent for the funeral home that he meant that the crematory is a contracting party with the funeral home.  Massey Depo., p. 177, lines 14-20.

32. Tommy Ray Marsh (the father of Brent Marsh) was never licensed as a funeral director in the State of Georgia. Exhibit 3 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Admitted.

33. Tommy Ray Brent Marsh (the son of "Ray" Marsh) was never licensed as a funeral director in the State of Georgia.

**RESPONSE:**

Admitted.

34. Clara Marsh was never licensed as a funeral director in the State of Georgia.

**RESPONSE:**

Admitted.

-15-

35. The Tri-State Crematory was never licensed as a funeral establishment in the State of Georgia. Exhibit 3 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Admitted.

36. The Tri-State Crematory was never licensed as a crematory in the State of Georgia. Exhibit 3 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Denied.  The Georgia Funeral Service Board never stopped Tri-State Crematory from performing cremations, even though the Board was aware Tri-State was in business.  Thus, the Board determined either that Tri-State did not require a license or that Tri-State was de facto licensed.

37. Rhames LaShea Marsh was never licensed as a funeral director in the State of Georgia  until December 31, 2001. Exhibit 3 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Admitted.

38. Rhames LaShea Marsh did not cremate bodies at Tri-State after December 31, 2001. *Rhames Marsh Deposition*, Exhibit 9 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Admitted.  Rhames LaShea Marsh testified that she never operated Tri-State Crematory after her father's strokes.  Further, Brent Marsh never asked her to operate the crematory for him.  Rhames LaShea Marsh Deposition, p. 78, lines 3-4, 17-21.

39. Rhames La Shea Marsh did not operate the Tri-State Crematory after December 31, 2001. *Rhames Marsh Deposition*, Exhibit 9 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Admitted.  Rhames LaShea Marsh testified that she never operated Tri-State Crematory after her father's strokes.  Further, Brent Marsh never asked her

to operate the crematory for him.  Rhames LaShea Marsh Deposition, p. 78, lines 3-4, 17-21.

40. Tommy Ray Brent Marsh has invoked the Fifth Amendment privilege against self- incrimination with respect to numerous questions related to the operation of the Tri-State Crematory. *Brent Marsh Deposition*, Exhibit 5 to Plaintiffs' Motion for Partial Summary Judgment.

**RESPONSE:**

Admitted.

41.Each of the Funeral Home Defendants currently a party in the within and foregoing action utilized Tri State Crematory for cremation services during at least some portion of the class period, 1988-2002.

**RESPONSE**:

The Funeral Home Defendants admit that each one of them retained Tri-State Crematory as an independent contractor to perform certain cremations during at least some portion of the class period, 1988-2002.

Respectfully Submitted, this 13th day of November, 2003.

**BRINSON, ASKEW, BERRY, SEIGLER, RICHARDSON & DAVIS, LLP**

By: _____
Robert M. Brinson
Georgia Bar No. 082900

The Omberg House
615 West First Street
Post Office Box 5513
Rome, GA  30162-5513
Phone  706/291-8853
Fax 706/234-3574

By: _____
J. Anderson Davis
Georgia Bar No. 211077

Lead and Liaison Counsel for
Defendant Funeral Homes

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for all parties with a copy of the within and foregoing **Funeral Home Defendants' Response to Plaintiffs' Statement Of Uncontested Material Facts** by causing a copy of same to be placed in first class U.S. mail with adequate postage affixed thereto and addressed as follows:

Robert H. Smalley, III, Esquire
McCAMY, PHILLIPS, TUGGLE & FORDHAM, LLP
Post Office Box 1105
Dalton, GA  30720-1105
Liaison for Plaintiffs

McCracken Poston, Jr., Esquire
OFFICE McCRACKEN POSTON
Post Office Box 1130
Ringgold, GA  30736
Counsel for Tri-State Crematory, Inc.

Frank E. Jenkins, III, Esquire
JENKINS & OLSON
15 Public Square, South
Cartersville, GA  30120-3350
Counsel for the Marsh Family

This 13th day of November, 2003.

J. Anderson Davis

Consistent with Rule 41(b), each such Plaintiff's claims against the respective Funeral Home Defendant should be dismissed with prejudice.

WHEREFORE, Funeral Home Defendants respectfully request that the claims of each Plaintiff identified above be dismissed with prejudice and Funeral Home Defendants be awarded their reasonable costs and attorneys' fees incurred due to each such Plaintiff's repeated and unexcused failure to appear.

Respectfully submitted this 14th day of November, 2003.

BRINSON, ASKEW, BERRY, SEIGLER, RICHARDSON & DAVIS, LLP

By: _____
Robert M. Brinson
Georgia Bar No. 082900

By: _____
J. Anderson Davis
Georgia Bar No. 211077

The Omberg House
615 West First Street
Post Office Box 5513
Rome, GA 30162-5513
Phone 706/291-8853
Fax 706/234-3574

Lead and Liaison Counsel for
Defendant Funeral Homes

## CERTIFICATE OF COMPLIANCE WITH LR 5.1(B)

This is to certify that the foregoing document was prepared using Times New Roman 14 point font in accordance with LR 5.1(B).

134503.1                                    -8-

# CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for all parties with a copy of the within and foregoing **Memorandum of Law in Support of Funeral Home Defendants' Motion to Exclude** by causing a copy of same to be placed in first class U.S. mail with adequate postage affixed thereto and addressed as follows:

Robert H. Smalley, III, Esquire
McCAMY, PHILLIPS, TUGGLE & FORDHAM, LLP
Post Office Box 1105
Dalton, GA 30720-1105
Liaison for Plaintiffs

McCracken Poston, Jr., Esquire
OFFICE McCRACKEN POSTON
Post Office Box 1130
Ringgold, GA 30736
Liaison/Lead Counsel for Tri-State
Crematory, Inc. and the Marsh Family

Frank L. Jenkins, Esquire
JENKINS & OLSON, P.C.
15 South Public Square
Cartersville, GA 30120-3350

This ___14th___ day of November, 2003.

_____
J. Anderson Davis
Georgia Bar No. 211077

134503.1