FILED IN CLERK'S OFFICE
U.S.D.C. Rome

NOV 14 2003

LUTHER D. THOMAS, Clerk
By: Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| IN RE: TRI-STATE CREMATORY LITIGATION | MDL DOCKET NO. 1467 |

## PLAINTIFFS' RESPONSE TO RYAN FUNERAL HOME, INC.' S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE FOR TRIAL

Plaintiffs hereby respond to Defendant Ryan Funeral Home, Inc.'s Statement of Material Facts as to which it alleges there is No Genuine Issue for Trial, pursuant to United States District Court for the Northern District of Georgia, Local Rule 56.1(B)(2) as follows:

1.

Ryan Funeral Home, Inc. defined as also ECI Georgia Services of Georgia, Inc., SCI Georgia Funeral Services of Georgia, Inc. FDBA Ryan Funeral Home, and all other entities owning or operating Ryan Funeral Home, Inc. 1985 through 1999 ("Ryan") started operations in 1976 in Trenton, Georgia. Ryan was sold in

1998 to a holding company named ECI Services of Georgia. This was later acquired by SCI Georgia Funeral Services, Inc. In 2001, the home was purchased back and is currently owned and operated by Robert A. Ryan, Jr. and David J. Ryan under the name, Ryan Funeral Home, LLC. (Deposition of Robert Anderson Ryan, Jr., pp. 7, 24, 28, 32, 33).

> RESPONSE: Not disputed and not material.

2.

Robert A. Ryan, Jr. has been a licensed funeral director in Georgia since 1970. (Id., p. 8).

> RESPONSE: Not disputed.

3.

Ryan began using the services of Tri-State Crematory ("Tri-State") in 1985. Ryan elected to use Tri-State has based its good reputation among the local funeral home operators. (Id., Depo., pp. 68, 70).

> RESPONSE: It is not disputed that Ryan utilized Tri-State Crematory beginning in 1985. It is disputed, though not material, that Ray Marsh enjoyed a "good reputation." (See, for instance, Grissom deposition, 31-32, 34-35, 42-43, 47; Rollins deposition, 57, 62-63, 70-73, 91-92, 102, 125, 135-136). Moreover, reputation is not the determining factor a reasonably prudent funeral director would rely upon in selecting a third party crematory. See expert witness disclosures of Charles Crawford and Donald Douthit, and class certification hearing testimony of Charles Crawford Transcript I, at 98-109, 122) and defense expert Kroboth (Transcript II, at 154), and the standard published by the Cremation Association of North

America regarding the requirements of the standard of care for a funeral home in selecting a third party crematory. (Exhibit 1)

4.

From 1985 to 1999, Ryan sent 38 bodies to Tri-State for cremation. No Ryan entity sent any bodies to Tri-State after 1999. (Id., Depo., p. 32, 57).

> RESPONSE: It is not disputed that Ryan has contended that it sent 38 decedents to Tri-State for cremation during the class period. However, the accuracy of such contention is unknown and unknowable as any such records, if existing, are within the control of Ryan. Also, Defendant Ryan selected a third party crematory which failed to maintain contemporaneous records of decedents. See Brent Marsh deposition at p. 135.

5.

Ryan did not control Tri-State Crematory's hours of work; instead, Robert A. Ryan, Jr. or David Ryan would call Ray or Brent Marsh on the phone, inform them Ryan needed a cremation for a particular decedent, and ask when he or David J. Ryan could bring the decedent to Tri-State for cremation. (Robert A. Ryan, Jr. Affidavit, ¶ 3).

> RESPONSE: It is not disputed that this is the contention of this funeral home. It is furthermore not material to the determination of whether the funeral home is liable for the acts of Tri-State. In addition to the fact that the duties undertaken by the funeral homes were non-delegable under Georgia law, fact issues preclude summary judgment on the question of agency, of which this alleged contention is one element. A small number of form documents used by each funeral home will govern the jury's ultimate determinations about this issue. Nearly every funeral home used a "Cremation Authorization" form that expressly authorized the funeral home – not Tri-State – to make arrangements for cremation and listed the funeral

home's specific requirements for manner in which the work was to be performed. The form contract between each funeral home and the class members states that: "The cremation authorized herein shall be performed in accordance with all governing laws, the rules, regulations and policies of the Crematory and Funeral Home and the following conditions:…" The form thus establishes that Tri-State was required to adhere to the funeral home's rules, policies and regulations regarding the manner in which the work was to be performed. The form agreement also establishes that statutory provisions governed the manner in which the work was to be performed and the duties undertaken by the funeral home were, therefore, non-delegable. Prior to use of this form, the funeral home defendants used a less detailed Authorization, which stated that, "I/we authorize _____ Funeral Home to cremate the remains of _____." While less detailed, this Authorization, as well, establishes that the funeral homes were the entities authorized to by the class members to cremate their loved ones' remains, and that the class member's contracts expressly provided for the funeral home to perform the cremation. The funeral homes' duties were therefore non-delegable, making Tri-State their agent. In addition, the Tennessee funeral homes executed a State of Tennessee, Permit for Final Disposition of Human Remains, in which the funeral home signed the following: "I agree to abide by all laws and rules of the Tennessee Department of Health and all other laws pertaining to the preparation, container, transportation, burial and/or cremation of same." These permits reflect that the state permit for disposition under regulations and applicable laws was issued to funeral home, not Tri-State, making disposition duties undertaken non-delegable. Moreover, the permits establish that statutory provisions governed the manner in which the work was to be performed and the duties undertaken by the funeral home were, therefore, non-delegable.

6.

Ryan did not tell Tri-State how or when to perform the cremation, nor instruct Ray or Brent Marsh to utilize a certain crematory manufacturer or use specific tools or materials associated with the cremation process. (Robert A. Ryan, Jr. Affidavit, ¶¶ 4, 5.)

> RESPONSE: This contention is not disputed; Ryan Funeral Home failed to instruct, properly direct or monitor Tri-State Crematory with regard to the performance of cremations. It is disputed that Ryan Funeral Home, Inc. met the standard of care required of a funeral director and funeral home in selecting, monitoring, and supervising a third-party crematory and it is disputed that a licensed funeral director could delegate his duties to an unlicensed crematory. See expert witness disclosures of Charles Crawford and Donald Douthit, and class certification hearing testimony of Charles Crawford (Transcript I, at 98-109, 122) and defense expert Kroboth (Transcript II, at 154), and the standard published by the Cremation Association of North America regarding the requirements of the standard of care for a funeral home in selecting a third party crematory. (Exhibit 1)

7.

Ray or Brent Marsh would transport the cremated remains back to the funeral home. (Robert A. Ryan, Jr., Affidavit, ¶ 6).

> RESPONSE: It is not disputed that this is the contention of this defendant and it further exemplifies a lack of due care in selecting, supervising and monitoring a third party crematory.

8.

The cremated remains which Ryan received were always represented by Tri-State to be the cremated remains of the respective body taken to Tri-State for cremation. (Robert A. Ryan, Jr. Affidavit, ¶ 7).

> RESPONSE: It is not disputed that this is the contention of this defendant and it further exemplifies a lack of due care in selecting, supervising and monitoring a third party crematory.

9.

On February 15, 2002, uncremated remains from the 1997-2002 era were discovered at the Tri-State location. (Second Affidavit of Kris Sperry, ¶¶ 4, 6-9.)

> RESPONSE: It is disputed that the remains discovered at the Tri-State location on and after February 15, 2002 were "from the 1997-2002 era." More than one hundred sets of remains recovered from the property have not been identified and, thus, their dates of death are unknown. (Sperry deposition, at 263, 332-333).

10.

Three Hundred and Thirty-Four sets of human remains were found at Tri-State and 223 of those sets of remains have been identified.

> RESPONSE: Disputed. Many additional bones, remains and cremated remains were located on the property. The identity of these decedents, or even the number of decedents from whom these remains came, is unknown and, due to the defendants' inadequate record-keeping, unknowable. (Transcript I, at 126-27, 157-59; Sperry deposition, at 283). It is not disputed that approximately 223 identifications have been announced at this point.

11.

According to Dr. Kris Sperry, Chief Medical Examiner of the State of Georgia, "based upon the scientific evidence analyzed to date. .. these bodies arrived at Tri-State Crematory no earlier than 1997." (Second Affidavit of Kris Sperry, ¶ 2.)

> RESPONSE: Not disputed that Kris Sperry made the quoted statement;

- 6 -

it is disputed that such statement is accurate. As was aptly demonstrated during Dr. Sperry's deposition, the assumptions underlying his initial conclusions in this regard were not accurate. (Sperry deposition, at 332-333). Additionally, Kris Sperry has also said that no family whose loved one was sent to Tri-State for cremation at any time can be certain of the result (Sperry deposition, at 263). Thus, while the statement is not disputed, the factual conclusion is disputed.

12.

Dr. Sperry's opinion is based upon his "analysis of the methodology by which these bodies were placed in mass graves, vaults and elsewhere on the property, forensic identification of the bodies and DNA test results." (Second Affidavit of Kris Sperry at 4-9.)

> RESPONSE: Not disputed that the quotation is Dr. Sperry's; it is disputed that Dr. Sperry was accurate in making such statement. See citations above to testimony of Sperry.

13.

Of the 223 remains identified, two of those remains were sent to Tri-State by Ryan.

> RESPONSE: It is not disputed that 223 remains have been identified or that a minimum of 2 of these remains were sent by Ryan. However, over one hundred uncremated remains were discovered on the property as well as the cremated and partially cremated remains of an unknown and unknowable number of decedents. Moreover, many families who had their loved one's remains positively identified among the remains recovered from the Tri-State property had received the human remains of another unknown and unknowable decedent, sent there by the funeral home defendants. See (Sperry deposition, at 283; Transcript I, at 126-127, 157-159).

Dated this ____ day _____, 2003

McCAMY, PHILLIPS, TUGGLE &
FORDHAM, LLP
Robert H. Smalley, III
P.O. Box 1105
Dalton, Georgia 30722
Telephone: (706) 278-4499
Facsimile: (706) 278-5002

*Plaintiffs'/Respondents' Liaison Counsel*


BARRETT LAW OFFICE
Don Barrett
P.O. Box 987
Lexington, Mississippi 39095
Telephone: (662) 834-2376
Facsimile: (662) 834-2628

Charles Barrett
Marshall H. Smith, Jr.
3319 West End Avenue, 6th Floor
Nashville, Tennessee 37203
Telephone: (615) 386-8391
Facsimile: (615) 386-8392

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Elizabeth J. Cabraser
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Plaintiffs'/Respondents' Lead Counsel*


Kathryn E. Barnett
Elizabeth A. Alexander
3319 West End Avenue, Suite 600
Nashville, Tennessee 37203
Telephone: (615) 313-9000
Facsimile: (615) 313-9965


DOFFERMYRE, SHIELDS,
CANFIELD, KNOWLES & DEVINE
Leslie Bryan
Suite 1600, 1355 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-8900
Facsimile: (404) 881-3007

288503.1

SIMS, GRADDICK & DODSON, PC
Charles Graddick
Todd Strohmeyer
205 St. Emanuel Street
Mobile, Alabama 36602

SHUMAKER, WITT, GAITHER & WHITAKER
William G. Colvin
Suite 500, First Tennessee Building
701 Market Street
Chattanooga, Tennessee 37402
Telephone: (423) 265-2214
Facsimile: (423) 266-1842

MABRY & McCLELLAND, LLP
Robert M. Darroch
Tenth Floor, 2200
Century Parkway, N.E.
Atlanta, Georgia 30345

THE FLEISSNER FIRM
Phillip A. Fleissner
600 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 756-3591
Facsimile: (423) 266-5455

DAVID RANDOLPH SMITH & ASSOCIATES
David Randolph Smith
Hillsboro Village, 1910 Acklen Avenue
Nashville, Tennessee 37212
Telephone: (615) 742-1775
Facsimile: (615) 742-1223

COPPEDGE & LEMAN, PC
Joe Leman
508 South Thornton Avenue
Dalton, Georgia 30720
Telephone: (706) 226-0040
Facsimile: (706) 226-0040

*Plaintiffs' Steering Committee*

- 9 -

288503.1

## PROOF OF SERVICE BY MAIL

I hereby certify that a copy of the foregoing was served by postage prepaid United States mail on the \_\_\_\_ of November, 2003 addressed to those listed below:

*[signature]*

J. Anderson Davis, Esq.
Brinson, Askew, Berry, Seigler,
Richardson & Davis, LLP
PO Box 5513
Rome, GA 30162

*Funeral Home Defendants Lead/Liaison Counsel*

Frank E. Jenkins, III
Jenkins & Olson, PC
15 South Public Square
Cartersville, GA 30120

McCracken K. Poston, Jr., Esq.
Attorney at Law
62 Nance Lane
PO Box 1130
Ringgold, GA 30736

*Counsel for Defendants
T. Ray Brent Marsh &
Tri-State Crematory*

288503.1



# EXHIBIT / ATTACHMENT

/

(To be scanned in place of tab)

# CANA Guidelines
## For Funeral Directors Who Do Not Have A Crematory – What To Inspect

*The purpose of this document is to provide the funeral director, who is acting as the agent of the family, with a list of questions that the cremation facility should be able to answer or provide the necessary information so that the funeral director can make an informed decision as to the competency and the adequacy of the cremation facility.*

### ADMINISTRATION

A. Review the cremation facility cremation authorization form. Does the form comply with state law? Has the authorization form been reviewed by legal counsel?

B. Review the rules and regulations of the cremation facility. Are they available to the general public? Review the price list and services offered. Is the price list and services available to the general public?

C. Does the cremation facility have a policy and procedures manual? Is there a synopsis of the manual available to the general public?

D. How are the records of the cremation facility maintained and stored? How long are they stored?

E. Is the cremation facility subject to inspections by local, state, provincial or federal regulatory agencies? If so, are there any reports that can be reviewed?

F. Are any permits or licenses required to operate the cremation facility? Are they posted in the facility, if required?

G. Are maintenance logs or reports kept on the cremation equipment? Are maintenance inspections performed on a routine basis?

H. Is the cremation facility a current member of the Cremation Association of North America or some other cremation association?

I. Have the cremation technicians received any formal training from CANA or some other certifying agency in cremation operations?

J. Are the employees of the cremation facility well-mannered, informed, dressed appropriately and professional?

K. Is the cremation facility adequately insured? What are the limits of liability?

CONTINUED ON PAGE 30

## CANA GUIDELINES
CONTINUED FROM PAGE 6

### FACILITY

A. Is the cremation facility clean, neat, orderly and secure?

B. Is the holding or storage for casket/containerized human remains clean, neat, orderly and secure? Are there individual holding spaces for each casket/container? Is the holding or storage area refrigerated?

C. Is the cremation facility open to inspection by the general public?

D. Is there an area for the family to allow them to witness the placing of the casket/container into the cremation unit?

E. Is the cremation facility handicap accessible?

F. Does the cremation facility have an area for committal services?

G. Is the processing and packaging area clean, neat, orderly and secure?

### OPERATIONS

A. What methods does the cremation facility employ to preserve the identity of the human remains?

B. What is the cremation facility policy on time to perform cremation and prepare cremated remains for final disposition?

C. Is the cremation process monitored at all times by a cremation technician?

D. What is the cremation facility policy on disposal of surgical prosthesis?

E. Does the cremation facility contract for biohazard disposal?

F. Does the cremation facility perform cremations of anatomical or pathological human remains? If so, what is their policy?

G. If all of the recovered cremated remains will not fit in a single receptacle, what is the policy of the cremation facility in handling the excess?

## WHAT TO DO
CONTINUED FROM PAGE 18

try to remain calm. Calmness evokes confidence, while tension suggests that you may have something to conceal. Don't rush; enunciate.

**9. Stay "on the record."** Information provided "off the record" does a reporter little good. Discuss sensitive issues in terms that protect you but that provide the reporter with useful information. "No comment" is an inadvisable response to a difficult question, suggesting that you are trying to conceal guilt. Instead, offer an explanation: "We're still investigating that matter," or "That's a personal matter and we need to preserve confidentiality."

**10. Stay on track.** Answer questions directly and concisely. Radio and television reporters in particular want short "sound bites" – punchy, witty, wise, insightful observations of no more than 10 seconds. Don't try to be a stand-up comic, but if a snappy turn of phrase comes to mind, use it.

**11. Be helpful.** Offer to send background information to the reporter by fax or email. If the reporter agrees, send material that will enhance understanding of the topic. While the reporter may not necessarily use the information for this particular story, such assistance helps establish a trusting, cooperative relationship that could invite the reporter to return to you for expert commentary on future stories.

**12. Beware what you wear.** Dress appropriately, particularly if you're going to be photographed. Solid, dark colors are best for television. Suggest settings that are visually interesting and underscore the story subject. Dispense with jangly jewelry if you're being interviewed on television or radio.

If you are pleased with the story, let the reporter know in a note or phone call.

These tips cover nonconfrontational news contacts. Times of crisis, however, call for special preparedness and responses. A written news media policy can provide guidelines to all of your employees for interaction with news reporters. *(Reprinted with permission. SOURCE: Family Business Strategies - www.FBNews.net).*

## CANA PROCEDURES
CONTINUED FROM PAGE 29

between the top of the plastic bag and lid of the container, this space should be filled with suitable packing material, such as, shredded white paper or styrofoam sheets. The lid can then be closed and secured.

E. Before any permanent label is affixed to the temporary receptacle, check the ID disc number and the ID card, all label and certificates for compatibility and accuracy.

F. If you are placing the temporary receptacle into a corrugated box, a permanent label should be affixed to the corrugated box. Seal the corrugated box using reinforcement tape.

**Classically Elegant & Exclusive Urns**

- Specializing in onyx, marble, granite & aluminum alloy urns
- Apple shape urn made of aluminum alloy that is quakeproof, flameproof, watertight & oxidation resistant
- Sculpture Buddhism Bible for Buddhist
- 2 in 1 urn outside onyx, inside brass is newly designed with patent
- Orders are received 24 hours a day

Chienmin Trading Ltd.
www.ashurns.com
Tel: 1-604-809-9921
Fax: 1-604-528-9923



...locations of additional programs, call Jen Parker at CANA headquarters: 312/673-5754