FILED IN CLERK'S OFFICE
U.S.D.C. Rome

NOV 14 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| IN RE: TRI-STATE CREMATORY LITIGATION | MDL DOCKET NO. 1467 |

**PLAINTIFFS' RESPONSE TO
SCI GEORGIA FUNERAL SERVICES, INC.'S d/b/a
JENNINGS-FUNERAL HOME a/k/a JENNINGS HERITAGE
CHAPEL FUNERAL HOME and PARNICK JENNINGS FUNERAL
HOME, and f/d/b/a KENEMER BROTHERS FUNERAL HOME,
J. AVERY BRYAN OF CHICKAMAGUA AND
WALLIS-STEWART FUNERAL HOME STATEMENTOF MATERIAL
FACTS AS TO WHICH THERE IS NO GENUINE ISSUE FOR TRIAL**

Plaintiffs hereby respond to Defendant SCI Georgia Funeral Services, Inc. d/b/a Jennings Funeral Home a/k/a Jennings Heritage Chapel Funeral Home and Parnick Jennings Funeral Home, and f/d/b/a Kenemer Brothers Funeral Home, J. Avery Bryan of Chickamauga and Wallis-Stewart Funeral Home's (hereinafter collectively "SCI Georgia" or "SCI Georgia Funeral Homes") Statement of Material Facts as to which it alleges there is No Genuine Issue for Trial, pursuant to United States District Court for the Northern District of Georgia, Local Rule 56.1(B)(2) as follows:

288436.1

684

1.

SCI Georgia Funeral Services, Inc. continues to do business today as Jennings Heritage Chapel (Rome) and Parnick Jennings Funeral Home (Cartersville), and formerly did business as Kenemer Brothers Funeral Home (Dalton), J. Avery Bryan of Chickamauga, and Wallis-Stewart Funeral Home (LaFayette). SCI Georgia acquired Jennings on August 30, 1991, through a merger with the Sentinel Group. SCI acquired Parnick Jennings on November 21, 1995. Kenemer Brothers was acquired on September 22, 1988 and closed on November 16, 2001. J. Avery Bryan was acquired in the same merger with Jennings, but was sold on August 24, 2002. In the same sale, Wallis-Stewart was sold. Wallis-Stewart was acquired on June 22, 1973.

    RESPONSE:    Not disputed and not material.

2.

In 1982 Jennings Funeral Home started using Tri-State Crematory to cremate bodies. Affidavit of J. Parnick Jennings Sr. ("Jennings Sr. Aff.") ¶ 2, attached as Exhibit "A" to the Appendix. For every decedent sent to Tri-State, Jennings Sr. or another licensed funeral director would call Ray Marsh to schedule an appointment. Jennings Sr. Aff. ¶ 3. Then a Jennings employee would personally deliver the decedent to Tri-State for cremation. Jennings Sr. Aff. ¶ 4. After the

288436.1

cremation was completed, a funeral home employee would pick up the cremated remains. Jennings Sr. Aff. ¶ 6.

> RESPONSE: It is not disputed that this is the contention of SCI Georgia.

3.

From 1988 to 1989, the Jennings Funeral Home sent two bodies to Tri-State for cremation. Jennings Sr. Aff. ¶ 19; Chart outlining the decedents sent to Tri-State by Jennings Funeral Home. The last body sent to Tri-State by Jennings was on or about August 31, 1988. After November 1988, Jennings Funeral Home started using another crematory. Jennings Sr. Aff. ¶ 19.

> RESPONSE: It is not disputed that Jennings Funeral Home has contended that it sent two decedents to Tri-State for cremation during the class period. However, the accuracy of such contention is unknown and unknowable as any such records, if existing, are within the control of Jennings Funeral Home. In addition, Jennings Funeral Home selected a third party crematory which failed to maintain contemporaneous decedent records or identification procedures. See Brent Marsh deposition at 135.

4.

Parnick Jennings also used Tri-State for purposes of cremation, implementing procedures similar to the Jennings Funeral Home. An employee of Parnick Jennings would call Ray Marsh for an appointment and personally deliver the decedent to Tri-State for cremation. Affidavit of J. Parnick Jennings Jr. ("Jennings Jr. Aff.") ¶¶ 3-4. Then an employee of Parnick Jennings would pick up

the cremated remains or Ray Marsh would return the cremated remains back to the funeral home. Jennings Jr. Aff. ¶ 6.

> RESPONSE: It is not disputed that this is a contention of SCI Georgia and it further exemplifies a lack of due care in selecting, supervising, and monitoring a third party crematory.

5.

For the years 1988 through 1993, Parnick Jennings sent seventeen bodies to Tri-State for cremation, with the last body sent on or about April 13, 1993. See Chart attached as Exhibit "B," Jennings Sr. Aff., ¶ 19.

> RESPONSE: It is not disputed that Parnick Jennings has contended that it sent seventeen decedents to Tri-State for cremation during the class period. However, the accuracy of such contention is unknown and unknowable as any such records, if existing, are within the control of Parnick Jennings. In addition, Parnick Jennings selected a third party crematory which failed to maintain contemporaneous decedent records or identification procedures. See Brent Marsh deposition at 135.

6.

Kenemer Brothers sent thirty-two bodies to Tri-State for cremation from September 13, 1988 to December 22, 1994. See Chart. Kenemer Brothers followed the same procedure as the Jennings Funeral Home when sending bodies to Tri-State for cremation, except sometimes Ray Marsh or someone from his grave digging service would return the cremated remains back to the funeral home. Affidavit. of Stonewall Ponders ("Ponders Aff.") ¶¶ 3-7.

> RESPONSE: It is not disputed that Kenemer Brothers has contended that it sent fifty-six decedents to Tri-State for cremation during the class period. However, the accuracy of such contention is unknown and unknowable as any such records, if existing, are within the control of Kenemer Brothers. In addition, Kenemer Brothers selected a third party crematory which failed to maintain contemporaneous decedent records or identification procedures. See Brent Marsh deposition at 135. It is also not disputed that Kenemer Brothers followed the procedures outlined above to send bodies to Tri-State for cremation; this contention further exemplifies the lack of due care in supervising and monitoring a third party crematory.

7.

J. Avery Bryan and Wallis-Stewart, sent only one body each to Tri-State for cremation. J. Avery Bryan sent a decedent on or about March 11, 1988 while WallisStewart sent one decedent on or about March 25, 1988. These funeral homes made no other use of Tri-State's services during the class period. See Chart attached as Exhibit "B."

> RESPONSE: It is not disputed that J. Avery Bryan and Wallis-Stewart have contended that they each sent one decedent to Tri-State during the class period. However, the accuracy of such contention is unknown and unknowable as any such records, if existing, are within the control of J. Avery Bryan and Wallis-Stewart. In addition, these funeral homes selected a third party crematory which failed to maintain contemporaneous decedent records or identification procedures. See Brent Marsh deposition at 135.

8.

According to J. Parnick Jennings Sr. and Jr., as well as Stonewall Ponders, the Marsh family, specifically Ray Marsh and Brent Marsh, the operators of the

288436.1

Tri-State Crematory, enjoyed a good reputation in the community and among funeral directors. Jennings Sr. Aff. ¶ 7; Jennings Jr. Aff. ¶ 7; Ponders Aff. ¶ 9.

> RESPONSE: It is disputed, though not material, that Ray Marsh enjoyed a "good reputation." (See for instance, Grissom deposition, 31-32, 34-35, 42-43, 47; Rollins deposition, 57, 62-63, 70-73, 91-92, 102, 125, 135-136). Moreover, reputation is not the determining factor a reasonably prudent funeral director would rely upon in selecting a third party crematory. See expert witness disclosures of Charles Crawford and Donald Douthit, and class certification hearing testimony of Charles Crawford Transcript I, at 98-109, 122) and defense expert Kroboth (Transcript II, at 154), and the standard published by the Cremation Association of North America regarding the requirements of the standard of care for a funeral home in selecting a third party crematory. (Exhibit 1)

9.

According to Former coroner William E. McGill, Ray Marsh was trusted in the community. Deposition of William E. McGill, pp. 28-29.

> RESPONSE: It is not disputed that McGill indicated he believed Ray Marsh was trusted in the community. It is, however, disputed that Mr. McGill thought his operation was reputable and disputed that he trusted that Tri-State Crematory was operating in compliance with all laws, rules, and regulations of the state of Georgia. He advised Funeral Directors to the contrary when they called for permits or other matters. (Depo. Of McGill, pp. 15-18).

10.

On February 15, 2002, remains that had not been cremated were discovered at the Tri-State location. Second Affidavit of Kris Sperry, ¶¶ 4, 6-9. While 334 sets of remains were found at Tri-State, 223 were identified. Deposition of Dr. Kris

Sperry ("Sperry Depo."), pp. 85, 90.

> RESPONSE: Not disputed that uncremated remains were discovered at Tri-State or that approximately 223 identifications have been announced at this point. However, many additional bones, remains and cremated remains were located on the property. The identity of these decedents, or even the number of decedents from whom these remains came, is unknown and, due to the defendants' inadequate record-keeping, unknowable. (Transcript I, at 126-27, 157-59; Sperry deposition, at 283).

11.

According to Dr. Kris Sperry, Chief Medical Examiner of the State of Georgia, "based upon the scientific evidence analyzed to date," "these bodies arrived at TriState Crematory no earlier than 1997." "This opinion is based upon my analysis of the methodology by which these bodies were placed in mass graves, vaults and elsewhere on the property; forensic identification of the bodies and DNA test results." Second Affidavit of Kris Sperry ¶¶ 2, 4-9.

> RESPONSE: Not disputed that Kris Sperry made the quoted statement; it is disputed that such statement is accurate. As was aptly demonstrated during Dr. Sperry's deposition, the assumptions underlying his initial conclusions in this regard were not accurate. (Sperry deposition, at 332-333). Additionally, Kris Sperry has also said that no family whose loved one was sent to Tri-State for cremation at any time can be certain of the result (Sperry deposition, at 263). Thus, while the statement is not disputed, the factual conclusion is disputed.

12.

Of the 223 remains identified, none of those remains were sent to Tri-State

288436.1

by these SCI Georgia Funeral Homes. These funeral homes stopped using Tri-State to perform cremations after December 22, 1994, and the bodies found at the site date from 1997 to 2002. Jennings Sr. Aff. ¶ 19; Chart attached as Exhibit "B"; Second Affidavit of Kris Sperry ¶ 9.

> RESPONSE: It is disputed that the bodies found at the site "date from 1997 to 2002" in that the dates of death of the unidentified remains have not been established. See above citations to testimony of Sperry. It is not disputed that the SCI Georgia Funeral Homes stopped using Tri-State in 1994. However, over one hundred uncremated remains were discovered on the property as well as the cremated and partially cremated remains of an unknown and unknowable number of decedents. Moreover, many families who had their loved one's remains positively identified among the remains recovered from the Tri-State property had received the human remains of another unknown and unknowable decedent, sent there by the funeral home defendants. See (Sperry deposition, at 283; Transcript I, at 126-127, 157-159).

13.

There is no evidence that the remains of the decedents sent to Tri-State by SCI Georgia Funeral Homes were adulterated or mishandled.

> RESPONSE: Disputed. All decedents sent to Tri-State during the class period, 1988-2002, were by definition, mishandled as a result of being sent to an unlicensed crematory in violation of statutory duties. There is additionally common evidence of widespread mishandling throughout the class period.

14.

Under Georgia statutes, crematories in existence prior to 1992, as defined

under the statute, did not have to obtain licensing until July 1, 1994, if at all. See O.C.G.A. § 43-18-72(g) (in effect from May 4, 1992 to July 1, 1998). Tri-State, which began operations in 1982, would be subject to this provision.

> RESPONSE: Disputed. The contention is a statement of law rather than fact; however, Georgia has required crematories to be licensed since at least 1950. See Plaintiffs' Motion for Partial Summary Judgment; *Smith v. Poteet*, 127 Ga. App. 735, 1972.

15.

Of the SCI Georgia Funeral Homes, only Kenemer Brothers sent any decedents to Tri-State after July 1, 1994. Kenemer sent seven decedents there from July 19, 1994 to December 22, 1994. See Chart.

> RESPONSE: It is not disputed that this is the contention of SCI Georgia.

16.

Ray Marsh and Brent Marsh had no criminal or derogatory record and the SCI Georgia Funeral Homes had no knowledge of any inefficacy in Tri-State's operations or any mistreatment of human remains or any criminal propensity on the part of the Marshes in 1988 through 1994. Jennings Sr. Aff. ¶¶ 7, 10-14; Jennings Jr. Aff. ¶¶ 7, 10-14; Ponders Aff. ¶¶ 9, 13-17.

RESPONSE: Disputed. It is unclear what is meant by a "derogatory record," but based upon the degrading nature of the premises, as described by funeral directors who went to the premises during the class period and others, and based upon the efforts of Coroner McGill to alert funeral homes to the lack of licensure at Tri-State Crematory (McGill Depo., pp. 15-18) the reasonable funeral home operator should have known to monitor and supervise carefully.

17.

SCI Georgia Funeral Homes did not control Tri-State Crematory's hours of work. Instead, the representative of the individual funeral home would call Ray Marsh on the telephone to inform him that the funeral homes needed a cremation for a particular decedent. The funeral home representative would ask when he or another funeral home employee could bring the decedent to Tri-State for cremation. The SCI Georgia Funeral Homes' utilization of Tri-State depended on the hours of the operation of the crematory and the hours kept by Ray Marsh. These funeral homes had no control over the hours of operation of Tri-State. Jennings Sr. Aff. ¶¶ 3- 6; Jennings Jr. Aff. ¶¶ 3-6; Ponders Aff. ¶¶ 4-7.

RESPONSE: It is not disputed that this is the contention of this funeral home. It is furthermore not material to the determination of whether the funeral home is liable for the acts of Tri-State. In addition to the fact that the duties undertaken by the funeral homes were non-delegable under Georgia law, fact issues preclude summary judgment on the question of agency, of which this alleged contention is one element. A small number of form documents used by each funeral home will govern the jury's ultimate determinations about this issue. Nearly every funeral home used a "Cremation Authorization" form that expressly authorized the funeral home – not Tri-State – to make arrangements for cremation and listed the funeral home's specific requirements for manner in which the work was to be

performed. The form contract between each funeral home and the class members states that: "The cremation authorized herein shall be performed in accordance with all governing laws, the rules, regulations and policies of the Crematory and Funeral Home and the following conditions:..." The form thus establishes that Tri-State was required to adhere to the funeral home's rules, policies and regulations regarding the manner in which the work was to be performed. The form agreement also establishes that statutory provisions governed the manner in which the work was to be performed and the duties undertaken by the funeral home were, therefore, non-delegable. Prior to use of this form, the funeral home defendants used a less detailed Authorization, which stated that, "I/we authorize _____ Funeral Home to cremate the remains of _____." While less detailed, this Authorization, as well, establishes that the funeral homes were the entities authorized to by the class members to cremate their loved ones' remains, and that the class member's contracts expressly provided for the funeral home to perform the cremation. The funeral homes' duties were therefore non-delegable, making Tri-State their agent. In addition, the Tennessee funeral homes executed a State of Tennessee, Permit for Final Disposition of Human Remains, in which the funeral home signed the following: "I agree to abide by all laws and rules of the Tennessee Department of Health and all other laws pertaining to the preparation, container, transportation, burial and/or cremation of same." These permits reflect that the state permit for disposition under regulations and applicable laws was issued to funeral home, not Tri-State, making disposition duties undertaken non-delegable. Moreover, the permits establish that statutory provisions governed the manner in which the work was to be performed and the duties undertaken by the funeral home were, therefore, non-delegable.

18.

Employees of the SCI Georgia Funeral Homes did not tell Ray Marsh how to perform cremations at Tri-State. After a funeral home employee personally delivered the decedent to Tri-State for cremation, this employee did not instruct Ray Marsh on what specific tools or materials to use for the cremation or what

cremation techniques or procedures to utilize. Jennings Sr. Aff. ¶ 4; Jennings Jr. Aff. ¶ 4; Ponders Aff. ¶ 5.

> RESPONSE: See Response to Number 17 above.

19.

SCI Georgia Funeral Home employees never instruct Ray Marsh to utilize a certain brand of cremation unit or to service the crematory, if necessary, by a certain time, manner, or method. Jennings Sr. Aff. ¶ 5; Jennings Jr. Aff. ¶ 5; Ponders Aff. ¶ 6.

> RESPONSE: It is not disputed that this is the contention of this defendant and it further exemplifies a lack of due care in selecting, supervising and monitoring a third party crematory.

20.

Neither Tri-State Crematory nor any Marsh family member, including Ray Marsh or Brent Marsh, was ever an agent, employee or servant of the of the SCI Georgia Funeral Homes. Jennings Sr. Aff. ¶ 9; Jennings Jr. Aff. ¶ 9; Ponders Aff. ¶ 12.

> RESPONSE: Disputed. Plaintiffs dispute the statement in that SCI Georgia has previously acknowledged in fact numbers 5, 6 and 7 above that it sent certain of its decedents to Tri-State for cremation. The relationship thus created is based upon the attempted delegation by SCI Georgia of a non-delegable duty. See Plaintiffs' Motion for Partial Summary Judgment. In the alternative, the relationship thus created is at least based upon factors to be determined by a jury.

21.

The employees of the SCI Georgia Funeral Homes never willfully or intentionally interfered with human remains or mishandled a corpse. See Jennings Sr. Aff. ¶¶ 15-16; Jennings Jr. Aff. ¶¶ 15-16; Ponders Aff. ¶¶ 18-19.

>    RESPONSE: Disputed to the extent that any agent of SCI Georgia Funeral Homes, such as Tri-State Crematory and/or the Marsh defendants, intentionally interfered with or mishandled a corpse. See Brent Marsh deposition, generally, pp. 131-133; See Plaintiffs' Motion for Partial Summary Judgment. In addition, it is disputed that this defendant did not act willfully, wantonly and/or in reckless disregard for the consequences of their actions. See specific testimony citations at Section IX of Plaintiffs' Consolidated Response in Opposition to Defendants' Summary Judgment Motions.

Dated this ____ day _____, 2003

McCAMY, PHILLIPS, TUGGLE & FORDHAM, LLP
Robert H. Smalley, III
P.O. Box 1105
Dalton, Georgia 30722
Telephone: (706) 278-4499
Facsimile: (706) 278-5002

*Plaintiffs'/Respondents' Liaison Counsel*

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Elizabeth J. Cabraser
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Plaintiffs'/Respondents' Lead Counsel*

Kathryn E. Barnett
Elizabeth A. Alexander
3319 West End Avenue, Suite 600
Nashville, Tennessee 37203
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

BARRETT LAW OFFICE
Don Barrett
P.O. Box 987
Lexington, Mississippi 39095
Telephone: (662) 834-2376
Facsimile: (662) 834-2628

Charles Barrett
Marshall H. Smith, Jr.
3319 West End Avenue, 6th Floor
Nashville, Tennessee 37203
Telephone: (615) 386-8391
Facsimile: (615) 386-8392

DOFFERMYRE, SHIELDS,
CANFIELD, KNOWLES & DEVINE
Leslie Bryan
Suite 1600, 1355 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-8900
Facsimile: (404) 881-3007

SIMS, GRADDICK & DODSON, PC
Charles Graddick
Todd Strohmeyer
205 St. Emanuel Street
Mobile, Alabama 36602

SHUMAKER, WITT, GAITHER &
WHITAKER
William G. Colvin
Suite 500, First Tennessee Building
701 Market Street
Chattanooga, Tennessee 37402
Telephone: (423) 265-2214
Facsimile: (423) 266-1842

MABRY & McCLELLAND, LLP
Robert M. Darroch
Tenth Floor, 2200
Century Parkway, N.E.
Atlanta, Georgia 30345

THE FLEISSNER FIRM
Phillip A. Fleissner
600 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 756-3591
Facsimile: (423) 266-5455

- 14 -

| | |
|---|---|
| DAVID RANDOLPH SMITH & ASSOCIATES<br>David Randolph Smith<br>Hillsboro Village, 1910 Acklen Avenue<br>Nashville, Tennessee 37212<br>Telephone: (615) 742-1775<br>Facsimile: (615) 742-1223 | COPPEDGE & LEMAN, PC<br>Joe Leman<br>508 South Thornton Avenue<br>Dalton, Georgia 30720<br>Telephone: (706) 226-0040<br>Facsimile: (706) 226-0040 |

*Plaintiffs' Steering Committee*

288436.1

## PROOF OF SERVICE BY MAIL

I hereby certify that a copy of the foregoing was served by postage prepaid United States mail on the \_\_\_\_ of November, 2003 addressed to those listed below:

*[signature]*

J. Anderson Davis, Esq.
Brinson, Askew, Berry, Seigler,
Richardson & Davis, LLP
PO Box 5513
Rome, GA  30162

*Funeral Home Defendants*
*Lead/Liaison Counsel*

Frank E. Jenkins, III
Jenkins & Olson, PC
15 South Public Square
Cartersville, GA 30120

McCracken K. Poston, Jr., Esq.
Attorney at Law
62 Nance Lane
PO Box 1130
Ringgold, GA  30736

*Counsel for Defendants*
*T. Ray Brent Marsh &*
*Tri-State Crematory*

288436.1



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

# CANA Guidelines
## For Funeral Directors Who Do Not Have A Crematory – What To Inspect

*The purpose of this document is to provide the funeral director, who is acting as the agent of the family, with a list of questions that the cremation facility should be able to answer or provide the necessary information so that the funeral director can make an informed decision as to the competency and the adequacy of the cremation facility.*

### ADMINISTRATION

A. Review the cremation facility cremation authorization form. Does the form comply with state law? Has the authorization form been reviewed by legal counsel?

B. Review the rules and regulations of the cremation facility. Are they available to the general public? Review the price list and services offered. Is the price list and services available to the general public?

C. Does the cremation facility have a policy and procedures manual? Is there a synopsis of the manual available to the general public?

D. How are the records of the cremation facility maintained and stored? How long are they stored?

E. Is the cremation facility subject to inspections by local, state, provincial or federal regulatory agencies? If so, are there any reports that can be reviewed?

F. Are any permits or licenses required to operate the cremation facility? Are they posted in the facility, if required?

G. Are maintenance logs or reports kept on the cremation equipment? Are maintenance inspections performed on a routine basis?

H. Is the cremation facility a current member of the Cremation Association of North America or some other cremation association?

I. Have the cremation technicians received any formal training from CANA or some other certifying agency in cremation operations?

J. Are the employees of the cremation facility well-mannered, informed, dressed appropriately and professional?

K. Is the cremation facility adequately insured? What are the limits of liability?

CONTINUED ON PAGE 30

## CANA GUIDELINES
CONTINUED FROM PAGE 6

### FACILITY

A. Is the cremation facility clean, neat, orderly and secure?

B. Is the holding or storage for casket/containerized human remains clean, neat, orderly and secure? Are there individual holding spaces for each casket/container? Is the holding or storage area refrigerated?

C. Is the cremation facility open to inspection by the general public?

D. Is there an area for the family to allow them to witness the placing of the casket/container into the cremation unit?

E. Is the cremation facility handicap accessible?

F. Does the cremation facility have an area for committal services?

G. Is the processing and packaging area clean, neat, orderly and secure?

### OPERATIONS

A. What methods does the cremation facility employ to preserve the identity of the human remains?

B. What is the cremation facility policy on time to perform cremation and prepare cremated remains for final disposition?

C. Is the cremation process monitored at all times by a cremation technician?

D. What is the cremation facility policy on disposal of surgical prosthesis?

E. Does the cremation facility contract for biohazard disposal?

F. Does the cremation facility perform cremations of anatomical or pathological human remains? If so, what is their policy?

G. If all of the recovered cremated remains will not fit in a single receptacle, what is the policy of the cremation facility in handling the excess?

## WHAT TO DO
CONTINUED FROM PAGE 18

try to remain calm. Calmness evokes confidence, while tension suggests that you may have something to conceal. Don't rush; enunciate.

**9. Stay "on the record."** Information provided "off the record" does a reporter little good. Discuss sensitive issues in terms that protect you but that provide the reporter with useful information. "No comment" is an inadvisable response to a difficult question, suggesting that you are trying to conceal guilt. Instead, offer an explanation: "We're still investigating that matter," or "That's a personal matter and we need to preserve confidentiality."

**10. Stay on track.** Answer questions directly and concisely. Radio and television reporters in particular want short "sound bites" — punchy, witty, wise, insightful observations of no more than 10 seconds. Don't try to be a stand-up comic, but if a snappy turn of phrase comes to mind, use it.

**11. Be helpful.** Offer to send background information to the reporter by fax or email. If the reporter agrees, send material that will enhance understanding of the topic. While the reporter may not necessarily use the information for this particular story, such assistance helps establish a trusting, cooperative relationship that could invite the reporter to return to you for expert commentary on future stories.

**12. Beware what you wear.** Dress appropriately, particularly if you're going to be photographed. Solid, dark colors are best for television. Suggest settings that are visually interesting and underscore the story subject. Dispense with jangly jewelry if you're being interviewed on television or radio.

If you are pleased with the story, let the reporter know in a note or phone call.

These tips cover nonconfrontational news contacts. Times of crisis, however, call for special preparedness and responses. A written news media policy can provide guidelines to all of your employees for interaction with news reporters. *(Reprinted with permission. SOURCE: Family Business Strategies - www.FBNews.net).*

## CANA PROCEDURES
CONTINUED FROM PAGE 29

between the top of the plastic bag and lid of the container, this space should be filled with suitable packing material, such as, shredded white paper or styrofoam sheets. The lid can then be closed and secured.

E. Before any permanent label is affixed to the temporary receptacle, check the ID disc number and the ID card, all label and certificates for compatibility and accuracy.

F. If you are placing the temporary receptacle into a corrugated box, a permanent label should be affixed to the corrugated box. Seal the corrugated box using reinforcement tape.



---

**Classically Elegant & Exclusive Urns**

- Specializing in onyx, marble, granite & aluminum alloy urns
- Apple shape urn made by aluminum alloy that is quakeproof, flameproof, watertight & oxidation resistant
- Sculpture Buddhism Bible for Buddhist
- 2 in 1 urn outside onyx, inside brass is newly designed with patent
- Orders are received 24 hours a day

Chienmin Trading Ltd.
www.ashurns.com
Tel: 1-604-809-9921
Fax: 1-604-528-9923