FILED IN OPEN COURT
FEB - 5 2004
Luther D. Thomas, Clerk

By: *[signature]*

Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

IN RE: TRI-STATE            )
CREMATORY LITIGATION        )        MDL DOCKET NO. 1467
                            )

---

## FUNERAL HOME DEFENDANTS' SECOND
## SUPPLEMENT TO THE PRE-TRIAL ORDER

The FUNERAL HOME DEFENDANTS respectfully supplement the Pre-Trial Order, by including the following attachments:

Attachment B - Defendants Voir Dire Questions:

    (4)    Defendant, Turner Funeral Home, Proposed Voir Dire Questions;

Attachment D - Outline of the Case for:

    (4)    Defendant Willis Funeral Home, Inc.;

    (5)    Defendant Peeples Funeral Home;

    (6)    Defendant Thomas & Son Funeral Home;

    (7)    Defendant Erwin-Pettit Funeral Home, Inc.;

    (8)    Defendant R.D. Moore Funeral Home, Inc.'

    (9)    Defendant Ryan Funeral Home, Inc.;

    (10)    Defendant Sequatchie Valley Memorial Funeral Home & Gardens, Inc.;

    (11)    Taylor Funeral Home of Chattanooga, Inc.;

954

(12)   Defendant Wallis-Wilbanks Funeral Home, LLC;

(13)   Defendant SCI Georgia Funeral Homes' Case Outline;

(14)   Defendant SCI Tennessee Funeral Homes' Case Outline;

Attachment F - 2:

Funeral Home Defendants' First Supplement to Attachment "F-2"

Defendants' Witness List;

Attachment K:

(3)    Juror Questionnaire; and

Attachment L:

Defendants' Deposition Excerpts.

The Funeral Home Defendants respectfully request the Court to include

these supplements in the Pre-Trial Order.

Respectfully submitted, this 5th day of February, 2004.

|  | BRINSON, ASKEW, BERRY, SEIGLER, RICHARDSON & DAVIS, LLP |
|---|---|
|  | By: _____ |
|  | Robert M. Brinson |
|  | Georgia Bar No. 082900 |
|  | By: _____ |
|  | J. Anderson Davis |
|  | Georgia Bar No. 211077 |

The Omberg House
615 West First Street
Post Office Box 5513
Rome, GA  30162-5513
Phone  706/291-8853
Fax 706/234-3574

Lead and Liaison Counsel for
Defendant Funeral Homes

141521

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served counsel for all parties with a copy

of the within and foregoing **Funeral Home Defendants' Supplement to the Pre-**

**Trial Order** by causing a copy of same to be hand delivered to the following:

Robert H. Smalley, III, Esquire
McCAMY, PHILLIPS, TUGGLE & FORDHAM, LLP
Post Office Box 1105
Dalton, GA  30720-1105
Liaison for Plaintiffs

McCracken Poston, Jr., Esquire
OFFICE McCRACKEN POSTON
Post Office Box 1130
Ringgold, GA  30736
Liaison/Lead Counsel for
Tri-State Crematory, Inc.

Frank E. Jenkins, III, Esquire
JENKINS & OLSON
15 Public Square, South
Cartersville, GA  30120-3350
Liaison/Lead Counsel for
the Marsh Family

This 5th  day of February, 2004.

J. Anderson Davis

141521



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)



EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

## DEFENDANT'S, TURNER FUNERAL HOME'S,
## PROPOSED VOIR DIRE QUESTIONS

1. The purpose of this voir dire is to determine whether this is a case on which you should serve as a juror. Every case such as this – one that comes to the point when jurors are asked to resolve a dispute between parties – is serious. Every verdict is important to the parties involved. There is no case in which the juror should consider that the time he or she spends hearing the evidence is anything less than important and valuable. And while it is true that every case is important, it is not true that every decision can be reached with ease. For that reason, I would like to discuss how you feel about making this decision.

2. One of the highest duties a citizen of this country can be called on to perform is that of jury service. Will you assure me that you will give it all of the attention and energy that it requires for all of the time that it will take in this courtroom?

3. Juror X, would you please tell me what your feelings were about jury duty as you opened your letter of summons?

4. Is there anyone on this panel who feels that jury duty is simply an intrusion on his or her time?

5. Is there anyone on this panel who would prefer not to be here? Juror Y, I noticed that you raised your hand. Could you just tell us why you would not like to be present as a member of this panel?

6. From what you know about this case and, admittedly at this point in time you don't know very much, would you like to serve on this jury? If not, why not?

7. Do you know anyone, directly or indirectly, who was sent to Tri-State for cremation? If so, who, what was your relationship to the deceased, when was the cremation and through what funeral home was the cremation arranged?

8. Have you had any experience or personal knowledge of someone who was missing in action from war, or died under circumstances where the body was not recovered? If so, please describe your experience.

9. Do any of you know anyone in the funeral home business? If so, please state the name of the person, which funeral home they work for, where the funeral home is located and your relationship to that person.

10.     Have any of you ever intentionally or unintentionally driven by the Tri-State facility since February 2002? If so, why, when and for what purpose?

11.     Do you or any of your family members know Mrs. Clara Marsh, Mr. Brent Marsh or Ms. LaShea Marsh? If so, please explain.

12.     Have any of you had interaction with the Marsh family in regard to civic groups or clubs? If so, please explain.

13.     This is not a criminal case. Do all members of the panel understand that in a civil case the plaintiffs must show that the conduct of the defendant, Turner Funeral Home, was below a standard set by their industry? Do you understand that the Defendant in this case, Turner Funeral Home, did not actually perform the crematory services, instead relying on Tri-State Crematory?

14.     Are you aware that there is a difference between the burden of proof in a criminal case and the burden of proof in a civil case?

15.     The court will instruct you that the plaintiff has the burden of proof in a civil case. Since this is a civil case, the plaintiff must prove by a by a preponderance of the evidence that the defendant, Turner Funeral Home, is liable for the lack of due care and criminal activity at Tri-State Crematory. What this simply means is that if we had a scale and if the scale were evenly balanced, as it is in your minds right now at the beginning of the trial, the plaintiff must be able to present evidence that would tip the scale so that the evidence would tend to show that the defendant is liable for the crematory practices at Tri-State Crematory. Do you understand this concept?

16.     Do you have any difficulty in differentiating between these two concepts: (1) that there is a burden of proof by a preponderance of the evidence, which is the burden of proof that we have in this civil case; (2) that there is also a burden of proof beyond a reasonable doubt, which is the burden of proof that exists in a criminal case? Please raise your hand if you understand the difference between a preponderance of the evidence and a burden of proof beyond a reasonable doubt.

17.     Would you have any difficulty applying the standard of "preponderance of the evidence" rather than the standard of "beyond a reasonable doubt" in this case?

18.     Do you know that it is within the domain of the jury to examine each witness for the credibility of the evidence offered in the case?

19.     In this case, you may hear conflicting statements concerning specific elements of the case. Will any of you have any trouble establishing a standard to follow in helping you to determine which witness is more credible?

2

20.     Are there any of you who will hesitate to make a judgement about what actually is the truth of the case? This is an important part of jury service and if you would not want to be called upon to make a determination, please let me know now.

21.     You all understand that in the trial of a lawsuit there is a division of labor between the jury and the judge; that is, the jury decides the facts in the case, and the judge decides what law applies to the case. Do you all understand that difference in function?

22.     In other words, the jury as a group will be the sole judge of the facts, and His Honor is the sole judge of the law as it applies to this case. After you have heard all of the evidence, Judge [          ] will instruct you as to what the applicable law is for this particular case. Do you all understand that?

23.     If you were to serve on this jury, would you take the law exactly as Judge [          ] gives it to you, the jury, at the end of the case, regardless of whether, in your mind, you might feel that some part of the law is unwise? Will you promise me, that whether you feel the law is wise or unwise, you will accept the law as given to you by the judge as being the law that you must use in deciding this case?

24.     Will you promise the court that you will not allow any of your own beliefs or any of your own thoughts or any of your own feelings, if they are contrary to what the judge tells you is the law, to interfere with the deliberations that you will make as you go as a member of the jury back into the jury room to consider and decide this lawsuit?

25.     Do you understand that you are to keep an open mind during the voir dire that I am conducting, during the instructions that you will be receiving from the judge concerning your behavior as a juror in this case, during the presentation of the plaintiff's side and testimony of all the witnesses that you will hear from both the plaintiff's side and defendant's side and all the evidence that you will see from both sides -- that you will keep an open mind and not have made any decisions, not have reached any opinions, not have formed any attitudes toward what you think is the way things actually happened, that you will still have an open mind when the defense begins to bring in its witnesses and its evidence?

26.     Do you think that after you have heard all the evidence and heard all of the witnesses from both sides, that then you should begin not to have an open mind? I don't want this to be a trick question: l want you to think it over very carefully: should you still have an open mind? (The answer should be yes).

3

27.     As you have just indicated, even after you have heard all the witnesses, and
        you have heard all of the evidence, and even after you have heard the closing
        arguments that will be made by me and the opposing counsel, you should still
        have an open mind. Isn't that right, juror Z?

28.     The last thing that you will hear will be the instructions from the judge that
        will give you the law that will apply to this case. The law will tell you how,
        according to the laws of Georgia, you should consider and evaluate the
        evidence that has been presented to you, the testimony of the witnesses that
        has been presented to you, and the arguments that have been made by the
        attorneys in their closing summations. At that time, you will go into the jury
        room, all alone, with no supervision, and at that time you will begin to
        deliberate. Now, juror Z, you think you should still have an open mind?

        (NOTE: The answer here should be, "Yes, I should have an open mind so that
        I will listen to and understand the arguments and the reasoning of my fellow
        jurors as to why they would vote on the verdict the way that they would vote.")

29.     Isn't it true, then, that as a member of the panel that is going to reach the
        decision in this case, you should have an open mind right up until the last
        ballot is cast?

30.     On the other hand, once you have evaluated the evidence and evaluated the
        testimony of the various witnesses for both sides and once you have looked
        at the evidence and the testimony as it relates to the law that is given to you
        by the judge and you have reached a conclusion that to you is reasonable and
        sound, do you then have to change your mind just because there are other
        members of the jury panel who do not agree with your interpretation?

31.     Of course, ladies and gentlemen of the jury, it is up to you as members of this
        panel to vote your own conscience and your own conscience only. The
        only request that we are making is that you do not begin to decide the case
        before all of the evidence is in, before all of the testimony of the witnesses
        has been heard, before the judge has given you the law so that you will
        understand how to interpret the evidence and how to interpret the testimony
        of the witnesses, and before you have had a chance to hear how the other
        jurors reason. We know that this is asking a lot, but is there any one of you
        who is not willing to keep an open mind right up to that final moment when
        you have in your own mind reached a conclusion as to what the verdict should
        be?

32.     Have any of you read or heard anything about this case before arriving here
        today? If yes, what have you read or heard?

33.     Has anyone here had occasion to use the services of Turner Funeral
        Home? Have you heard of them by reputation or advertising?

                                        4

34.   Has anyone had any business dealings with Turner Funeral Home in any capacity? If so, what was the nature of those business dealings?

35.   Have you or anyone close to you ever owned stock in any kind of funeral home or crematory company?

36.   Have any of you or has anyone close to you had any business dealings or employment connections with any funeral home or crematory that you have not yet reported to us?

37.   Will any of you have any difficulty holding Turner Funeral Home not responsible according to the laws of Georgia, in particular with the laws that indicate that, when a corporation meets the standards of the funeral home industry, it can not be found liable for the conduct of a third party service provider?

38.   For your information, this trial will require your presence in this courtroom from nine in the morning until about five in the afternoon, with time out for lunch. Is there anyone here who would find that a hardship for either personal or health reasons?

39.   Do you know anyone else on this jury panel – do you have any contact at all with any of them, either as friends, neighbors, church members, co-workers or relatives (either directly or through marriage)? Do you have any knowledge or association with anyone else on the panel?

40.   Is there anything in particular that you do not like about our judicial system, whether it may be with the courts themselves or the lawyers or even service on the jury?

41.   If you were the defendant in this case, would you be satisfied to have a juror who is in your frame of mind sitting as a juror on this case?

42.   Is there any reason that you can think of that would prevent you from being a fair and impartial juror? Without knowing anything at all about this case other than what you have heard in the charge from the judge and the few comments that we have made before we began to conduct this voir dire, is there any reason why you would feel that it would be inappropriate or improper for you to serve as a juror on this case?

43.   Is there any question that we have not asked you or is there any piece of information that you feel would be important to share with us that would enable us to understand you better and to be better able assess your ability or your desire to serve as a member of this jury panel? If you would please just share that with us now, we would all appreciate it very much.

5



EXHIBIT / ATTACHMENT



(To be scanned in place of tab)



# EXHIBIT / ATTACHMENT

4

(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

## ATTACHMENT "D" FOR DEFENDANT

## WILLIS FUNERAL HOME, INC.

Willis Funeral Home, Inc. opened its doors to the public in Dalton, Georgia in 1949. Willis was owned and operated by Dorothy and William J. Willis, Sr., long-time residents of Whitfield County. In 1988, Willis incorporated and William J. Willis, Jr. then became President. Mr. Willis, Sr. and Mr. Willis, Jr. have been licensed funeral home directors in Georgia for many years, as has Mr. Willis, Jr.'s sister, Mary Suttles.

Willis and Ray Marsh began their long standing and successful working relationship several years ago when the funeral home utilized the grave digging service owned and operated by Ray Marsh. In 1982, Ray Marsh opened up Tri-State Crematory and contacted Willis about its possible use of the crematory. In 1985, Willis began to use Tri-State Crematory due to its close proximity and the excellent reputation Ray Marsh enjoyed in his community and among various funeral homes in the area.

From 1985 to 2000, Willis sent 20 bodies to Tri-State Crematory for cremation. The last body was sent in December of 2000. During this 15-year period, an employee or representative from Willis, on many occasions, personally visited the Tri-State property to deliver a body for cremation. During this time, there was absolutely nothing to give anyone from Willis any concern about the business practices of Tri-State Crematory and Ray Marsh.

**In re: Tri-State Crematory**
**MDL Docket No. 1467**

At no time prior to February 15, 2002, did anyone at Willis have any information - or even a suspicion - that Ray Marsh, Brent Marsh, or any member of the Marsh family committed any crimes, had any propensity to commit any crimes, or that any of the Marsh family members were improperly performing cremations or providing any adulterated, commingled, or misidentified cremated remains. The alleged actions of Brent Marsh and Tri-State Crematory were absolutely unforeseeable to anyone at Willis Funeral Home. The allegations the Plaintiffs have asserted against Willis are simply unfounded and completely unsupported by the evidence in this case.



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

## ATTACHMENT "D" FOR DEFENDANT

## PEEPLES FUNERAL HOME

Peeples Funeral Home opened its doors to the public in Chatsworth, Georgia in 1965. The Home was and currently is owned and operated by John Wesley Peeples. The family has been in the funeral home industry for decades, and John Wesley Peeples has been a licensed funeral director in Georgia since he opened Peeples Funeral Home in the 1960's. John Wesley Peeples' wife, Frances Peeples, is also a licensed funeral director employed at the funeral home. John Peeples' son-in-law, Jerry Herndon, and Daniel Carroll are also licensed funeral directors and have been employed at Peeples for several years.

Peeples and the Marsh family began their long standing and successful working relationship several years ago in the early 1980's. Although Peeples used crematories in Tennessee and South Carolina, the funeral home began to use Tri-State Crematory due to its close proximity and the excellent reputation the Crematory enjoyed in the community and among various funeral homes in the area.

From the early 1980's to April of 2001, Peeples used the Tri-State Crematory for cremation. From early 1988 to April of 2001, Peeples sent 67

bodies to Tri-State Crematory for cremation. The last body was sent in March of 2001. During this 13-year period, on at least two occasions, employees or representatives from Peeples personally visited the Tri-State property to deliver a body for cremation. Either Ray, Brent, or Rhames Marsh would return the cremated remains back to Peeples funeral home after the cremation process was completed. In essence, each time Peeples did business with Tri-State, a Peeples employee or representative actually interacted with Ray, Brent, or Rhames Marsh.

During this time, there was absolutely nothing to give anyone from Peeples any concern about the business practices of Tri-State Crematory and the Marsh family. Peeples saw no "red flags" during the time in which it used the crematory that something was amiss. In April of 2001, Peeples installed a crematory in its own funeral home in Chatsworth. Hence, Peeples did not need to use the services of Tri-State Crematory any longer. As a result, Peeples handled its own cremations and sent no bodies to Tri-State for cremation after April of 2001.

On February 15, 2002, uncremated remains from the 1997-2002 era were discovered on the property of Tri-State Crematory. Indeed, 334 sets of human remains were found on Tri-State, and 223 sets of those remains have been identified by the authorities. Of the 223 remains purportedly identified,

14 were sent by Peeples.  There is absolutely no evidence that any other decedent sent by Peeples to Tri-State Crematory was not cremated as promised.  Certainly, there is absolutely no evidence that anyone from Peeples mishandled, adulterated, or participated in failing to cremate any decedents.

At no time prior to February 15, 2002 did anyone at Peeples have any information – or even a suspicion – that Ray Marsh, Brent Marsh, or any member of the Marsh family committed any crimes, had any propensity to commit any crimes, or that any of the Marsh family members were improperly performing cremations or providing any adulterated, commingled, or misidentified cremated remains.  The alleged actions of Brent Marsh and Tri-State Crematory were absolutely unforeseeable to anyone at Peeples Funeral Home.  The allegations the Plaintiffs have asserted against Peeples are simply unfounded and completely unsupported by the evidence in this case.



# EXHIBIT / ATTACHMENT

6

(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

## ATTACHMENT "D"
## FOR DEFENDANT THOMAS & SON FUNERAL HOME

Thomas & Son Funeral Home has been a family owned funeral home for over 30 years.  It has been located in Calhoun, Georgia and has served individuals in the surrounding area for over three (3) decades. Bruce Thomas, the current owner,  has been a licensed funeral director in Georgia since prior to 1984.  The Thomas family has been synonymous with providing quality services in the funeral hone business for more than three (3) decades.

Thomas & Son Funeral Home began its business relationship with Tri-State Crematory in 1984. The funeral home used the crematory  due to its close proximity and the excellent reputation Ray Marsh enjoyed in his community and among various funeral homes in the area.  Accordingly, Ray Marsh, Tri-State Crematory and Thomas & Son Funeral Home continued their working relationship until 1999.

From 1984 to 1999, Thomas & Son Funeral Home used Tri-State Crematory for cremations and sent five (5) decedents to the crematory  for cremation.  Thomas & Son Funeral Home sent no bodies to Tri-State Crematory after March of 1999 and only two (2) were sent after 1996.  During that fifteen-year period, Bruce Thomas would personally call Ray or Brent Marsh on the phone, inform them that Thomas &

In re: Tri-State Crematory
MDL Docket No. 1467

Son Funeral Home needed a cremation for a particular decedent, and ask when he or another employee could bring the decedent to Tri-State.

In other words, when Thomas & Son Funeral Home did business with Tri-State Crematory, either Bruce Thomas or another employee would actually visit the property, deliver the body and interact with the Marsh family. This practice was in conformance with good and reasonable funeral home practices given the reputation of Tri-State Crematory.

During this lengthy period of time, there was absolutely nothing to give anyone from Thomas & Son Funeral Home any concern about the business practices of Tri-State Crematory or the Marsh family. At no time prior to February 15, 2002, did any Thomas & Son Funeral Home employee or owner have any information, or even suspicion, that any member of the Marsh family had committed any crimes or even had the propensity to commit a crime. Furthermore, there was no evidence that Tri-State Crematory was improperly performing cremations or that the crematory had given anyone any adulterated, commingled or misidentified cremated remains or even that the crematory had any uncremated bodies on the premises.

The actions of Brent Marsh and Tri-State Crematory were absolutely unforeseeable to anyone at Thomas & Son Funeral Home . Furthermore, these activities were totally outside of the scope of the contracted for duties that Tri-State

In re: Tri-State Crematory
MDL Docket No. 1467

Crematory and Brent Marsh were supposed to perform.  Therefore, Brent Marsh and

Tri-State Crematory's misconduct was entirely personal in nature to them and in no

way related to Thomas & Son Funeral Home.

For these reasons , the allegations the Plaintiffs have asserted against Thomas

& Son Funeral Home are undoubtedly unsubstantiated and wholly unsupported by the

evidence.



EXHIBIT / ATTACHMENT



7

(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

## ATTACHMENT "D"
## FOR DEFENDANT ERWIN-PETITT FUNERAL HOME, INC,

Erwin-Petitt Funeral Home has been operating under its current name since 1969 in Summerville, Georgia.  It is currently owned and operated by Durward Petitt under the original name of Erwin-Petitt Funeral Home, Inc. Durward Petitt has been a licensed funeral director in Georgia since 1950.  Durward Petitt and Erwin Petitt Funeral Home has been synonymous with providing quality services in the funeral home business for more than three decades.

Erwin-Petitt Funeral Home began its business relationship with Tri-State Crematory in 1988. The funeral home used Tri-State Crematory due to its close proximity and the excellent reputation Ray Marsh enjoyed in his community and among various funeral homes in the area.  Accordingly, Ray Marsh, Tri-State Crematory and Erwin-Petitt continued their working relationship off and on until 2002.

From 1988 to 2002, Erwin-Petitt Funeral Home used Tri-State Crematory for cremations and sent six (6) decedents to Tri-State for cremation.  From 1988 through 1992, Joe Spears, a valuable and trustworthy employee of Erwin-Petitt Funeral Home would deliver every body to Tri-State.  During this period of time, Mr. Spears

In re: Tri-State Crematory
MDL Docket No. 1467

delivered each body and interacted with the Marsh family.   No evidence of
misconduct was observed.

After Erwin Petitt resumed using Tri-State Crematory again in 2001, Ray Brent
Marsh offered a pick-up and delivery service and transported three (3) decedents to
Tri-State and returned the cremations to the funeral home.   This practice was in
conformance with good and reasonable funeral home practices given the reputation
of Tri-State Crematory.

During both of these periods of time, there was absolutely nothing to give
anyone from Erwin-Petitt Funeral Home any concern about the business practices of
Tri-State Crematory or the Marsh family.   At no time prior to February 15, 2002, did
any Erwin-Petitt Funeral Home employee or owner have any information, or even
suspicion, that any member of the Marsh family had committed any crimes or even
had the propensity to commit a crime.   Furthermore, there was no evidence that Tri-
State Crematory was improperly performing cremations or that the crematory had
given anyone any adulterated, commingled or misidentified cremated remains or even
that the crematory  had any uncremated bodies on the premises.

The actions of Brent Marsh and Tri-State Crematory were absolutely
unforeseeable to anyone at Erwin-Petitt Funeral Home . Furthermore, these activities
were totally outside of the scope of the contracted for duties that Tri-State Crematory

In re: Tri-State Crematory
MDL Docket No. 1467

and Brent Marsh were supposed to perform.  Therefore, Brent Marsh and Tri-State

Crematory's misconduct was entirely personal in nature to them and in no way related

to Erwin-Petit Funeral Home.

For these reasons , the allegations the Plaintiffs have asserted against Erwin-

Petitt Funeral Home are undoubtedly unsubstantiated and wholly unsupported by the

evidence.



 EXHIBIT / ATTACHMENT

_____8_____

(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

## ATTACHMENT "D"
## FOR DEFENDANT R.D. MOORE FUNERAL HOME, INC,

R.D. Moore Funeral Home has been operated by the Moore family since 1970 in Trenton, Georgia.  Larry Moore, the current owner,  has been a licensed funeral director in Georgia since 1971. He took over the family business in the mid 1990's after the death of his brother.  The Moore family name has been synonymous with providing quality services in the funeral home business for more than three decades.

R.D. Moore Funeral Home began its business relationship with Tri-State Crematory in 1983. The funeral home used Tri-State Crematory due to its close proximity and the excellent reputation Ray Marsh enjoyed in his community and among various funeral homes in the area.   Accordingly, Ray Marsh, Tri-State Crematory and R.D. Moore continued their working relationship until 2001.

From 1983 to 2001, R.D. Moore used Tri-State for cremations and sent thirty-two (32) decedents to Tri-State for cremation.  During that eighteen-year period, Larry Moore or his brother, Ronnie Moore would personally call Ray or Brent Marsh on the phone, inform them that R.D. Moore Funeral Home needed a cremation for a particular decedent, and ask when they should transport the decedent to Tri-State. Subsequently,  Larry Moore visited the crematory prior to his first use of Tri-State Crematory in 1997. After Larry Moore had established a good relationship, Brent

In re: Tri-State Crematory
MDL Docket No. 1467

Marsh began transporting the decedents to the crematory.  These practices were in

conformance with good and reasonable funeral home practices given the reputation

of Tri-State Crematory.

During this lengthy period of time, there was absolutely nothing to give anyone

from R.D. Moore Funeral Home any concern about the business practices of Tri-State

Crematory or the Marsh family.  At no time prior to February 15, 2002, did any R.D.

Moore Funeral Home employee or owner have any information, or even suspicion,

that any member of the Marsh family had committed any crimes or even had the

propensity to commit a crime.  Furthermore, there was no evidence that Tri-State

Crematory was improperly performing cremations or that the crematory had given

anyone any adulterated, commingled or misidentified cremated remains or even that

the crematory  had any uncremated bodies on the premises.

The actions of Brent Marsh and Tri-State Crematory were absolutely

unforeseeable to anyone at R.D. Moore Funeral Home . Furthermore, these activities

were totally outside of the scope of the contracted for duties that Tri-State Crematory

and Brent Marsh were supposed to perform.  Therefore, Brent Marsh and Tri-State

Crematory's misconduct was entirely personal in nature to them and in no way related

to R.D. Moore Funeral Home.

In re: Tri-State Crematory
MDL Docket No. 1467

For these reasons , the allegations the Plaintiffs have asserted against R.D.

Moore Funeral Home are undoubtedly unsubstantiated and wholly unsupported by

the evidence.



EXHIBIT / ATTACHMENT



9

(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

## ATTACHMENT "D"
## FOR DEFENDANT RYAN FUNERAL HOME, INC,

The Ryan family has been in the funeral home business since 1976 in Trenton, Georgia. Ryan Funeral Home, Inc. is currently owned by  Robert A. Ryan, Jr. and David J. Ryan.  The Ryan family name has been synonymous with providing quality services in the funeral home business for more than three decades.

Ryan Funeral Home began its business relationship with Tri-State Crematory in 1985. The funeral home used Tri-State Crematory due to its close proximity and the excellent reputation Ray Marsh enjoyed in his community and among various funeral homes in the area.  Accordingly, Ray Marsh, Tri-State Crematory and Ryan continued their  working relationship until 1999.

From 1985 to 1999, Ryan Funeral Home used Tri-State Crematory for cremations and sent thirty-eight (38) decedents to the crematory for cremation. During that fourteen-year period, Robert A. Ryan, Jr. or David J. Ryan would personally call Ray or Brent Marsh on the phone, inform them that Ryan needed a cremation for a particular decedent, and ask when they could bring the decedent to Tri-State Crematory.

In other words, each time Ryan did business with Tri-State Crematory, either Robert A. Ryan, Jr. or David J. Ryan would actually visit the property, deliver the

In re: Tri-State Crematory
MDL Docket No. 1467

body and interact with the Marsh family. This practice was in conformance with good and reasonable funeral home practices given the reputation of Tri-State Crematory.

During this lengthy period of time, there was absolutely nothing to give anyone from Ryan any concern about the business practices of Tri-State Crematory or the Marsh family. At no time prior to February 15, 2002, did any Ryan employee or owner have any information, or even suspicion, that any member of the Marsh family had committed any crimes or even had the propensity to commit a crime. Furthermore, there was no evidence that Tri-State Crematory was improperly performing cremations or that the crematory had given anyone any adulterated, commingled or misidentified cremated remains or even that the crematory had any uncremated bodies on the premises.

The actions of Brent Marsh and Tri-State Crematory were absolutely unforeseeable to anyone at Ryan Funeral Home. Furthermore, these activities were totally outside of the scope of the contracted for duties that Tri-State Crematory and Brent Marsh were supposed to perform. Therefore, Brent Marsh and Tri-State Crematory's misconduct was entirely personal in nature to them and in no way related to Ryan Funeral Home.

In re: Tri-State Crematory
MDL Docket No. 1467

  For these reasons , the allegations the Plaintiffs have asserted against Ryan Funeral Home are undoubtedly unsubstantiated and wholly unsupported by the evidence.



# EXHIBIT / ATTACHMENT

## 10

(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

## ATTACHMENT "D"
## FOR DEFENDANT SEQUATCHIE VALLEY
## MEMORIAL FUNERAL HOME & GARDENS, INC,

Sequatchie Valley Memorial Funeral Home & Gardens, Inc. has been operating under its current name since 1990 in Jasper, Tennessee.  The funeral home began its operation in 1986.  James Eggert, Randy Tate and Edwin Farley were operating as funeral directors for Sequatchie Valley Memorial Funeral Home & Gardens from 1986 until 2002.  Byron and Harrell Boyd have owned and operated the funeral home since 1990.  Sequatchie Valley Memorial Funeral Home & Gardens has been synonymous with providing quality services in the funeral home business for more than a decade.

Sequatchie Valley Memorial Funeral Home & Gardens began its business relationship with Tri-State Crematory in 1989. The funeral home used Tri-State Crematory due to its close proximity and the excellent reputation Ray Marsh enjoyed in his community and among various funeral homes in the area.  Accordingly, Ray Marsh, Tri-State Crematory and Sequatchie Valley Memorial Funeral Home & Gardens continued their working relationship until 2001.

From 1989 to 2001, Sequatchie Valley Memorial Funeral Home & Gardens used Tri-State Crematory for cremations and sent twenty (20) decedents to the crematory for cremation.  During that thirteen-year period, an employee of Sequatchie

In re: Tri-State Crematory
MDL Docket No. 1467

Valley Memorial Funeral Home & Gardens would personally call Ray or Brent Marsh

on the phone, inform them that the funeral home needed a cremation for a particular

decedent, and ask when either of them could bring the decedent to Tri-State

Crematory after 1999, when a representative of Tri-State could pick up the decedent.

These practices were in conformance with good and reasonable funeral home

practices given the reputation of Tri-State Crematory.

During this lengthy period of time, there was absolutely nothing to give anyone

from Sequatchie Valley Memorial Funeral Home & Gardens any concern about the

business practices of Tri-State Crematory or the Marsh family.  At no time prior to

February 15, 2002, did any Sequatchie Valley Memorial Funeral Home & Gardens

employee or owner have any information, or even suspicion, that any member of the

Marsh family had committed any crimes or even had the propensity to commit a

crime.  Furthermore, there was no evidence that Tri-State Crematory had any

uncremated bodies on the premises.

The actions of Brent Marsh and Tri-State Crematory were absolutely

unforeseeable to anyone at Sequatchie Valley Memorial Funeral Home & Gardens.

. Furthermore, these activities were totally outside of the scope of the contracted for

duties that Tri-State Crematory and Brent Marsh were supposed to perform.

Therefore, Brent Marsh and Tri-State Crematory's misconduct was entirely personal

In re: Tri-State Crematory
MDL Docket No. 1467

in nature to them and in no way related to Sequatchie Valley Memorial Funeral

Home & Gardens.

For these reasons , the allegations the Plaintiffs have asserted against

Sequatchie Valley Memorial Funeral Home & Gardens are undoubtedly

unsubstantiated and wholly unsupported by the evidence.



# EXHIBIT / ATTACHMENT

## 11

(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

## ATTACHMENT "D"
## FOR DEFENDANT
## TAYLOR FUNERAL HOME
## OF CHATTANOOGA, INC.

The Taylor Funeral Home of Chattanooga, Inc. started operating in 1990 in Chattanooga, Tennessee.   John Taylor has been a licensed funeral director in Tennessee since 19990.  Taylor Funeral Home has been providing quality services in the funeral home business over a decade.

Taylor Funeral Home began its business relationship with Tri-State Crematory in 1992. The funeral home used Tri-State due to its close proximity and the excellent reputation Ray Marsh enjoyed in his community and among various funeral homes in the area.  Accordingly, Ray Marsh, Tri-State Crematory and the funeral home continued their  working relationship until 2002.

From 1992 to 2002, Taylor Funeral Home used Tri-State Crematory for cremations and sent thirty-two (32) decedents to the crematory for cremation. During that ten-year period, John Taylor, Anita Taylor or another Taylor Funeral Home employee would personally call Ray or Brent Marsh on the phone, inform them that Taylor needed a cremation for a particular decedent, and ask when either they could bring the decedent to Tri-State Crematory or when the decedent could be picked up.

In re: Tri-State Crematory
MDL Docket No. 1467

These practices were in conformance with good and reasonable funeral home practices given the reputation of Tri-State Crematory.

During this lengthy period of time, there was absolutely nothing to give anyone from Taylor Funeral Home any concern about the business practices of Tri-State Crematory or the Marsh family. In fact, as recently as December of 2001, a decedent was personally taken to Tri-State by Anita Taylor and personally placed into the retort and the machine was turned on. The decedent was later identified on the property. At no time prior to February 15, 2002, did any Taylor Funeral Home employee or owner have any information, or even suspicion, that any member of the Marsh family had committed any crimes or even had the propensity to commit a crime. Furthermore, there was no evidence that Tri-State Crematory was improperly performing cremations or that the crematory had given anyone any adulterated, commingled or misidentified cremated remains or even that Tri-State Crematory had any uncremated bodies on the premises.

The actions of Brent Marsh and Tri-State Crematory were absolutely unforeseeable to anyone at Taylor Funeral Home. Furthermore, these activities were totally outside of the scope of the contracted for duties that Tri-State Crematory and Brent Marsh were supposed to perform. Therefore, Brent Marsh and Tri-State

In re: Tri-State Crematory
MDL Docket No. 1467

Crematory's misconduct was entirely personal in nature to them and in no way related to Taylor Funeral Home.

For these reasons , the allegations the Plaintiffs have asserted against Taylor Funeral Home are undoubtedly unsubstantiated and wholly unsupported by the evidence.



# EXHIBIT / ATTACHMENT

## 12

(To be scanned in place of tab)

**In Re: Tri-State Crematory**
**MDL Docket No. 1467**

## ATTACHMENT "D" FOR DEFENDANT

## WALLIS-WILBANKS FUNERAL HOME, LLC

In 2000, Wallis-Wilbanks Funeral Home, LLC was formed, and purchased a

funeral home which had been operating in Lafayette, Georgia for decades. Richard

M. Wilbanks was the Funeral Director in charge of the funeral home. Mr. Wilbanks

had been a Funeral Director in Lafayette for many years.

Tri-State Crematory began operations in 1982 under the careful operation of

Ray Marsh, a long time resident of Walker County. Mr. Marsh and his wife Clara,

as well as their children Brent and LaShea, were all respected members of the

Walker County community. At the time Mr. Marsh opened his crematory, he was

already well-known and respected by funeral homes in the tri-state area because of

his grave digging business.

In 1982, Mr. Wilbanks was working at a funeral home known as the Wallis

& Son Funeral Home in Lafayette, Georgia. That year, Ray Marsh told Mr.

Wilbanks he had opened a crematory and asked Mr. Wilbanks to invite John

Massey, the State Funeral Home Inspector, to come and inspect the Marsh

crematory. Mr. Massey did visit the crematory, and found it perfectly suitable for

cremations.

In 1983, the next year, Richard M. Wilbanks, working then at the Wallis &

Son Funeral Home, began using the Marsh crematory when a family requested

cremation. The identity of the crematory was always disclosed to the family members. The crematory acted as an independent contractor. The funeral home where Mr. Wilbanks worked never made any profit off of any of the cremations. There was absolutely no mark-up on the cremation charge.

Mr. Wilbanks and the funeral home where he worked reasonably assumed and understood that the crematory was operating legally in the State of Georgia since the crematory was an open and obvious place of business, and its existence and operation were known throughout the Walker County community. Additionally, the State of Georgia was well aware of the existence and operation of the crematory because its own State Funeral Home Inspector had inspected the crematory.

Over the years, Mr. Wilbanks made a number of trips to the crematory and always found it presentable. He never saw anything out of order or unusual. He always saw Ray Marsh treat the bodies that he handled in a respectful and dignified manner.

Around 1997, Ray Marsh fell into bad health, and his son Brent took over the family business. Brent Marsh exhibited the same dignity and respect in handling bodies in Mr. Wilbanks' pr esence as Brent's fath er Ray Marsh had done. There was nothing to indicate to Richard M. Wilbanks or anyone at the funeral home that Brent Marsh would engage in criminal behavior with the bodies.

In the year 2000, the funeral home where Mr. Wilbanks had worked for many years was sold to a newly-formed corporation Wallis-Wilbanks Funeral Home, LLC, a limited liability corporation. Wallis-Wilbanks Funeral Home, LLC is a

defendant in this lawsuit. It was not in operation before the year 2000, and Mr. Wilbanks, himself, is not a defendant in the case.

On February 15, 2002, uncremated bodies were found at the crematory. Wallis-Wilbanks Funeral Home, LLC and all of its staff, including Mr. Wilbanks, were shocked and appalled by the discovery. The funeral home has been victimized the same as the families.



# EXHIBIT / ATTACHMENT

## /3

(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

### Attachment "D" – SCI Georgia Funeral Homes' Case Outline

This Case Outline is filed on behalf of five separate funeral homes: (1) SCI Georgia Funeral Services, Inc. d/b/a Jennings-Funeral Home a/k/a Jennings Heritage Chapel Funeral Home ("Jennings Funeral Home"); (2) SCI Georgia Funeral Services, Inc. d/b/a Parnick Jennings Funeral Home ("Parnick Jennings"); (3) SCI Georgia Funeral Services, Inc. f/d/b/a Kenemer Brothers Funeral Home ("Kenemer Brothers"), (4) SCI Georgia Funeral Services, Inc. d/b/a J. Avery Bryan of Chickamauga ("J. Avery Bryan"); and (5) SCI Georgia Funeral Services, Inc.d/b/a Wallis-Stewart Funeral Home ("Wallis Stewart"). These funeral homes will be referred to collectively as "SCI Georgia Funeral Homes."

The Plaintiffs' claims in this case all revolve around events at Tri-State Crematory, which operated over a twenty year time period from 1982 to 2002. Starting in 1982, Tommy Ray Marsh operated the crematory until his stroke in 1996. At that time, Tommy Ray's son, Ray Brent Marsh, took control of the facility.

In 1982 Jennings Funeral Home started using Tri-State Crematory to cremate remains. For every decedent sent to Tri-State, Jennings Sr. or another licensed

In re: Tri-State Crematory
MDL Docket No. 1467

funeral director would call Ray Marsh to schedule an appointment.  Then a

Jennings employee would personally deliver the decedent to Tri-State for

cremation.  After the cremation was completed, the Jennings employee would pick

up the cremated remains.  From 1988 to 1989, Jennings Funeral Home sent four

bodies to Tri-State for cremation, with three bodies in 1988 and one in 1989.  The

last body was sent by Jennings on or about July 14, 1999.

Parnick Jennings Funeral Home also used Tri-State for purposes of

cremation, implementing procedures similar to the Jennings Funeral Home.  A

Parnick Jennings employee would call Ray Marsh for an appointment and

personally deliver the decedent to Tri-State for cremation.  Then a Parnick Jennings

employee would pick up the cremated remains or Ray Marsh would return the

cremated remains back to the funeral home.  For the years 1988 through 1993,

Parnick Jennings sent seventeen bodies to Tri-State for cremation, with the last

body sent on or about April 13, 1993.

Kenemer Brothers also followed the same procedure as the Jennings Funeral

Home when sending bodies to Tri-State for cremation, except sometimes Ray

In re: Tri-State Crematory
MDL Docket No. 1467

Marsh or someone from his grave digging service would return the cremated

remains back to the funeral home. Kenemer Brothers sent thirty-one bodies to Tri-

State for cremation from September 13, 1988 to December 22, 1994.

The last two funeral homes at issue, J. Avery Bryan and Wallis-Stewart, sent

only one body each to Tri-State for cremation. J. Avery Bryan sent a decedent on

or about March 11, 1988 while Wallis-Stewart sent one decedent on or about

March 25, 1988. These funeral homes made no other use of Tri-State's services.

In summary, the SCI Georgia Funeral Homes used the services of Tri-State

Crematory in the years 1982 to 1994. After December 22, 1994, these Funeral

Homes stopped sending decedents to Tri-State for cremation. Over seven years

later, on February 15, 2002, remains that had not been cremated were discovered at

the Tri-State location. 334 sets of remains were found at Tri-State with 223 now

identified. None of the remains identified were sent there by the SCI Georgia

Funeral Homes. According to Dr. Kris Sperry, the Chief Medical Examiner of the

State of Georgia, the bodies found at Tri-State arrived there no earlier then 1997,

after Ray Brent Marsh had taken control of the facility. The SCI Georgia Funeral

3

In re: Tri-State Crematory
MDL Docket No. 1467

Home had not used the facility since December 1994, over a year before Ray Brent Marsh had operated it.

The Plaintiffs have filed suit against Tri-State Crematory, the Marsh family and every funeral home that sent a body for cremation to Tri-State any time in the years 1988 to 2002, a twelve year time period. The SCI Georgia Funeral Homes only sent remains for cremation to Tri-State from 1988 and 1994, the first seven years of this twelve year class period. Moreover, Tri-State was operating as an independent contractor, not an agent of the SCI Georgia Funeral Homes. Thus, Tri-State was a business separate and apart from that of the SCI Georgia Funeral Homes and was not under their direction and control.

The SCI Georgia Funeral Homes did not know that the Marshes were not cremating the remains sent to Tri-State. The Marshes hid their activities from the SCI Georgia Funeral Homes, as well as Plaintiffs. As a result, the SCI Georgia Funeral Homes were also victimized by the Marshes. Further, no uncremated remains have been found at the site which date from 1988 to 1994, the only years the SCI Georgia Funeral Homes used the services of Tri-State.

4

In re: Tri-State Crematory
MDL Docket No. 1467

Plaintiffs do not seek to recover from the SCI Georgia Funeral Homes because of any mishandling by these funeral homes or based on their knowledge of what was going on at Tri-State. Instead, the Plaintiffs seek to hold these Defendants liable for the actions of Tri-State on the tort claims on two grounds only: (1) The contracts between the individual Plaintiffs and the SCI Georgia Funeral Homes dating from 1988 to 1994 expressly hold these Funeral Homes liable for any actions of Tri-State; and (2) The laws and regulations of Georgia from 1988 to 1994 place a non-delegable duty on these Funeral Homes to handle the cremations at issue, even though Tri-State was a separate business.

An examination of the contracts at issue and the applicable statutes and regulations of Georgia will show that no such non-delegable duty exists. The contracts notified all parties that Tri-State was performing the cremations at issue. These contracts do not expressly require the SCI Georgia Funeral Homes to be responsible for the conduct of Tri-State and the Marshes, independent contractors under Georgia law. Moreover, Georgia's statutes and regulations permitted Tri-State to operate as a separate, independent crematory. Otherwise, Georgia state

5

In re: Tri-State Crematory
MDL Docket No. 1467

officials would have closed the crematory.

Also, the SCI Georgia Funeral Homes cannot be held liable for negligence because the activities at Tri-State were not foreseeable and were intervening criminal acts.  The Marsh family had never been in trouble with the law before, and they had an excellent reputation in the community.  The SCI Georgia Funeral Homes maintain that the Marsh Defendants' failure to cremate was so unlikely and unimaginable that these Funeral Homes could not have reasonably anticipated the Marsh Defendants' criminal acts.  Moreover, there is no evidence that Tri-State failed to cremate any remains sent by the SCI Georgia Funeral Homes from 1988 to 1994.  These Funeral Homes can not be expected to foresee what might happen three, five or seven years after they last used Tri-State.

The SCI Georgia Funeral Homes rely on the following general, special and affirmative defenses: failure to state claims upon which relief can be granted; statute of limitations; failure to exercise ordinary diligence; waiver, estoppel and absence of any damages.

In addition, the SCI Georgia Funeral Homes filed a cross-claim against the

6

In re: Tri-State Crematory
MDL Docket No. 1467

Tri-State Defendants for contribution and indemnity.  Thus, if these Funeral Homes

have to pay any damages, they should recover these damages from the Tri-State

Defendants, the parties that failed to cremate the remains at issue.

## Applicable Statutes and Case Law

**I.**   **Breach of Contract**

Odem  v. Pace Academy, 235 Ga. App. 648, 654, 510 S.E.2d 326, 331 (1998); and

Sofet v. Roberts, 185 Ga. App. 451, 364 S.E.2d 595 (1987).

**II.**   **Negligence**

O.C.G.A. § 9-3-24;

O.C.G.A.  § 43-18-1 through 43-18-79 (including earlier statutory versions);

O.C.G.A. § 51-1-2;

O.C.G.A. § 51-2-4;

O.C.G.A. § 51-2-5;

Regulations governing funeral homes and crematories in Georgia from 1988 to 2002;

7

In re: Tri-State Crematory
MDL Docket No. 1467

Amos v. City of Butler, 242 Ga. App. 505, 506, 529 S.E.2d 420, 421
(2000);

Barnwell v. Barnett & Co., 222 Ga. App. 694, 476 S.E.2d 1 (1996);

Board of Regents v. Oglesby, No. 103A137, 2003 WL 22746216 (Ga.
Ct. App. Nov. 21, 2003);

Cope v. Enterprise Rent-A-Car, 250 Ga. App. 648, 651, 551 S.E.2d
841, 844 (2001);

Corp. of Mercer University v. National Gypsum Co., 258 Ga. 365,
368 S.E.2d 732 (1988);

Fields v. B&B Pipeline Co., 147 Ga. App. 875, 250 S.E.2d 582
(1978);

Fort Oglethorpe Associates II, LTD v. Hails Construction co. of Ga.,
196 Ga. App. 663, 396 S.E.2d 585 (1990);

Griffin v. Fowler, 260 Ga. App. 443, 579 S.E.2d 439 (2003);

Hang v. Wages & Sons Funeral Home, Inc., 262 Ga. App. 177, 585
S.E.2d 118 (June 19, 2003);

Harris v. Wall Tire Co., 197 Ga. App. 818, 399 S.E.2d 580 (1990);

Hodges v. Putzel Electric Contractors, 260 Ga. App. 590, 580 S.E.2d
243 (2003);

Jackson v. Post Properties, Inc., 236 Ga. App. 701, 513 S.E.2d 259
(1999);

In re: Tri-State Crematory
MDL Docket No. 1467

Jacobs v. Taylor, 190 Ga. App. 520, 379 S.E.2d 563 (1989);

Johnson v. American Nat'l Red Cross, 276 Ga. 270, 578 S.E.2d 106
(2003);

Mears v. Gulfstream Aerospace Corp., 225 Ga. App. 636, 484 S.E.2d
659 (1997);

Metlife v. Wright, 220 Ga. App. 827, 470 S.E.2d 717 (1996);

Mitchell v. Austin, 261 Ga. App. 585, 587, 583 S.E.2d 249, 251
(2003);

Russaw v. Martin, 221 Ga. App. 683, 472 S.E.2d 508 (1996);

Ryckeley v. Callaway, 261 Ga. 828, 829, 412 S.E.2d 826, 826 (1992);

Sletto v. Hospital Authority of Houston County, 239 Ga. App. 203,
521 S.E.2d 199 (1999);

Smith v. Poteet, 127 Ga. App. 735, 195 S.E.2d 213 (1972);

Toys 'R' Us, Inc. v. Atlanta Economic Dev. Corp., 195 Ga. App. 195,
393 S.E.2d 44 (1990);

Walker v. Hammock, 246 Ga. App. 640, 541 S.E.2d 439 (2000);

Whitaker v. Jones, McDougald, Smith, Pew Co., 69 Ga. App. 711(1),
26 S.E.2d 545 (1943);

Widner v. Brookins, Inc., 236 Ga. App. 563, 512 S.E.2d 405 (1999);
and

In re: Tri-State Crematory
MDL Docket No. 1467

Wilson v. Mallard Creek Holdings, 238 Ga. App. 746, 519 S.E.2d 925
(1999).

## III. Willful Interference with Remains and Intentional Mishandling of a Corpse

O.C.G. A. § 9-3-24;

Bauer v. North Fulton Medical Center, Inc., 241 Ga. App. 568, 527
S.E.2d 240 (1999);

Habersham Memorial Park, Inc. v. Moore, 164 Ga. App. 676,  297
S.E.2d 315 (1982);

Hill v. City of Fort Valley, 251 Ga. App. 615, 554 S.E.2d 783 (2001);

McCoy v. Georgia Baptist Hospital, 167 Ga. App. 495, 306 S.E.2d
746 (1983);

McNeal Loftis, Inc. v. Helmey, 218 Ga. App. 628, 462 S.E.2d 789
(1995);

Pollard v. Phelps, 56 Ga. App. 408, 193 S.E. 102 (1937); and

Rivers v. Greenwood Cemetery, 194 Ga. 524, 22 S.E.2d 134 (1942).

## IV. Negligent Interference with Remains and Mishandling of a Corpse

McCoy v. Ga. Baptist Hosp., 167 Ga. App. 495, 306 S.E.2d 746
(1983);

In re: Tri-State Crematory
MDL Docket No. 1467

> Wages v. Amisub of Georgia, 235 Ga. App. 156, 508 S.E.2d 783
> (1998); and

> Negligence cases listed herein.

## V.   Statutes of Limitation

> Board of Regents v. Oglesby, ___ Ga. App. ___, 2003 WL 22746216 (Nov.
> 21, 2003).

The SCI Georgia Funeral Homes submit that  Plaintiffs' tort claims based on

the alleged mishandling of decedents' remains at Tri-State Crematory sent by

these Funeral Homes from 1988 to 1994 are time-barred by the four year statute of

limitations.  These tort claims accrued at the time the remains were allegedly

mishandled or when a cremation was not performed properly.  "The true test to

determine when a cause of action accrues is to ascertain the time when the plaintiff

could first have maintained [his or] her action of a successful result." Colormatch

Exteriors, Inc. v. Hickery, 275 Ga. 249, 251, 569 S.E.2d 495, 497 (2002)(citations

omitted).   The tort claims at issue are not emotional distress claims but (1)

negligence; (2) willful interference with remains and intentional mishandling of a

corpse; and (3) negligent interference with remains and mishandling of a corpse.

11

In re: Tri-State Crematory
MDL Docket No. 1467

Thus, claims based on mishandling of remains could first have been maintained at the time of the mishandling and damage to the remains.

For example, a willful interference with remains claim is based in the "quasi-property right" in the body of the deceased by the next of kin. See McCoy v. Georgia Baptist Hospital, 167 Ga. App. 495, 306 S.E.2d 746 (1983); Rivers v. Greenwood Cemetery, 194 Ga. 524, 22 S.E.2d 134 (1942). Moreover, the claim is not pecuniary in nature; it only encompasses the power to ensure that a corpse is "orderly handled and laid to rest, nothing more." Bauer v. North Fulton Medical Center, Inc., 241 Ga. App. 568, 571, 527 S.E.2d 240, 244 (1999). The Georgia Supreme Court in Louisville & N.R. Co. v. Wilson, 123 Ga. 62, 72, 51 S.E. 25 (1905) "while not making any decision regarding the recovery of damages, implied that the next of kin might recover for 'actual pecuniary damage to the coffin and shroud, and injury to the body.'" Bauer, 241 Ga. App. at 573, 527 S.E.2d at 245. Thus, for these claims, the cause of action accrued when any alleged damage was done to the decedent's body. See Hill v. City of Fort Valley, 251 Ga. App. 615, 618, 554, S.E.2d 783, 786 (2001)(Although children had a

In re: Tri-State Crematory
MDL Docket No. 1467

quasi-property right in mother's body, there is no evidence body was damaged in

any way by move to another grave.).

     In <u>Board of Regents v. Oglesby</u>, 2003 WL 22746216 (Nov. 21, 2003), the

Georgia Court of Appeals found that any cause of action arising from the

mishandling of a body accrues at the time of the alleged mishandling. The

plaintiff, Frances Oglesby, discovered in 1989 that upon the death of her mother in

1949, a Georgia medical school obtained the remains for autopsy and physical

study. The remains of plaintiff's mother, Bessie Wilborn, had been on display for

a number of years in the glass case in an anatomy laboratory at the medical school.

No family member had given permission for the autopsy and study of the remains

of plaintiff's mother. <u>Id.</u> at *1. In 2000, plaintiff notified the Georgia Board of

Regents of her claims for intentional infliction of emotional distress, interference

with possession of her mother's remains, interference with burial services and

mutilation of her mother's remains. Subsequently, plaintiff filed suit. The Board

of Regents sought dismissal on the ground of sovereign immunity or summary

judgment based on the expiration of the statutes of limitation. The trial court

13

In re: Tri-State Crematory
MDL Docket No. 1467

denied these motions but granted an interlocutory appeal of the issues.

The Georgia Court of Appeals reversed and ruled that any claims based on

mishandling of the mother's remains accrued at the time the remains were

allegedly mistreated.

> "A cause of action in negligence accrues . . . when there
> is a negligent act coupled with a proximately resulting
> injury" and "[t]he true test to determine when a cause of
> action accrues is to ascertain the time when the plaintiff
> could first have maintained her action to a successful
> result. U-Haul Co. & c.v. Abreu & Robeson, Inc., 247
> Ga. 565, 566, 277 S.E.2d 497 (1981)." Travis Pruitt v.
> Assocs. P.C. v. Bowling, 238 Ga. App. 225, 226(1), 518
> S.E.2d 453 (1999).  Consequently, any cause of action
> arising from the treatment of Mrs. Wilborn's body
> accrued in 1949.

Id. at *4.

Therefore any claims prior to February 26, 1998 are barred by the applicable

statutes of limitation, and all the tort claims against the SCI Georgia Funeral

Homes, dating from 1988 through 1994, are time-barred.



# EXHIBIT / ATTACHMENT

## 14

(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

## **Attachment "D" - SCI Tennessee Funeral Homes' Case Outline**

This Case Outline is filed on behalf of SCI Tennessee Funeral Services
d/b/a the Chattanooga Funeral Homes. The Chattannooga Funeral Homes operate
four chapels, the East, North, West and Valley View Chapels, in the Chattanooga
metropolitan area. These funeral establishments will be referred to collectively as
the "Chattanooga Funeral Homes." This Case Outline is also filed on behalf of SCI
Tennessee Funeral Services, Inc. d/b/a Fike Funeral Home ("Fike"). Both Fike and
the Chattanooga Funeral Homes will be referred to collectively as the "SCI
Tennessee Funeral Homes."

The Plaintiffs' claims in this case all revolve around events at Tri-State
Crematory, which operated over a twenty year time period from 1982 to 2002.
Starting in 1982, Tommy Ray Marsh operated the crematory until his stroke in
1996. At that time, Tommy Ray's son, Ray Brent Marsh, took control of the
facility.

In 1982 Ray Marsh contacted the Chattanooga Funeral Homes to notify them
he was putting in a crematory and to ask them to use it. Several people from the
Funeral Homes, specifically Eugene Pike, George Fisher and Carroll Wells, visited

In re: Tri-State Crematory
MDL Docket No. 1467

Tri-State in 1982 to view the facilities before using them.  In 1982 Eugene Pike

observed that the Tri-State building had a retort inside and was fairly small.  Tri-

State had a table to elevate the body up and down, as well as a work station with a

couple of mallets and a device like a disposal on a sink.  Pike found that the Tri-

State facilities looked almost identical to other crematory facilities he had visited.

Eugene Pike already had plenty of experience in the funeral home industry in 1982;

he had been a licensed funeral director and embalmer in Georgia and Tennessee

since 1959.

Thereafter, the Chattanooga Funeral Homes used the Tri-State crematory

facilities.  For every body sent to Tri-State, Pike or another funeral home employee

would call Ray Marsh to schedule an appointment.  Then Pike  or another

employee would take the body to Tri-State for cremation.  Normally the funeral

home employee would help Ray Marsh put the body in the retort to cremate.  After

the cremation was completed, the funeral home employee would pick up the

cremated remains or Ray Marsh would bring them to the funeral home.

From 1988 to 1989, Chattanooga Funeral Homes sent 56 bodies to Tri-State

2

In re: Tri-State Crematory
MDL Docket No. 1467

for cremation, with the last body sent on or about June 12, 1989. After June 1989,

Chattanooga Funeral Homes started using a crematory in Rossville, Georgia

opened by the Sentinel Corporation, which was closer and more convenient. In

addition, Valley View Chapel stopped using Tri-State in 1988 because it started

operations at its own crematory. After June 1989 the Chattanooga Funeral Homes

never sent another body to Tri-State for cremation.

As for Fike Funeral Home, it sent only four decedents to Tri-State for

cremation from May 30, 1988 to August 4, 1988. Fike followed the same

procedure as the Chattanooga Funeral Homes when sending bodies to Tri-State for

cremation. After August 1988, Fike used the crematory in Rossville, Georgia.

In summary, the SCI Tennessee Funeral Homes sent remains to Tri-State for

cremation only from 1988 to 1989. Over twelve years later, on February 15, 2002,

remains that had not been cremated were discovered at the Tri-State location. 334

sets of remains were found at Tri-State with 223 now identified. None of the

remains identified were sent there by the SCI Tennessee Funeral Homes.

According to Dr. Kris Sperry, the Chief Medical Examiner of the State of Georgia,

3

In re: Tri-State Crematory
MDL Docket No. 1467

the bodies found at Tri-State arrived there no earlier then 1997, after Ray Brent

Marsh had taken control of the facility.  The SCI Tennessee Funeral Home had not

used the facility since 1989, seven years before Ray Brent Marsh had operated it.

The Plaintiffs have filed suit against Tri-State Crematory, the Marsh family

and every funeral home that sent a body for cremation to Tri-State any time in the

years 1988 to 2002, a twelve year time period.  The SCI Tennessee Funeral Homes

only sent remains for cremation to Tri-State in 1988 and 1989, the first two years of

this twelve year class period.  Moreover, Tri-State was operating as an independent

contractor, not an agent of the SCI Tennessee Funeral Homes.  Thus, Tri-State was

a business separate and apart from that of the SCI Tennessee Funeral Homes and

was not under their direction and control.

The SCI Tennessee Funeral Homes did not know that the Marshes were not

cremating the remains sent to Tri-State.  The Marshes hid their activities from the

SCI Tennessee Funeral Homes, as well as Plaintiffs.  As a result, the SCI

Tennessee Funeral Homes were also victimized by the Marshes.  Further, no

uncremated remains have been found at the site which date from 1988 or 1989, the

4

In re: Tri-State Crematory
MDL Docket No. 1467

only years the SCI Tennessee Funeral Homes used the services of Tri-State.

Plaintiffs do not seek to recover from the SCI Tennessee Funeral Homes

because of any mishandling by these funeral homes or based on their knowledge of

what was going on at Tri-State.  Instead, the Plaintiffs seek to hold these

Defendants liable for the actions of Tri-State on the tort claims on two grounds

only: (1) The contracts between the individual Plaintiffs and the SCI Tennessee

Funeral Homes dating from 1988 and 1989 expressly hold these Funeral Homes

liable for any actions of Tri-State;  and (2) The laws and regulations of Georgia in

1988 and 1989 place a non-delegable duty on these Funeral Homes to handle the

cremations at issue, even though Tri-State was a separate business.

An examination of the contracts at issue and the applicable statutes and

regulations of Georgia will show that no such non-delegable duty exists.  The

contracts notified all parties that Tri-State was performing the cremations at issue.

These contracts do not expressly require the SCI Tennessee Funeral Homes to be

responsible for the conduct of Tri-State and the Marshes,  independent contractors

under Georgia law.  Moreover, Georgia's statutes and regulations permitted Tri-

5

In re: Tri-State Crematory
MDL Docket No. 1467

State to operate as a separate, independent crematory.  Otherwise, Georgia state

officials would have closed the crematory.

Also, the SCI Tennessee Funeral Homes cannot be held liable for negligence

because the activities at Tri-State were not foreseeable and were intervening

criminal acts.  The Marsh family had never been in trouble with the law before, and

they had an excellent reputation in the community.  The SCI Tennessee Funeral

Homes maintain that the Marsh Defendants' failure to cremate was so unlikely and

unimaginable that these Funeral Homes could not have reasonably anticipated the

Marsh Defendants' criminal acts.  Moreover, there is no evidence that Tri-State

failed to cremate any remains sent by the SCI Tennessee Funeral Homes in 1988

and 1989.  These Funeral Homes can not be expected to foresee what might happen

eight, ten or twelve years after they last used Tri-State.

The SCI Tennessee Funeral Homes rely on the following general, special and

affirmative defenses: failure to state claims upon which relief can be granted;

statute of limitations; failure to exercise ordinary diligence; waiver, estoppel and

absence of any damages.

In re: Tri-State Crematory
MDL Docket No. 1467

In addition, the SCI Tennessee Funeral Homes filed a cross-claim against the

Tri-State Defendants for contribution and indemnity.  Thus, if these Funeral Homes

have to pay any damages, they should recover these damages from the Tri-State

Defendants, the parties that failed to cremate the remains at issue.

## Applicable Statutes and Case Law

### I.      Breach of Contract

Odem v. Pace Academy, 235 Ga. App. 648, 654, 510 S.E.2d 326, 331
(1998); and

Sofet v. Roberts, 185 Ga. App. 451, 364 S.E.2d 595 (1987).

### II.      Negligence

O.C.G.A. § 9-3-24;

O.C.G.A.  § 43-18-1 through 43-18-79 (including earlier statutory
versions);

O.C.G.A. § 51-1-2;

O.C.G.A. § 51-2-4;

O.C.G.A. § 51-2-5;

Regulations governing funeral homes and crematories in Georgia from

7

In re: Tri-State Crematory
MDL Docket No. 1467

1988 to 2002;

Amos v. City of Butler, 242 Ga. App. 505, 506, 529 S.E.2d 420, 421
(2000);

Barnwell v. Barnett & Co., 222 Ga. App. 694, 476 S.E.2d 1 (1996);

Board of Regents v. Oglesby, No. 103A137, 2003 WL 22746216 (Ga.
Ct. App. Nov. 21, 2003);

Cope v. Enterprise Rent-A-Car, 250 Ga. App. 648, 651, 551 S.E.2d
841, 844 (2001);

Corp. of Mercer University v. National Gypsum Co., 258 Ga. 365,
368 S.E.2d 732 (1988);

Fields v. B&B Pipeline Co., 147 Ga. App. 875, 250 S.E.2d 582
(1978);

Fort Oglethorpe Associates II, LTD v. Hails Construction co. of Ga.,
196 Ga. App. 663, 396 S.E.2d 585 (1990);

Griffin v. Fowler, 260 Ga. App. 443, 579 S.E.2d 439 (2003);

Hang v. Wages & Sons Funeral Home, Inc., 262 Ga. App. 177, 585
S.E.2d 118 (June 19, 2003);

Harris v. Wall Tire Co., 197 Ga. App. 818, 399 S.E.2d 580 (1990);

Hodges v. Putzel Electric Contractors, 260 Ga. App. 590, 580 S.E.2d
243 (2003);

In re: Tri-State Crematory
MDL Docket No. 1467

Jackson v. Post Properties, Inc., 236 Ga. App. 701, 513 S.E.2d 259
(1999);

Jacobs v. Taylor, 190 Ga. App. 520, 379 S.E.2d 563 (1989);

Johnson v. American Nat'l Red Cross, 276 Ga. 270, 578 S.E.2d 106
(2003);

Mears v. Gulfstream Aerospace Corp., 225 Ga. App. 636, 484 S.E.2d
659 (1997);

Metlife v. Wright, 220 Ga. App. 827, 470 S.E.2d 717 (1996);

Mitchell v. Austin, 261 Ga. App. 585, 587, 583 S.E.2d 249, 251
(2003);

Russaw v. Martin, 221 Ga. App. 683, 472 S.E.2d 508 (1996);

Ryckeley v. Callaway, 261 Ga. 828, 829, 412 S.E.2d 826, 826 (1992);

Sletto v. Hospital Authority of Houston County, 239 Ga. App. 203,
521 S.E.2d 199 (1999);

Smith v. Poteet, 127 Ga. App. 735, 195 S.E.2d 213 (1972);

Toys 'R' Us, Inc. v. Atlanta Economic Dev. Corp., 195 Ga. App. 195,
393 S.E.2d 44 (1990);

Walker v. Hammock, 246 Ga. App. 640, 541 S.E.2d 439 (2000);

Whitaker v. Jones, McDougald, Smith, Pew Co., 69 Ga. App. 711(1),
26 S.E.2d 545 (1943);

In re: Tri-State Crematory
MDL Docket No. 1467

Widner v. Brookins, Inc., 236 Ga. App. 563, 512 S.E.2d 405 (1999); and

Wilson v. Mallard Creek Holdings, 238 Ga. App. 746, 519 S.E.2d 925 (1999).

**III.   Willful Interference with Remains and Intentional Mishandling of a Corpse**

O.C.G. A. § 9-3-24;

Bauer v. North Fulton Medical Center, Inc., 241 Ga. App. 568, 527 S.E.2d 240 (1999);

Habersham Memorial Park, Inc. v. Moore, 164 Ga. App. 676,  297 S.E.2d 315 (1982);

Hill v. City of Fort Valley, 251 Ga. App. 615, 554 S.E.2d 783 (2001);

McCoy v. Georgia Baptist Hospital, 167 Ga. App. 495, 306 S.E.2d 746 (1983);

McNeal Loftis, Inc. v. Helmey, 218 Ga. App. 628, 462 S.E.2d 789 (1995);

Pollard v. Phelps, 56 Ga. App. 408, 193 S.E. 102 (1937); and

Rivers v. Greenwood Cemetery, 194 Ga. 524, 22 S.E.2d 134 (1942).

**IV.   Negligent Interference with Remains and Mishandling of a Corpse**

McCoy v. Ga. Baptist Hosp., 167 Ga. App. 495, 306 S.E.2d 746

10

In re: Tri-State Crematory
MDL Docket No. 1467

(1983);

Wages v. Amisub of Georgia, 235 Ga. App. 156, 508 S.E.2d 783
(1998); and

Negligence cases listed herein.

## V.   Statutes of Limitation

Board of Regents v. Oglesby, ___ Ga. App. ___, 2003 WL 22746216 (Nov.

21, 2003).

The SCI Tennessee Funeral Homes submit that Plaintiffs' tort claims based

on the alleged mishandling of decedents' remains at Tri-State Crematory sent by

these Funeral Homes from 1988 to 1989 are time-barred by the four year statute of

limitations. These tort claims accrued at the time the remains were allegedly

mishandled or when a cremation was not performed properly. "The true test to

determine when a cause of action accrues is to ascertain the time when the plaintiff

could first have maintained [his or] her action of a successful result." Colormatch

Exteriors, Inc. v. Hickery, 275 Ga. 249, 251, 569 S.E.2d 495, 497 (2002)(citations

omitted). The tort claims at issue are not emotional distress claims but (1)

negligence; (2) willful interference with remains and intentional mishandling of a

11

In re: Tri-State Crematory
MDL Docket No. 1467

corpse; and (3) negligent interference with remains and mishandling of a corpse.

Thus, claims based on mishandling of remains could first have been maintained at

the time of the mishandling and damage to the remains.

For example, a willful interference with remains claim is based in the

"quasi-property right" in the body of the deceased by the next of kin.  See McCoy

v. Georgia Baptist Hospital, 167 Ga. App. 495, 306 S.E.2d 746 (1983); Rivers v.

Greenwood Cemetery, 194 Ga. 524, 22 S.E.2d 134 (1942).  Moreover, the claim is

not pecuniary in nature; it only encompasses the power to ensure that a corpse is

"orderly handled and laid to rest, nothing more."  Bauer v. North Fulton Medical

Center, Inc., 241 Ga. App. 568, 571, 527 S.E.2d 240, 244 (1999).  The Georgia

Supreme Court in Louisville & N.R. Co. v. Wilson, 123 Ga. 62, 72, 51 S.E. 25

(1905) "while not making any decision regarding the recovery of damages,

implied that the next of kin might recover for 'actual pecuniary damage to the

coffin and shroud, and injury to the body.'"  Bauer, 241 Ga. App. at 573, 527

S.E.2d at 245.  Thus, for these claims, the cause of action accrued when any

alleged damage was done  to the decedent's body.  See Hill v. City of Fort Valley,

12

In re: Tri-State Crematory
MDL Docket No. 1467

251 Ga. App. 615, 618, 554, S.E.2d 783, 786 (2001)(Although children had a

quasi-property right in mother's body, there is no evidence body was damaged in

any way by move to another grave.).

In Board of Regents v. Oglesby, 2003 WL 22746216 (Nov. 21, 2003), the

Georgia Court of Appeals found that any cause of action arising from the

mishandling of a body accrues at the time of the alleged mishandling. The

plaintiff, Frances Oglesby, discovered in 1989 that upon the death of her mother in

1949, a Georgia medical school obtained the remains for autopsy and physical

study. The remains of plaintiff's mother, Bessie Wilborn, had been on display for

a number of years in the glass case in an anatomy laboratory at the medical school.

No family member had given permission for the autopsy and study of the remains

of plaintiff's mother. Id. at *1. In 2000, plaintiff notified the Georgia Board of

Regents of her claims for intentional infliction of emotional distress, interference

with possession of her mother's remains, interference with burial services and

mutilation of her mother's remains. Subsequently, plaintiff filed suit. The Board

of Regents sought dismissal on the ground of sovereign immunity or summary

13

In re: Tri-State Crematory
MDL Docket No. 1467

judgment based on the expiration of the statutes of limitation.  The trial court

denied these motions but granted an interlocutory appeal of the issues.

The Georgia Court of Appeals reversed and ruled that any claims based on

mishandling of the mother's remains accrued at the time the remains were

allegedly mistreated.

> "A cause of action in negligence accrues . . . when there
> is a negligent act coupled with a proximately resulting
> injury" and "[t]he true test to determine when a cause of
> action accrues is to ascertain the time when the plaintiff
> could first have maintained her action to a successful
> result. U-Haul Co. & c.v. Abreu & Robeson, Inc., 247
> Ga. 565, 566, 277 S.E.2d 497 (1981)." Travis Pruitt v.
> Assocs. P.C. v. Bowling, 238 Ga. App. 225, 226(1), 518
> S.E.2d 453 (1999).  Consequently, any cause of action
> arising from the treatment of Mrs. Wilborn's body
> accrued in 1949.

Id. at *4.

Therefore any claims prior to February 26, 1998 are barred by the applicable

statutes of limitation, and all the tort claims against the SCI Tennessee Funeral

Homes, dating from 1988 and 1989, are time-barred.



EXHIBIT ATTACHMENT



(To be scanned in place of tab)



# EXHIBIT / ATTACHMENT

2

(To be scanned in place of tab)

**TRI-STATE WITNESS LIST**
**FIRST SUPPLEMENT TO ATTACHMENT "F-2"**
**DEFENDANTS WITNESS LIST**

| | |
|---|---|
| Boyd, Byron | P.O. Box 608<br>Jasper, TN 37437 |
| Boyd Harrell | P.O. Box 608<br>Jasper, TN 37437 |
| Dietz, Park | 537 Newport Center Drive #300<br>Newport Beach, GA 92660 |
| | |
| | |

141525



# EXHIBIT / ATTACHMENT

_K_

(To be scanned in place of tab)





EXHIBIT / ATTACHMENT

3

(To be scanned in place of tab)

# UNITED STATES DISCTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

## JUROR QUESTIONNAIRE

*Purpose.* This questionnaire is designed to assist the court and the parties to select a fair and impartial jury to hear the case captioned [      ]. Your truthful answers to the questions contained in this questionnaire are necessary to allow the Court and the parties to determine if you will be able to deliberate the issues raised in the case objectively.

*Answer all questions fully.* Please answer each question as completely and accurately as possible. If the space provided to answer any question is insufficient, you may continue your answer on one of the bank pages at the back of the questionnaire, but please be sure to place the question number next to any answer continued in this manner. If you do not understand any question or do not know the answer to a question, answer the question by explaining what part of the question you do not understand. Answer all parts of the question you are able to answer, even if you do not understand a part of a question.

*Your answers are under penalty of perjury.* Please be candid. You are required to tell the truth in your answers. Your answers are considered to be statements given to the Court under oath. The answers must be your own, based on your own best understanding of the questions asked. Do not discuss the questions or your answers with anyone else.

*After completing answers to questions.* You must sign the questionnaire at the bottom. This certifies to the court and to the parties that you have answered the questions to the best of your ability. Follow-up questions will be asked in open court concerning your answers to this questionnaire or concerning related matters.

## QUESTIONS

1.    Juror's Name: _____
      Sex:           _____
      Age:           _____
      Date of Birth: _____
      Race:          _____

2.    Residence
      City or Town: _____
      Zip Code:      _____
      Ownership status (check one)
                            Own    _____
                            Rent   _____
                            Other  _____

2

3.   List the cities and states where you have lived during the past 10 years:

_____

_____

_____

4.   Educational Background:
     Highest Grade Level Completed:         _____
     Degrees Received:                      _____
     If a college graduate, what college did you attend and what was your
     major?

     _____

     Did you take any law-related courses?      _____
     If yes, what courses?   _____

     _____

     Have you ever taken any courses or had any training in any of the
     following areas?

     Mortuary science          _____
     Psychology                _____
     Forensics                 _____
     Medicine                  _____
     Law enforcement           _____
     Grief counseling          _____

5.   What is your current employment status (check one)?
     Full-time         _____
     Part-time         _____
     Retired           _____
     Unemployed        _____
     Student           _____
     Homemaker         _____

6    If you are a student, what school do you attend and what is your major?

     _____

7.   If you are employed, what is your occupation?   _____
     Job Title:            _____
     Nature of Work:       _____
     Name and Address      _____
       of employer:        _____

     _____

     How long have you
       been working for this employer?     _____

3

Please describe your typical duties or tasks that would be performed by you during an ordinary workday:

_____

_____

_____

8.  Do you supervise other employees or have you in the past? _____
    If yes, how many?        _____

9.  Please list all other occupations and employers you have had for the past
    10 years:

    _____

    _____

    _____

    _____

10. Have you ever owned your own business?    _____
    If yes, please explain (type of business, how long, etc.).

    _____

    _____

    _____

11. Marital Status:        _____
    If married,
    Spouse's Name:        _____
    Spouse's educational background
      (including degrees or certificates):   _____

    Spouse's employment status: _____
    Spouse's occupation:  _____
    Length of spouse's employment:      _____
    Spouse's job title and description of responsibilities:

    _____

    _____

12. Children:
    If you have children, please indicate for each:

    Name of first child:   _____
    Age:    _____
    Sex:    _____

4

School Grade or Occupation: _____

Live with you or on her/his own? _____

Name of second child: _____

Age: _____

Sex: _____

School Grade or Occupation: _____

Live with you or on her/his own? _____

Name of third child: _____

Age: _____

Sex: _____

School Grade or Occupation: _____

Live with you or on her/his own? _____

Continue on blank page as needed

13. Do any other adults live in your household? _____

If yes, please list:

Name of first adult: _____

Highest educational level: _____

Current Occupation: _____

Name of second adult: _____

Highest educational level: _____

Current Occupation: _____

Continue on blank page as needed

14. Are you a member of any political party? _____

If yes, please check:

Democratic _____

Republican _____

Other _____

15. What are the names of any social, civic, professional, trade, union or other organizations of which you are a member or with which you are affiliated?

_____

_____

If you listed any organizations above, have you been or are you presently an officer of any of these organizations? _____

5

16. Have you ever served in the military? _____
    If yes, please indicate the following:

    Branch: _____
    Rank: _____
    Dates of Services: _____
    Duties: _____
    _____
    _____
    Type of Discharge: _____

17. Have you ever served on a jury before? _____
    If yes, what type of jury (check all that apply)?

    Grand jury: _____
    Civil trial jury: _____
    Criminal trial jury: _____

18. If you have served on a jury, please indicate the following:

    Year served: _____
    Federal or State Court _____
    City and State where served _____
    What verdict was rendered?
    Civil case:
            For plaintiff        _____
            For defendant        _____
    Criminal case:
            Guilty
            Not guilty           _____

19. Have you ever served as a foreperson on a grand jury or a trial jury? _____
    If you answered yes, please indicate the following:

    Year served: _____
    Federal or State Court _____
    City and State where served _____

20. Have you ever testified as a witness in a court proceeding? _____
    If yes, and it was a civil case, indicate if were you a witness for:

    The plaintiff        _____
    The defendant        _____

6

If yes, and it was a criminal case, indicate if were you a witness for:

The government  _____
The defendant  _____

21. Have you, any member of your family, or a close friend ever been involved in a civil lawsuit as either a plaintiff or defendant?  _____
If yes, please explain the circumstances and the type of suit:

_____
_____
_____
_____
_____

What was the outcome and were you satisfied?  _____

_____
_____

How did you feel about the judicial process at the conclusion of the lawsuit?

_____
_____
_____

22. Have you ever been to court for any other reason (excluding divorce or traffic cases)?  _____
If yes, please explain the circumstances:

_____
_____
_____

23. Have you ever been arrested?  _____

24. Have you, any member of your family, or a close friend ever been convicted of a crime?  _____
If yes, please explain the circumstances:

_____
_____
_____

25. Is any member of your family or any close friend a judge, lawyer or employee of any court?  _____
If yes, what are their names and relationships to you?

_____
_____

7

26.     Based on your experience, what is your general opinion of lawyers (check one)?

        Good    _____
        Fair    _____
        Poor    _____

27.     Do you believe that because someone or some company has been sued that they most likely have done something wrong?

28.     What newspaper(s) do you read regularly?    _____

20.     To what magazine(s) or other periodical(s) do you subscribe?    _____
_____

30.     Have you ever written a letter to the editor of a newspaper or magazine?    _____

31.     What are two of your favorite books?    _____
_____

32.     What television news programs do you watch regularly?    _____
_____

33.     Which of the following do you watch more frequently or find more interesting (check one):

        National news       _____
        Local news          _____

34.     What radio programs, if any, do you listen to frequently?    _____
_____

35.     What type of volunteer work, if any, have you done in the last 10 years?
_____

36.     When you are in a group, and you have a particular opinion about something, are you likely to (check one):

        Change your mind if a number of people in the group have a different opinion?    _____
        Maintain your original opinion despite what other people think?    _____

37.     Do you know, or have you ever been represented by, [NAMES OF DEFENSE ATTORNEYS]?    _____

8

If yes, how do you know them?  Explain in detail:

_____

_____

_____

38.     Do you know, or have you ever been represented by [NAMES OF PLAINTIFF ATTORNEYS]?          _____

If yes, how do you know them?  Explain in detail.

_____

_____

_____

39.     Do you know T. Ray Brent Marsh, or any member of his family?     _____

If yes, how do you know them?  Explain in detail.

_____

_____

40.     Do you know any of the parties to this litigation, listed below, or any member of their families?     _____

If yes, how do you know them?  Explain in detail. [Continue on blank page]

_____

_____

Parties [NAMES – including plaintiffs and defendants]   Known to Juror [Y/N]

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

41.     Do you know any of the following individuals who may be called as witnesses? (indicate yes or no for each individual)

_____        _____

_____        _____

_____        _____

_____        _____

9

_____          _____
_____          _____
_____          _____
_____          _____
_____          _____
_____          _____
_____          _____

For each witness that you know, describe how you know him/her:

_____
_____
_____
_____

42.   Would your acquaintance with a witness in any way affect your ability to
      sit as a juror?  _____

43.   Do you know anyone who you believe may be involved in any way in
      this lawsuit?  _____

44.   Have you or any members of your family or close friends ever worked
      in the funeral industry?  _____
      If you answered yes, please explain:

      _____
      _____

45.   Are you currently or have you ever been a member of the National Rifle
      Association?  _____ Yes  _____ No

46.   Are you currently or have you previously been a member of the Parent-
      Teacher Association?  _____ Yes  _____ No

47.   What, if anything, have you heard or read about the Tri-State Crematory
      Case?  Please explain: _____
      _____
      _____
      _____
      _____
      _____

48. Do you have any feelings or opinions regarding the responsibility of funeral homes for what happened at Tri-State Crematory? _____ Yes _____ No

If yes, please describe your feelings or opinions: _____
_____
_____
_____
_____

49. Have you ever had occasion to use the services of a funeral home?
_____ Yes _____ No
If yes, do you consider your experiences with the funeral home to be positive or negative? _____ Positive _____ Negative
Please explain: _____
_____
_____

50. When you witness the graphic depiction of death on TV or otherwise, how are you affected?
(1) Extremely bothered _____
(2) Somewhat bothered _____
(3) Neutral _____
(4) Not bothered at all _____

51. What are your opinions regarding the alternative burial practice of "cremation"?
_____
_____
_____
_____

52. Has any member of your family ever been cremated? _____ Yes _____ No
If yes, please identify the relationship to you and year of cremation. _____
_____
_____
_____
_____

53. Within the past three (3) years, have you experienced the death of a loved one such as a family member, or of a person to whom you were especially close?
_____ Yes _____ No
If yes, would you say that your emotional recovery from that loss is?
(1) Is far from complete; I am still experiencing a substantial amount of grief and pain as a result of that person's death. _____

11

(2) Is fairly complete, I miss my loved one, but I have been able to move on with my life. _____

Comments: _____

_____

_____

_____

54.   Have you ever seen or heard any advertisements for Turner Funeral Home on television, the radio, in the newspaper, in circulars, on billboards or signs, or any other place?

55.   Do you have any medical problems (for example, problems with your vision or hearing) that may prevent you from serving as a juror? _____

56.   Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror? _____

57.   Is there any matter not covered in this questionnaire that could affect your ability to be a fair and impartial juror? _____

If you answered yes, please explain: _____

_____

_____

_____

58.   List below any reason why you do not wish to serve as a juror or why you should not serve as a juror:

_____

_____

_____

Date on which you completed this questionnaire: _____

_____

Print your name here

_____

Sign your name here

12



EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

In re: Tri-State Crematory
MDL Docket No. 1467

## DEFENDANT'S EXCERPTS FROM JOHN TAYLOR'S DEPOSITION

Deposition of John Taylor: 18:2-5; 22:23- 23:16; 24:12-25:11; 27:15-21; 28:2-9;

28:23-29:1-3; 29:24-30:5; 30:10-25; 31:23-32:22; 33:5-12; 34:14-18; 35:1-7; 35:19-23;

36:13-21; 38:10-19; 38:20-39:14; 39:17-40:6; 40:13-23; 41:10-42:8; 42:20-43:6; 44:6-14;

105:11-16; 132:3-8; 132:16-1; 134:9; 134:22-135:10; 139:22-140:1; 148:19-149:11;

149:18-25; 150:1-18; 150:22-151:1-4; 151:5-12; 154:15-155:17; 158:25- 159:1-3.


**James Eggert Deposition Excerpts**- 19:10-20:7; 20:13-22:16; 25:25-27:5; 31:10-31:20;

41:17-43:16; 45:16-24; 46:12-49:1; 56:5-58:15; 60:4-62:24; 64:14-66:18; 67:14-68:19;

93:4-8; 93:11-22; 93:25-94-1.


**Robert A. Ryan, Jr. Deposition Excerpts**- Defendants designate the entire deposition

EXCEPT- 23:9-35:7 ; 43:24-45:1;73:1-74:1;94:25-97:1;

**FUNERAL HOME DEFENDANTS' COUNTER-DESIGNATIONS**
**FROM NOVEMBER 13, 2002 DEPOSITION OF RICHARD WILBANKS**

| Plaintiffs' Designation | Defendants' Counter-Designation |
|---|---|
| p. 35 | Tri-State was only crematory in area while SCI owned Wallis & Sons (pp. 46-47) |
| p. 64 | Saw situation at Lane South Crest where there was body in retort and body brought had to wait until other completed (pp. 65-66) |
| pp. 68-69 | Even after procedure changed, Wilbanks took bodies to Tri-State (p. 70) |
| pp. 79-80 | Left the permit and cremation authorization form with the Marshes (p. 85) |
| p. 87 | Wilbanks "figured" the state would take care of whether Tri-State needed to be licensed (p. 88) |
| p. 102 | Wilbanks "figured" the state would take care of whether Tri-State needed to be licensed (p. 88) |
| pp. 115-117 | Did not see protective clothing at Lane South Crest; at Lane South Crest, persons placing bodies in retorts did not wear protective masks (p. 117) |

9975204